UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Consumer Financial Protection Bureau, | |
|    Plaintiff, | |
| v. | Case No.: 3:21-cv-00055-RNC |
| 1st Alliance Lending, LLC; John Christopher DiIorio; Kevin Robert St. Lawrence; and Socrates Aramburu, | Date: April 1, 2021 |
|    Defendants. | |

**AMENDED COMPLAINT**

The Consumer Financial Protection Bureau (Bureau) alleges the following against 1st Alliance Lending, LLC (1st Alliance), John Christopher DiIorio, Kevin Robert St. Lawrence, and Socrates Aramburu.

**Preliminary Statement**

1.    1st Alliance is a non-depository mortgage company that, from 2004 until late 2019, originated mortgages in at least 46 states and the District of Columbia. At all times relevant to this Complaint, DiIorio, St. Lawrence, and Aramburu (the Individual Defendants) co-owned and actively managed 1st Alliance as its top executives.

2.    From no later than 2015 until at least August 2019, unlicensed 1st Alliance employees routinely and illegally engaged in mortgage-origination activities and interactions with consumers that required the employees to be licensed under the applicable state laws, in violation of the Truth in Lending Act and Regulation Z. The Individual Defendants designed, directed, or were aware of these unlawful features of

1

1st Alliance's business model.

3.    Following company policy, 1st Alliance employees regularly required consumers to submit documents for verification before issuing the consumer a Loan Estimate, in violation of the Truth in Lending Act and Regulation Z.

4.    Following company policy, on thousands of occasions, 1st Alliance employees denied credit to consumers based on information in a consumer report or in response to an application but did not give the consumer the "adverse action" notice required under the Fair Credit Reporting Act or the Equal Credit Opportunity Act.

5.    1st Alliance representatives made repeated misrepresentations, omissions, and false statements to consumers, in telephone calls and other electronic communications, about such matters as whether the consumer had been preapproved or guaranteed for a particular program or term and whether and on what terms the consumer was likely to obtain refinancing.

6.    At all times relevant to this Complaint, 1st Alliance's business model incorporated, in part, a series of deceptive acts or practices, unfair acts or practices, or both, that harmed or posed a substantial risk of harm to consumers.

## Jurisdiction and Venue

7.    The Bureau brings this action under §§ 1031, 1036, 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536, 5564, 5565; § 626 of the Omnibus Appropriations Act of 2009, as amended by § 1097 of the CFPA, 12 U.S.C. § 5538, and § 1014.3 of its implementing rule, the Mortgage Acts and Practices—Advertising Rule (MAP Rule or Regulation N), 12 C.F.R. § 1014.3; the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*., and its implementing regulation, Regulation Z,

12 C.F.R. § 1026; the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, and the Equal

Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, and its implementing regulation,

Regulation B, 12 C.F.R. § 1002. Each of these is a "Federal consumer financial law." 12

U.S.C. § 5481(12), (14).

8.    This Court has subject-matter jurisdiction over this action because it is

brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a

federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28

U.S.C. § 1345.

9.    This Court has personal jurisdiction over Defendants and venue is proper

in this district because Defendants are located, reside, or do business here. 12 U.S.C. §

5564(f).

## Parties

10.    The Bureau is an independent agency of the United States created by the

CFPA and charged with regulating the offering and provision of consumer-financial

products and services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The

Bureau has independent litigating authority. *See* 12 U.S.C. § 5564(a)-(b).

11.    1st Alliance was incorporated in 2004 in Connecticut and has or had its

principal place of business in East Hartford, Connecticut. On information and belief, 1st

Alliance has not originated mortgages since August 2019, and it ceased operations in

November 2019.

12.    1st Alliance offered consumers residential mortgages, which are

consumer-financial products or services under § 1002 of the CFPA. 12 U.S.C. §§ 5481(5),

5481(7), 5481(15)(A)(i). 1st Alliance is therefore is a "covered person" under the CFPA. 12 U.S.C. § 5481(6)(A).

13.    At all times relevant to this Complaint, DiIorio owned a 59.5% share of 1st Alliance and served as its Chief Executive Officer and one of its three Managing Members. DiIorio is therefore a "Related Person" under the CFPA, 12 U.S.C. § 5481(25)(C)(i), (ii), and is thus deemed a "Covered Person" under the CFPA. 12 U.S.C. § 5481(25)(B).

14.    At all times relevant to this Complaint, St. Lawrence owned a 25.5% share of 1st Alliance and served as its President of Production and one of three Managing Members. St. Lawrence is therefore a "Related Person" under the CFPA, 12 U.S.C. § 5481(25)(C)(i), (ii), and is thus deemed a "Covered Person" under the CFPA. 12 U.S.C. § 5481(25)(B).

15.    At all times relevant to this Complaint, Aramburu owned a 15% share of 1st Alliance and served as its President of Capital Markets and one of three Managing Members. Aramburu is therefore a "Related Person" under the CFPA, 12 U.S.C. § 5481(25)(C)(i), (ii), and is thus deemed a "Covered Person" under the CFPA. 12 U.S.C. § 5481(25)(B).

16.    In 2014, the Bureau entered a consent order against 1st Alliance (2014 Order) for violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2607. 1st Alliance stipulated to entry of the 2014 Order and admitted all of its findings of facts and conclusions of law. In the 2014 Order, 1st Alliance was ordered to "refrain from committing violations of . . . any . . . provision of a 'Federal Consumer Financial Law,' as defined by 12 U.S.C. § 5481(14)." 2014 Order, ¶ 13.

4

## Facts

### *1st Alliance structured its mortgage-origination business so that unlicensed salespeople were consumers' primary points of contact.*

17.    1st Alliance, for many years, used a position called a "Submission Coordinator," or "SC." Initially, SCs mainly received and tracked documentation from consumers and had little consumer interaction.

18.    Beginning on or about 2015, SCs' job duties changed, and SCs became the first employee who interacted with the consumer on behalf of 1st Alliance and the primary consumer point of contact throughout the mortgage-origination process. In short, SCs became salespeople. More people were SCs than held any other position at 1st Alliance.

19.    At around the same time that SCs' job duties changed, 1st Alliance's mortgage-origination business shifted from "short refis"—refinancing of underwater properties—to purchase mortgages. 1st Alliance also began offering FHA Streamline refinance loans (Streamline refis) around the same time. By mid-2016, most of 1st Alliance's monthly originations were purchase mortgages.

20.    From roughly 2015 until at least August 2019, 1st Alliance's mortgage-origination business largely consisted of purchase mortgages and Streamline refis.

21.    In January 2018, SCs were renamed "Home Loan Consultants" by 1st Alliance, with minimal changes to their duties. At the same time, 1st Alliance also created the related positions "Senior Home Loan Consultant" and "Servicing Streamline Home Loan Consultant" (SSHLCs) (collectively, together with Home Loan Consultants, HLCs).

22.     At all times relevant to this Complaint, every state and the District of Columbia had in force a state "SAFE Act" requiring mortgage-origination organizations such as 1st Alliance to ensure that each person working for it who originated loans was licensed. Each such state SAFE Act was enacted pursuant to the federal SAFE Act, 12 U.S.C. § 5101, *et seq*.

23.     1st Alliance never required SCs or HLCs to hold mortgage-originator licenses in the states where a residential property was to be mortgaged. In most, if not all, cases SCs and HLCs were not licensed in any state.

24.     As many as 20% of SCs at one time were temporary employees, and turnover among SCs and HLCs was high. In 2017, roughly half of SCs had been with 1st Alliance for under three months.

25.     At all times relevant to this Complaint, 1st Alliance employed about four times as many SCs or HLCs as licensed mortgage-loan originators (MLOs).

### *1st Alliance's unlicensed SCs and HLCs took mortgage applications and offered and negotiated mortgage terms.*

26.     Throughout this period, 1st Alliance's purchase business relied on SCs and HLCs contacting consumer leads via emails, text messages, and phone calls. SCs and HLCs conducted an initial "intake" phone call with interested prospective borrowers; these calls typically lasted between 15 and 25 minutes.

27.     On the intake call, the SC or HLC asked questions about and discussed with the consumer details of the consumer's particular financial circumstances, and in most cases, while on the call, the SC or HLC performed a credit check and discussed specific aspects of the consumer's credit report and credit scores. The SC or HLC typically asked the consumer to estimate a purchase price. The SC or HLC typically

suggested a particular program, such as an FHA, VA, or conventional loan, as best-suited to the consumer's circumstances.

28.     The SC or HLC often quoted to the consumer a range of interest rates likely to be available to the consumer as part of the recommended program; gave an estimated monthly payment, including principal, interest, taxes, hazard insurance, and any applicable mortgage insurance; and told the consumer the dollar amount they would need for a down payment or closing costs.

29.     1st Alliance's policy stated that it was permissible for SCs and HLCs to quote an interest-rate range to consumers.

30.     In practice, SCs and HLCs often quoted consumers an interest-rate range on the order of 0.5%, and occasionally quoted consumers a particular interest rate, not a range.

31.     Each intake call—and often some further interactions between the consumer and the SC or HLC—took place before the consumer had had any contact with a licensed MLO at 1st Alliance and before any 1st Alliance MLO had reviewed the consumer's file.

32.     SCs and HLCs reasonably regarded themselves as "owning" the relationship with the consumer at 1st Alliance.

33.     At 1st Alliance, SC and HLC compensation relied heavily on commissions tied to originated mortgages—much more heavily than MLO compensation did. For some SCs and HLCs, commissions represented most of their compensation.

34.     Compared to MLOs at 1st Alliance, SCs and HLCs were incentivized to sell mortgages, and they were paid higher commissions and lower base salaries.

35.    No later than February 2017, 1st Alliance's chief compliance officer began raising concerns to senior company leaders, including the Individual Defendants, that activities SCs were engaging in could require licensing under federal or state SAFE Acts.

36.    On or about October 2017, 1st Alliance's Compliance Manager notified senior management, including DiIorio and St. Lawrence, that an internal audit had found that SCs "were at times engaged in what may constitute . . . licensed activity under the SAFE Act."

37.    The 2017 internal audit found that, at times, Submission Coordinators provided credit-repair advice, discussed interest rates and other loan terms with consumers, made credit decisions, and disqualified consumers.

### *1st Alliance denied credit to thousands of consumers but sent no adverse-action notice.*

38.    On or after some intake calls, based on information supplied in a consumer report, a 1st Alliance representative such as an SC, HLC, or MLO concluded, and informed the consumer, that the consumer was "ineligible" or "not qualified" for a loan, for instance, because of a recent bankruptcy, or because the consumer's credit score was below 1st Alliance's threshold.

39.    On or after some intake calls, following a prequalification request from the consumer, the SC, HLC, or another 1st Alliance representative treated such a request as an application for credit and, after evaluating the consumer's information, based in whole or in part on information contained in the consumer's credit report, concluded and informed the consumer that they were "ineligible" or "not qualified" for a loan.

40.    1st Alliance did not issue written adverse-action notices to consumers who were denied credit in this fashion or to any consumers to whom it denied credit before submission of a complete Form 1003, the Uniform Residential Loan Application form.

41.    According to data from the contact-management system used by 1st Alliance, it appears that over 7,000 such consumers were denied credit and coded "not qualified" by 1st Alliance between August 2017 and July 2019. During this same period, the system coded only 30 consumers as having been "denied" credit.

### 1st Alliance regularly misrepresented Streamline refis to induce consumers to obtain a purchase mortgage.

42.    As noted, beginning in about 2015 and continuing until at least 2019, 1st Alliance originated Streamline refis in addition to its purchase-mortgage business. Between 2016 and 2019, 1st Alliance originated several thousand Streamline refis.

43.    As with its purchase-mortgage business, for Streamline refis, SCs and HLCs were consumers' first and primary point of contact with 1st Alliance.

44.    When speaking with consumers seeking a purchase mortgage, 1st Alliance representatives regularly made representations about the availability and cost savings to the consumer of a Streamline refi loan.

45.    As an inducement to the consumer to enter into a purchase mortgage, SCs and HLCs often said that after six months of satisfactory payments, the consumer could obtain a significantly better rate through a Streamline refi than under the purchase mortgage.

46.    In fact, the SC or HLC had no assurance that the consumer would qualify for a Streamline refi loan, even if the on-time payment conditions were met, or that the rate would be significantly better than the consumer's purchase-mortgage interest rate.

47.    SCs and HLCs frequently told consumers that the consumer could obtain a Streamline refi at no cost to the consumer when, in fact, this was not true.

### 1st Alliance salespeople made other misrepresentations and false statements to consumers.

48.    Unlicensed 1st Alliance personnel sent solicitation emails to consumers indicating that they were licensed and registered on NMLS when, in fact, they were not.

49.    Some HLCs represented to the public, through social-media sites and other channels, that they performed the duties of a mortgage-loan originator.

50.    Through their words and actions, SCs and HLCs gave borrowers the impression that they were licensed or otherwise qualified to originate loans when, in fact, they were not licensed or qualified.

51.    During the prequalification or application process, SCs and HLCs made misrepresentations to borrowers concerning a borrower's likelihood of obtaining a mortgage-credit product or term, including whether the consumer was prequalified for a mortgage with 1st Alliance.

52.    As a result of their reliance on SCs' and HLCs' misrepresentations concerning their likelihood of obtaining a loan with 1st Alliance, some consumers lost thousands of dollars in fees, expenses, and deposits and wasted months of time that they could have spent securing alternative financing for a home.

### The Individual Defendants actively directed 1st Alliance's conduct.

53.    At all times relevant to this Complaint, 1st Alliance has had three shareholders: Individual Defendants DiIorio, St. Lawrence, and Aramburu.

54.     The Individual Defendants were and are the "Managing Members" of 1st Alliance.

55.     As the Managing Members, the Individual Defendants were each responsible for and approved 1st Alliance's business model, including the particular duties assigned under that model to unlicensed personnel such as SCs and HLCs, as well as to licensed MLOs.

56.     As Managing Members, the Individual Defendants each had advance knowledge of and approved 1st Alliance policies and procedures.

57.     As Managing Members, the Individual Defendants each had knowledge of and approved 1st Alliance's sales practices and the specific functions performed by those in particular job roles, including SCs, HLCs, and MLOs, at each point in time.

58.     At all times relevant to this Complaint, DiIorio was responsible for the day-to-day executive management of 1st Alliance.

59.     As part of his duties, DiIorio frequently interacted with others at 1st Alliance concerning the structure and nature of the company's mortgage-origination business, including the specific roles played in that structure by sales staff and others, including SCs, HLCs, and MLOs. DiIorio directed and approved changes to those roles and interacted with 1st Alliance's compliance and legal functions in doing so.

60.     St. Lawrence, as a Managing Member and President of Production, was responsible for and oversaw the structure and operation of sales and other production functions at 1st Alliance, which included SCs, HLCs, and MLOs, among others.

61.     St. Lawrence controlled the offices in which 1st Alliance's sales personnel, including SCs and HLCs, worked, and where its call center was located.

62.     DiIorio and St. Lawrence, as well as Aramburu in his capacity as a

Managing Member and President of Capital Markets, each had knowledge of and

approved 1st Alliance's policies and procedures relating to the federal and state SAFE

Acts.

**COUNT ONE:**
**Regulation Z—Failing to Ensure that Loan Originators Were Licensed**
**(Against 1st Alliance)**

63.     The Bureau realleges and incorporates by reference paragraphs 1-62.

64.     The Truth in Lending Act (TILA), 15 U.S.C § 1601 *et seq.*, was enacted by

Congress to encourage the informed use of credit by assuring meaningful disclosure of

credit terms to consumers. Regulation Z was promulgated to implement TILA. 12 C.F.R.

§ 1026.1.

65.     1st Alliance is a "loan originator organization" under Regulation Z. 12

C.F.R. § 1026.36(a)(1)(iii). 1st Alliance's SCs and HLCs are "individual loan originators"

under Regulation Z. 12 C.F.R. § 1026.36(a)(1)(ii).

66.     As a loan originator organization, 1st Alliance must ensure that "each

individual loan originator who works for [it] is licensed" to the extent required "under

the SAFE Act, its implementing regulations, and State SAFE Act implementing law

before the individual acts as a loan originator in a consumer credit transaction secured

by a dwelling." 12 C.F.R. § 1026.36(f)(2).

67.     The Secure and Fair Enforcement for Mortgage Licensing Act of 2008

(SAFE Act), 12 U.S.C. § 5101, *et seq.*, encouraged states to implement state versions of

the SAFE Act, with the minimum standards in the federal act as a floor. 12 C.F.R. §

1008.1(b).

68.     Since enactment of the SAFE Act, every state has enacted a version of the model state SAFE Act that expands the category of individuals who must be licensed by broadening the definition of "loan originator" to include an individual who, for compensation or gain or the expectation of compensation or gain, *either* "takes a residential mortgage loan application" *or* "offers or negotiates terms of a residential mortgage loan," and not only, as under the federal SAFE Act, an individual who does both. *See* State Model Language for Implementation of Public Law 110-289, Title V—S.A.F.E. Mortgage Licensing Act (CSBS/AARMR 2009).

69.     Some states, including Arkansas, Florida, Kentucky, New Hampshire, North Carolina, Ohio, South Carolina, and the District of Columbia further broadened the definition of "loan originator" in their state SAFE Act to include additional conduct requiring licensing, such as "assisting" a borrower in obtaining or applying for a mortgage loan, or "soliciting" a mortgage loan or an application for a mortgage loan.

70.     At all times relevant to this Complaint and in every state in which 1st Alliance operated, SCs and HLCs engaged in conduct that constituted "assisting" a borrower in obtaining or applying for a mortgage loan and "soliciting" a mortgage loan or application.

71.     1st Alliance SCs and HLCs gathered the information about the borrower that is customary or necessary in a decision to make an offer of residential-mortgage loan terms, including the prospective borrower's name, address, marital status, dependents, income, SSN to obtain a credit report, employment information, and property address (if known).

72.     1st Alliance's SCs and HLCs each took mortgage-loan applications, offered or negotiated terms of residential-mortgage loans, or both. SCs and HLCs were

therefore required under "State SAFE Act implementing law"—that is, the state SAFE Act of the applicable state—to be licensed. But they were not licensed.

73.    1st Alliance thus violated Regulation Z when SCs or HLCs acted as loan originators by taking mortgage-loan applications or offering or negotiating terms of a residential-mortgage loan.

## COUNT TWO:
### Regulation Z—Requiring Consumers to Submit Verifying Documents Before Providing a Loan Estimate (Against 1st Alliance)

74.    The Bureau realleges and incorporates by reference paragraphs 1-62.

75.    Under Regulation Z, a creditor such as 1st Alliance "shall not require a consumer to submit documents verifying information related to the consumer's application before providing" to the consumer certain disclosures, generally known as a Loan Estimate. 12 C.F.R. § 1026.19(e)(2)(ii), (iii).

76.    1st Alliance employees regularly required consumers, often during the consumer's first telephone call with 1st Alliance, to submit verifying documents before 1st Alliance issued the consumer a Loan Estimate. Each time they did so, 1st Alliance violated Regulation Z.

## COUNT THREE:
### Deceptive Mortgage-Origination Acts or Practices (Against all Defendants)

77.    The Bureau realleges and incorporates by reference paragraphs 1-62.

78.    Under the CFPA, it is unlawful for any covered person to engage in a deceptive act or practice in connection with any transaction with a consumer for a

consumer-financial product or service or the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

79.    An act or practice is deceptive if it involves a material misrepresentation, omission, or practice that is likely to mislead a consumer acting reasonably under the circumstances.

80.    At times, unlicensed SCs and HLCs presented themselves to consumers as licensed mortgage-loan originators by, among things, using a licensed employee's signature block and including their NMLS licensing number in e-mail solicitations to consumers to refinance their mortgages.

81.    SCs and HLCs created the impression that they were licensed loan originators through social-media profiles and solicitations to consumers for preapprovals.

82.    When unlicensed SCs and HLCs performed various tasks and took various information from the consumer, all of which required licensing, they caused consumers reasonably to believe that the SCs and HLCs were legally authorized to do those things when, in fact, the SCs and HLCs were not legally authorized.

83.    Consumers referred to SCs and HLCs as their "loan officer," "loan originator," and "sole contact" at 1st Alliance.

84.    Consumers lost money and time by relying on SC and HLC misinformation about the consumer's likelihood of getting a loan with 1st Alliance.

85.    By implying during the mortgage-origination process that unlicensed SCs and HLCs were licensed loan originators, 1st Alliance made misrepresentations or omissions or engaged in practices that were likely to mislead consumers. 1st Alliance's misleading misrepresentations, omissions, or practices were material because a

reasonable consumer would likely have acted differently, including by taking their business elsewhere, saving time and money, if informed of the truth.

86.    1st Alliance's express misrepresentations were material to consumers' decision-making with respect to choosing their mortgage originator, because they presumptively affected the consumer's conduct or decision with regard to their mortgage originator.

87.    1st Alliance therefore engaged in deceptive acts or practices under the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

88.    The Individuals Defendants each engaged in the deceptive act or practice. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

89.    The Individual Defendants (1) participated directly in the deceptive acts or had the authority to control 1st Alliance, which also engaged in deceptive acts or practices, and (2) had actual knowledge of the material misrepresentations, were recklessly indifferent to the truth or falsity of the misrepresentations, or were aware of a high probability of fraud along with an intentional avoidance of the truth.

90.    The Individual Defendants had actual knowledge of how 1st Alliance used unlicensed SCs and HLCs in the mortgage-origination process as part of its business model, including the particular acts and practices detailed above, and encouraged, directed, or failed to prevent such conduct from occurring even though they had the authority to do so. The Individual Defendants approved all aspects of 1st Alliance's business model, policies, and procedures, including the particular acts and practices that underlie this claim.

91.    The Individual Defendants therefore violated the CFPA.

**COUNT FOUR:**
**Unfair Mortgage-Origination Acts or Practices**
**(Against all Defendants)**

92.    The Bureau realleges and incorporates by reference paragraphs 1-62.

93.    Under the CFPA, it is unlawful for any covered person to engage in an unfair act or practice in connection with any transaction with a consumer for a consumer-financial product or service or the offering of a consumer-financial product or service. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

94.    An act or practice is unfair if it causes or is likely to cause consumers substantial injury that is not reasonably avoidable and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

95.    1st Alliance's SCs and HLCs (1) were not subject to mandatory, rigorous MLO training, (2) had no license to be suspended or revoked in the event of misbehavior, and (3) were not listed in the NMLS directory, in which consumers could find disciplinary action and employment history.

96.    1st Alliance's use of unqualified SCs and HLCs caused or was likely to cause substantial injury to potential borrowers because these employees did not provide critical, accurate, and timely information about loan terms to any potential borrower concerning what was, for many, the biggest financial transaction of their life.

97.    At times, an SC or HLC told consumers that they were eligible for a mortgage with 1st Alliance, but the consumer was told much later in the application process that the SC or HLC had been mistaken and their application had been denied.

98.     1st Alliance's use of unqualified SCs and HLCs therefore posed a serious risk of financial harm to many consumers, including loss of time, money, or the ability to shop around for better loan terms from competitors, which in turn made 1st Alliance less disposed to make consumers their best offer.

99.     Consumers lost time and money as a result of relying on misinformation provided by SCs or HLCs.

100.    Consumers could not reasonably have avoided these injuries from 1st Alliance's unqualified SCs and HLCs not providing critical, accurate, or timely information about loan terms, as they were unlikely to be aware of the potential harm in time to do so.

101.    The injuries were not outweighed by countervailing benefits to consumers or competition. 1st Alliance's unqualified SCs and HLCs not providing critical, accurate, and timely information about loan terms to potential borrowers provided little, if any, benefit to consumers. In fact, the failure to provide this information damaged competition and thereby harmed consumers by giving the company a competitive advantage over mortgage companies that abided by the law.

102.    1st Alliance's unqualified SCs and HLCs not providing critical, accurate, and timely information about loan terms to potential borrowers was an unfair act or practice that violated the CFPA, for which 1st Alliance and the Individual Defendants are each liable. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

103.    As alleged above, 1st Alliance's business model, including all aspects of its use of sales representatives, was designed and implemented by or with the knowledge of the Individual Defendants so that, in relevant part, unlicensed SCs and HLCs routinely performed mortgage origination activities as part of their core duties.

18

104.    The Individual Defendants each engaged in the unfair acts or practices. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

105.    The Individual Defendants each (1) participated directly in the wrongful acts or practices or had the authority to control 1st Alliance, which did so, and (2) had some knowledge of the acts or practices.

106.    The Individual Defendants had actual knowledge that 1st Alliance's unqualified SCs and HLCs failed to provide critical, accurate, and timely information about loan terms to potential borrowers, and encouraged, directed, or failed to prevent such conduct from occurring even though they had the authority to do so. The Individual Defendants approved all aspects of 1st Alliance's business model, policies, and procedures, including the acts and practices that underlie this claim.

107.    The Individual Defendants therefore violated the CFPA.

## COUNT FIVE:
### Deception Regarding the FHA Streamline Program
### (Against all Defendants)

108.    The Bureau realleges and incorporates by reference paragraphs 1-62.

109.    1st Alliance repeatedly made representations to consumers seeking a purchase mortgage about the availability and terms of an FHA Streamline refinance loan, including costs, interest rates, and timing, even though it was impossible for 1st Alliance to know if its representations were true or accurate.

110.    In so doing, 1st Alliance misrepresented the program to consumers. These misrepresentations were material because they were likely to influence consumers' behavior concerning the loans.

111.    These misrepresentations were therefore deceptive acts or practices under the CFPA for which 1st Alliance is liable. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

112.    The Individual Defendants each engaged in the deceptive act or practice. §§ 5531(a), 5536(a)(1)(B).

113.    The Individual Defendants (1) participated directly in the deceptive acts or had the authority to control 1st Alliance, which did so, and (2) had actual knowledge of the material misrepresentations, were recklessly indifferent to the truth or falsity of the misrepresentations, or were aware of a high probability of fraud along with an intentional avoidance of the truth.

114.    The Individual Defendants had actual knowledge of how the SCs and HLCs were misrepresenting the Streamline refi program to consumers and encouraged, directed, or failed to prevent such conduct from occurring even though they had the authority to do so. The Individual Defendants approved all aspects of 1st Alliance's business model, policies and procedures, and sales practices that underlie this claim.

115.    The Individual Defendants therefore violated the CFPA.

**COUNT SIX:**
**MAP Rule**
**(Against 1st Alliance)**

116.    The Bureau realleges and incorporates by reference paragraphs 1-62.

117.    It is a violation of Regulation N, known as the Mortgage Acts and Practices (MAP) Rule, "for any person to make any material misrepresentation, expressly or by implication, in any commercial communication, regarding any term of any mortgage credit product." 12 C.F.R. § 1014.3.

118.    1st Alliance is subject to the MAP Rule because it is a person over which the Federal Trade Commission has jurisdiction under the Federal Trade Commission Act, 15 U.S.C. §§ 41–58. *See* 12 C.F.R. § 1014.1.

119.    1st Alliance provided "mortgage credit product[s]" under the MAP Rule. 12 C.F.R. § 1014.2.

120.    1st Alliance's sales calls, text messages, and emails were "commercial communications" regarding a term of a "mortgage credit product" under 12 C.F.R. § 1014.2.

121.     1st Alliance's representatives communicated repeatedly to consumers that the consumer would qualify for one of 1st Alliance's mortgages when 1st Alliance had already received information from the consumer that would disqualify the consumer from receiving a 1st Alliance mortgage, and the consumer was, in fact, later disqualified.

122.    As noted above, 1st Alliance repeatedly mischaracterized the FHA Streamline refi program to consumers who were seeking a purchase mortgage, making representations about availability and terms, including costs, interest rates, and timing, when it had no way of knowing the truth or falsity of the representations.

123.    In both cases, 1st Alliance committed material misrepresentations in commercial communications with consumers, in violation of the MAP Rule.

## COUNT SEVEN:
### Equal Credit Opportunity Act
### (Against 1st Alliance)

124.    The Bureau realleges and incorporates by reference paragraphs 1-62.

125.    Under the Equal Credit Opportunity Act (ECOA) and its enabling regulation, Regulation B, a creditor such as 1st Alliance must give proper written notice

of its reason for taking adverse action to a consumer within 30 days of denying the consumer's application for credit. 15 U.S.C. §1691(d), 12 C.F.R. § 1002.9(a).

126.    A creditor is deemed to have treated a prequalification request as an application for purposes of 12 C.F.R. § 1002.9 if, after evaluating information, the creditor decides it will not approve the request and communicates that decision. Comment 5 to 12 C.F.R. § 1002.9 (App'x. Supp. I to Part 1002).

127.    1st Alliance denied applications for credit from thousands of consumers and verbally informed those consumers. But as a matter of policy, 1st Alliance sent consumers no written notice that it had denied them credit. 1st Alliance violated ECOA and Regulation B as to each such consumer.

### COUNT EIGHT:
### Fair Credit Reporting Act
### (Against 1st Alliance)

128.    The Bureau realleges and incorporates by reference paragraphs 1-62.

129.    Under the Fair Credit Reporting Act, any person who "takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report" must give that consumer a written or electronic disclosure that includes a numerical credit score and certain other information. 15 U.S.C. § 1681m(a).

130.    1st Alliance took an adverse action based on information in a consumer report with respect to thousands of consumers, by denying those consumers a mortgage loan. But as a matter of policy, 1st Alliance did not send those consumers any written or electronic notice. 1st Alliance violated FCRA each time it failed to do so.

**COUNT NINE:**
**CFPA Violations Based on Violations of Federal Consumer Financial Law**
**(Against 1st Alliance)**

131.    The Bureau realleges and incorporates by reference paragraphs 1-62.

132.    Under § 1036 of the CFPA, it is unlawful for "any covered person . . . to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

133.    TILA, FCRA, ECOA, and the MAP Rule are Federal consumer financial laws. 12 U.S.C. §§ 5481(12), (14).

134.    Thus, each violation of a Federal consumer financial law recited above is also a violation of § 1036 of the CFPA.

**Demand for Relief**

Wherefore, the Bureau requests that the Court:

1.    enjoin Defendants from committing future violations of the CFPA, TILA, the MAP Rule, FCRA, and ECOA;

2.    award additional injunctive relief as justice may require;

3.    award consumer redress;

4.    award damages or other monetary relief;

5.    order disgorgement of ill-gotten gains;

6.    award civil-money penalties;

7.    award costs; and

8.    award additional relief as the Court may determine to be just and proper.

Respectfully submitted,


*Counsel for Consumer Financial Protection Bureau*
Cara M. Petersen
*Acting Enforcement Director*
Jeffrey Paul Ehrlich
*Deputy Enforcement Director*
Owen Martikan
 *Assistant Litigation Deputy*

/s/ Donald R. Gordon
Donald R. Gordon (Bar No. phv11058)
donald.gordon@cfpb.gov
Phone: (212)328-7011
Amanda Lewis (Bar No. phv11057)
amanda.lewis@cfpb.gov
Phone: (202)360-9204
Fax: (703) 642-4585
1700 G Street, NW
Washington, DC 20552

Local Counsel:
Sarah Gruber (Bar No. ct29918)
Assistant United States Attorney
Phone: (203)821-3700
Fax: (203)773-5373
sarah.gruber@usdoj.gov
United States Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510