UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

Consumer Financial Protection Bureau,

Plaintiff,

v.

1st Alliance Lending, LLC; John Christopher DiIorio; Kevin Robert St. Lawrence; and Socrates Aramburu,

Defendants.

Case No.: 3:21-cv-00055-RNC

Date: June 15, 2021

**CONSOLIDATED MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## Table of Contents


Background and Legal Standard ..... 1

I. Count One properly states a claim, to which 1st Alliance can reasonably respond. ..... 2

A. The regulation that 1st Alliance violated was properly promulgated under TILA. ..... 3

B. The Bureau's allegations in Count One are not too vague. ..... 6

II. Count Two states a claim for relief under Regulation Z. ..... 9

III. Count Six states a claim for relief under the MAP Rule. ..... 11

IV. Count Nine is adequately pleaded and should not be dismissed. ..... 13

V. The Bureau states claims for relief against the Individual Defendants. ..... 14

A. The Individual Defendants are directly liable for unfair and deceptive acts or practices. ..... 15

1. The FTC Act standard for individual liability applies to the Bureau's claims against the Individual Defendants. ..... 15

2. The Individual Defendants had both the authority to control 1st Alliance and knowledge of the unfair and deceptive acts or practices. ..... 19

3. The Amended Complaint adequately distinguishes the Individual Defendants. ..... 22

Conclusion ..... 23

## Table of Authorities

### Cases

*AMG Capital Mgmt. LLC v. FTC*,
141 S. Ct. 1341 (2021) ..... 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 2, 13

*CFPB v. All Am. Check Cashing, Inc.*,
No. 3:16-CV-356-WHB-JCG, 2016 WL 11635752 (S.D. Miss. July 15, 2016) ..... 12

*CFPB v. CashCall, Inc.*,
No. cv-15-7522-JFW, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ..... 16, 21

*CFPB v. Frederick J. Hanna & Assocs., P.C.*,
114 F. Supp. 3d 1342 (N.D. Ga. 2015) ..... 12

*CFPB v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ..... 15, 16

*CFPB v. ITT Educ. Servs. Inc.*,
219 F. Supp. 3d 878 (S.D. Ind. 2015) ..... 15

*CFPB v. Navient Corp.*,
No. 3:17-CV-101, 2017 WL 3380530 (M.D. Pa. Aug. 4, 2017) ..... 12, 14, 15

*CFPB v. NDG Fin. Corp.*,
No. 15-cv-5211-CJM, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ..... 15, 16, 19

*CFPB v. Prime Mktg. Holdings, LLC,*
No. 16-CV-7111-BRO, 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) ..... 14

*CFPB v. RD Legal Funding, LLC*,
332 F. Supp. 3d 729 (S.D.N.Y. 2018),
*amended by*, No. 17-CV-890 (LAP), 2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018),
*rev'd in part on other grounds*, 828 F. App'x 68 (2d Cir. 2020) ..... 12, 14, 22, 23

*CFPB v. Think Fin., LLC*,
No. cv-17-127-GF-BMM, 2018 WL 3707911 (D. Mont. Aug 3, 2018) ..... 14

*Columbia Ins. Co. v. Brown Shoe Co., Inc.*,
233 F.R.D. 250 (D. Conn. 2005) ..... 6, 7

*Floersheim v. FTC*,
411 F.2d 874 (9th Cir. 1969) ..... 16

*FTC v. Freecom Commc'ns, Inc.*,
401 F.3d 1192 (10th Cir. 2005) ..... 12

*FTC v. LeadClick Media, LLC,*
838 F.3d 158 (2d Cir. 2016) ..... 18

*FTC v. Med. Billers Network, Inc.*,
543 F. Supp. 2d 283 (S.D.N.Y. 2008) ..... 19

*FTC v. Moses*,
913 F.3d 297 (2d Cir. 2019) ..... 16

*Hudak v. Berkley Grp., Inc.*,
No. 3:13-cv-00089-WWE, 2014 WL 354676 (D. Conn. Jan. 23, 2014) ..... 23

*Jim Walter Corp. v. FTC*,
625 F.2d 676 (5th Cir. 1980) ..... 17

*Ming Li v. Colonial BT, LLC*,
No. 3:14-CV-999 (CSH), 2015 WL 5684060 (D. Conn. Sept. 28, 2015) ..... 6

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ..... 12

*United States v. Graham*,
305 F.3d 1094 (10th Cir. 2002) ..... 17

*Vantone Grp. LLC v. Yangpu NGT Indus. Co., Ltd.*,
No. 13CV7639-LTS-MHD, 2015 WL 4040882 (S.D.N.Y. July 2, 2015) ..... 14, 22

**Statutes & Regulations**

12 U.S.C. § 5531(a) ..... 16

12 U.S.C. § 5536(a) ..... 15, 16

15 U.S.C. § 45(a) ..... 16

15 U.S.C. § 1604(a) ..... 3

15 U.S.C. § 1639b ..... 3, 4

12 C.F.R. § 1008, App. B ..... 9

12 C.F.R. § 1014.3 ..... 11

12 C.F.R. § 1026.19(e)(2) ........ 9, 10

12 C.F.R. § 1026.36(f) ........ *passim*

12 C.F.R. Pt. 1026, Supp. I, Part 2 ........ 10

Vt. Stat. Ann. tit. 8, § 2200 ........ 7, 8

**Rules**

Fed. R. Civ. P. 8 ........ *passim*

Fed. R. Civ. P. 9(b) ........ 12, 14

Fed. R. Civ. P. 12 ........ 6, 8

Fed. R. Civ. P. 15(a)(2) ........ 23

**Other Authorities**

4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1376 (3d ed. 1998) ........ 6

Final Rule, 12 C.F.R. Part 1026, Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 11280 (Feb. 15, 2013) ........ 3, 4, 5

Final Rule, Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth In Lending Act (Regulation Z), 78 Fed. Reg. 79730 (Dec. 31, 2013) (to be codified at 12 C.F.R. Parts 1024 and 1026) ...... 11

Webster's New World College Dictionary (3d ed. 1997) ........ 17

## Background and Legal Standard

As set forth in the Amended Complaint, Defendants, a mortgage company and its owners, used unlicensed, unqualified, unaccountable first-in-time sales staff to engage with the company's consumers as trusted advisors, in violation of law. Consumers were also unlawfully required by the company to submit documents before receiving Loan Estimates, denied credit without being given required notices, and subjected to false and misleading statements regarding their eligibility for refinancing programs and those programs' terms. The Consumer Financial Protection Bureau (Bureau) brought this action to stop Defendants' unlawful conduct, prevent it in the future, and obtain relief for consumers who were harmed by it.

The Amended Complaint comprises nine counts.[1] Counts One and Two charge 1st Alliance Lending, LLC (1st Alliance) with violating the Truth In Lending Act (TILA) and Regulation Z, respectively, by failing to ensure that its loan officers were licensed, and unlawfully requiring verifying documents from the consumer before a Loan Estimate was issued. Counts Three, Four, and Five charge all Defendants—including John Christopher DiIorio, Kevin Robert St. Lawrence, and Socrates Aramburu (Individual Defendants)—with violating the Consumer Financial Protection Act of 2010 (CFPA) by engaging in deceptive and unfair acts and practices. Count Six charges 1st Alliance with violating the Mortgage Acts and Practices (MAP) Rule by making material misrepresentations to consumers. Counts Seven and Eight charge 1st Alliance with violating the Equal Credit Opportunity Act (ECOA) and the Fair Credit Reporting Act (FCRA) by failing to provide required notices to consumers who were denied credit.

[1] *See* Am. Compl. (ECF No. 27).

Finally, Count Nine charges 1st Alliance with violating the CFPA based on its violations of "Federal consumer financial laws."

Defendants do not challenge the Bureau's claims under ECOA and FCRA in Counts Seven and Eight. But they argue that Counts One through Six should be dismissed as to some or all Defendants for failure to state a claim and that Count Nine should be dismissed because the violations on which it is based were not properly pleaded.[2]

As demonstrated below, Defendants are wrong about the sufficiency of the Bureau's pleading. The Amended Complaint contains facts, which must be accepted as true, sufficient for the Court "to draw the reasonable inference" that Defendants are "liable for the misconduct alleged."[3] The Court should therefore deny the motions to dismiss.

## I. Count One properly states a claim, to which 1st Alliance can reasonably respond.

In Count One, the Bureau alleges that 1st Alliance violated Regulation Z by failing to ensure that individuals working for it were licensed under the applicable state SAFE Act.[4] 1st Alliance argues that the provision of Regulation Z on which Count One relies, 12 C.F.R. § 1026.36(f)(2), is not authorized by TILA and that Count One fails as a result.[5] But 1st Alliance is wrong. Congress gave the Bureau broad authority to issue regulations to implement TILA and specifically contemplated that the Bureau would issue

[2] *See* Def. 1st Alliance's Mot. to Dismiss (ECF No. 33) (Counts 1, 2, 6, and 9); Indiv. Defs.' Mot. to Dismiss (ECF No. 32) (Counts 3, 4, and 5).

[3] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

[4] *See, e.g.*, Am. Compl. (ECF No. 27) ¶¶ 65–73.

[5] Def. 1st Alliance's Mem. in Supp. of its Mot. to Dismiss (1A MTD Br.) (ECF No. 33-1) at 8–10. *See* Am. Compl. ¶ 66.

regulations defining loan originators' qualification, registration, and licensing obligations. 1st Alliance moves in the alternative for a more definite statement, but Count One is not vague or ambiguous, and 1st Alliance can reasonably respond to it.

### A. The regulation that 1st Alliance violated was properly promulgated under TILA.

Section 129B(b) of TILA, as amended by the Dodd-Frank Act, provides in part that "[s]ubject to regulations prescribed under this subsection, each mortgage originator shall . . . be qualified and, when required, registered and licensed as a mortgage originator in accordance with applicable State or Federal law, including the Secure and Fair Enforcement for Mortgage Licensing Act of 2008."[6] And TILA § 105(a) directs the Bureau to "prescribe regulations to carry out the purposes of [TILA]," which

> may contain such additional requirements, classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for all or any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith.[7]

Consistent with this clear statutory authority, the Bureau issued regulations to implement § 129B(b) in 2013. In particular, 12 C.F.R. § 1026.36(f), part of Regulation Z, sets forth "[l]oan originator qualification requirements." One of these requirements is that loan originator organizations (*i.e.*, loan originators who are not natural persons) must "[e]nsure that that each individual loan originator who works for the loan originator organization is licensed or registered" under federal and state SAFE Act laws and regulations "before the individual acts as a loan originator . . . ." In other words, the

[6] 15 U.S.C. § 1639b(b)(1)(A).

[7] 15 U.S.C. § 1604(a). That the statute permits regulations containing "additional requirements" means that the Bureau is empowered under TILA § 105(a) "to prescribe requirements *beyond those specifically listed in the statute*." Final Rule, 12 C.F.R. Part 1026, Loan Originator Compensation Requirements Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 11280, 11292 (Feb. 15, 2013) (emphasis added).

Bureau's regulation defines what loan originator organizations must to do to be qualified and registered and licensed under TILA § 129B(b).[8] And Congress, in 15 U.S.C. § 1639b(b)(1)(A), expressly contemplated that loan originators' compliance with TILA § 129B(b) would be "[s]ubject to regulations" prescribed by the Bureau.

In addition, § 129B(e) of TILA authorizes the Bureau "to *prohibit or condition terms, acts, or practices* relating to residential mortgage loans on a variety of bases, including when the Bureau finds the terms, acts, or practices are *not in the interest of the consumer*."[9] As the Bureau discussed in the section-by-section analysis of § 1026.36(f)(2) in the 2013 final rule, requiring loan originator organizations to ensure that their individual loan originators are licensed "benefit[s] consumers by giving them recourse if an individual who has failed to obtain a loan originator license nonetheless acts as a loan originator for the benefit of the loan originator organization and causes harm to a consumer in originating the loan."[10] Therefore, the Bureau was also authorized under § 129B(e) to require loan originator organizations to ensure that their individual loan originators were lawfully licensed, in order to give consumers recourse where individual loan originators were engaging in unlicensed activity to consumers' detriment—as it did in promulgating § 1026.36(f)(2).

---

[8] *See* Final Rule, 12 C.F.R. Part 1026, 78 Fed. Reg. at 11374.

[9] Final Rule, 12 C.F.R. Part 1026, 78 Fed. Reg. at 11292 (emphasis added). *See also* 15 U.S.C. § 1639b(e) ("The Bureau shall, by regulations, prohibit or condition terms, acts or practices relating to residential mortgage loans that the Bureau finds to be abusive, unfair, deceptive, predatory, . . . or are not in the interest of the borrower.").

[10] Final Rule, 12 C.F.R. Part 1026, 78 Fed. Reg. at 11376.

The Bureau therefore had ample statutory authority to prescribe that all loan originator organizations must ensure that the individual loan originators they work with are, in fact, licensed and registered as federal and state laws require.[11]

1st Alliance's contrary theory would provide a blueprint for evasion. 1st Alliance does not dispute that TILA § 129B(b)(1)(A) requires all mortgage originators—individuals and entities—to be licensed under applicable law.[12] Yet under 1st Alliance's interpretation, loan originator organizations could—with impunity—encourage the *individual* loan originators working for them not to be licensed, or even *direct* them not to be licensed. This was not Congress's intent. On the contrary, as the Bureau explained in the rule's preamble, Congress was concerned "about the risk that trusted advisers or first-in-time service providers could steer consumers to particular credit providers, products, and terms."[13] It is just such unlicensed first-in-time actors, like those the Amended Complaint alleges represented 1st Alliance early in the loan origination process and became trusted advisors throughout the process, at which § 1026.36(f)(2) is aimed. Congress gave the Bureau a broad mandate to protect consumers from such harms, and the Bureau properly exercised that authority in § 1026.36(f)(2).

The Court should deny 1st Alliance's motion to dismiss Count One.

[11] Indeed, even before the Bureau's rule, "employers [were] generally *already responsible* under State law for ensuring their employees comply with all State licensing requirements that apply to activities within the scope of their employment." Final Rule, 12 C.F.R. Part 1026, 78 Fed. Reg. at 11376 (emphasis added).

[12] *See* 1A MTD Br. at 9.

[13] Final Rule, 12 C.F.R. Part 1026, 78 Fed. Reg. at 11298.

### B. The Bureau's allegations in Count One are not too vague.

Having failed to show that Count One does not state a claim under Rule 12(b)(6), 1st Alliance argues, in the alternative, for a more definite statement under Rule 12(e). But that argument fails as well.

Rule 12(e) motions are justified only where the pleading "is so vague or ambiguous that the [moving] party cannot reasonably prepare a response."[14] Such motions are "generally disfavored."[15] They "should not be granted if the complaint complies with the short and plain statement requirement of Federal Rule of Civil Procedure 8 because the aim of Rule 12(e) is to remedy unintelligible pleadings, not to correct for lack of detail."[16] And even if the Bureau's pleading were "vague or ambiguous," such that it "cannot be construed to show a right to relief"—and that is not the case—"the proper attack is by a motion under Rule 12(b)(6) rather than Rule 12(e)."[17]

In any event, the Amended Complaint is not vague, and 1st Alliance can respond to it without further elaboration. Count One alleges that 1st Alliance violated § 1026.36(f)(2) of Regulation Z *in every state in which it operated*.[18] 1st Alliance argues

---

14 Fed. R. Civ. P. 12(e).

15 *Ming Li v. Colonial BT, LLC*, No. 3:14-CV-999 (CSH), 2015 WL 5684060, at *2 (D. Conn. Sept. 28, 2015).

16 *Columbia Ins. Co. v. Brown Shoe Co., Inc.*, 233 F.R.D. 250, 251 (D. Conn. 2005) (cleaned up).

17 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1376 (3d ed. 1998) (Motion for a More Definite Statement—Scope of Rule 12(e)).

18 *See* Am. Compl. ¶ 65 (1st Alliance is a "loan originator organization" under Regulation Z), ¶ 66 (Regulation Z requires "loan originator organizations" to ensure that individuals working for it are licensed under federal and state SAFE Acts), ¶ 68 (SAFE Act of "every state" requires licensing for taking an application or offering or negotiating terms), ¶ 72 (1st Alliance unlicensed personnel both took applications and offered or negotiated terms), ¶ 73 ("1st Alliance thus violated Regulation Z when SCs or HLCs acted as loan originators by taking mortgage-loan applications or offering or negotiating terms of a residential-mortgage loan"). *See* 12 C.F.R. § 1026.36(f)(2) (requiring loan originator organizations to

that state SAFE Acts are "different in important ways,"[19] but with respect to the Bureau's claims, they are not. The Bureau pleads, and 1st Alliance tacitly acknowledges, that every state's SAFE Act requires the licensing of any person who engages in taking an application *or* offering or negotiating terms with respect to a residential mortgage loan.[20] Those activities are specified in the federal SAFE Act, and their meaning is construed by Regulation H.[21] The Amended Complaint also pleads pages of detailed facts in support of its claim that unlicensed personnel at 1st Alliance engaged in those licensable activities.[22] The Bureau also claims that 1st Alliance ran afoul of state SAFE Acts in a subset of states for additional reasons: its employees engaged in "assisting" or "soliciting" consumers for mortgage loans without being licensed, as required in those states.[23] These are more than "short and plain statement[s]" of the claim.[24]

1st Alliance's discussion of Vermont's SAFE Act undermines its argument that each state's SAFE Act is so materially distinct that it must be pleaded in detail.[25] As 1st Alliance's lengthy quoted passage from Vermont's law shows, what Vermont defines as licensable activity augments, rather than limits, the requirement universal to every state

---

"[e]nsure that each individual loan originator who works for the loan originator organization is licensed . . . under the SAFE Act . . . and State SAFE Act implementing law").

[19] 1A MTD Br. at 10.

[20] Am. Compl. ¶ 68. *See* 1A MTD Br. at 4–5 ("The Model Safe Act defines 'mortgage loan originator' as an individual who for compensation or gain: (A) Takes a residential mortgage loan application *or* (B) Offers or negotiates terms of a residential mortgage loan. . . . Laws based on the model SAFE Act have been adopted, in various forms, by all fifty states.").

[21] 1st Alliance acknowledges the authority of Regulation H, which, as it correctly notes, "set[s] minimum standards for state licensing . . . of mortgage loan originators" prescribed under the Federal SAFE Act. 1A MTD Br. at 5.

[22] *See, e.g.*, Am. Compl. ¶¶ 17–37.

[23] *See, e.g.*, Am. Compl. ¶¶ 69–70.

[24] *Columbia Ins. Co.*, 233 F.R.D. at 251.

[25] 1A MTD Br. at 13–14 (quoting Vt. Stat. Ann. tit. 8, § 2200).

that any individual who "takes a[n] . . . application" or "offers or negotiates terms"[26] must be licensed—precisely, in other words, what the Bureau has pleaded.

1st Alliance's argument suggests that the Bureau is enforcing state law and must therefore enumerate state law. It is not, and it need not. In bringing Count One, the Bureau is enforcing TILA, through Regulation Z, which requires 1st Alliance to ensure that its loan originators are licensed to the extent they are required to be licensed under applicable state and federal law.[27] Specifically, the Bureau has alleged that unlicensed personnel took applications or offered or negotiated terms and that they also assisted or solicited consumers. This satisfies the Bureau's pleading burden, which does not require it to plead every fact that might support its claims, and is perfectly intelligible.

1st Alliance also argues that the Bureau has failed to allege that 1st Alliance's unlicensed employees engaged in licensable conduct "habitually" or "repeatedly."[28] The argument seems more suited to a 12(b)(6) motion, but it fails either way. The Amended Complaint spells out, across more than twenty paragraphs, allegations that, as part of their job duties, 1st Alliance's unlicensed SCs and HLCs engaged habitually and repeatedly in licensable activity, including by "routinely" engaging in such activity as "unlawful features of 1st Alliance's business model."[29] Moreover, because 1st Alliance itself performed origination activities "with a degree of habitualness and repetition,"

[26] 1A MTD Br. at 13–14. (quoting Vt. Stat. Ann. tit. 8, § 2200).

[27] *See* 12 C.F.R. § 1026.36(f)(2).

[28] 1A MTD Br. at 13.

[29] Am. Compl. ¶¶ 17–37. *See also id.* ¶ 2 (describing "unlicensed 1st Alliance employees *routinely* and illegally engag[ing] in mortgage-origination activities" as "unlawful features of 1st Alliance's business model.") (emphasis added).

unlicensed employees acting on its behalf "engaged in the business of a loan originator" under Regulation H and thus were subject to licensing requirements.[30]

Because 1st Alliance can respond to Count One, the motion in the alternative for a more definite statement should be denied.

## II. Count Two states a claim for relief under Regulation Z.

1st Alliance's motion to dismiss Count Two cites to no case law, is premised on a misreading of the governing regulation, and relies upon a quotation from regulatory commentary that omits contrary, controlling language. It should be rejected.

Count Two sets forth the Bureau's straightforward claim that 1st Alliance "regularly required consumers . . . to submit verifying documents" before 1st Alliance issued a Loan Estimate.[31] This violates Regulation Z, which, in a provision labeled "[v]erification of information," specifies that a creditor "shall not require a consumer to submit documents verifying information related to the consumer's application before providing the [Loan Estimate]."[32] The Bureau also alleges that when 1st Alliance employees did these things, they were "[f]ollowing company policy."[33]

1st Alliance first misstates the Bureau's claim, asserting that the Bureau claims that "the company asked for and/or received certain documentation before an application was taken and therefore before a Loan Estimate could be provided."[34] Not

---

[30] Appendix B to Regulation H provides that an individual engages in the business of a loan originator if either the individual does so with a degree of habitualness or repetition, *or* if the source of the prospective financing performs origination activities with a degree of habitualness or repetition. *See* 12 C.F.R. § 1008, App. B (emphasis added).

[31] Am. Compl. ¶ 76.

[32] 12 C.F.R. § 1026.19(e)(2)(iii).

[33] Am. Compl. ¶ 3.

[34] 1A MTD Br. at 15.

so. The regulation, and the claim in Count Two, is about "verifying documents"—that is, documents that verify information the consumer has already provided, which presumably would form the basis for a Loan Estimate.

1st Alliance quotes the Bureau's official commentary to justify its illegal policy of requiring verifying documents before a Loan Estimate has issued: "A 'creditor . . . may collect from the consumer any information that it requires prior to providing the early disclosures . . . .'"[35]

But 1st Alliance omits the critical passage following that quoted language: "However, the creditor . . . is *not* permitted to require, before providing the [Loan Estimate], that the consumer submit *documentation to verify* the information collected from the consumer."[36] 1st Alliance thus elides the critical distinction between mere information—which it may (indeed must) collect before issuing a Loan Estimate—and *documents* intended to *verify* that information, which it may not require—and which are the subject of the Bureau's claim. The commentary thus reinforces that 1st Alliance's reading of its Loan Estimate obligations, and thus of § 1026.19(e)(2), is wrong.

1st Alliance also argues that under Regulation Z creditors (1) *may* require verifying documents from a consumer until the consumer submits an application; then (2) *may not* require such documents until a Loan Estimate is issued; and then (3) *may* require such documents again. This nonsensical interpretation of the regulation hinges on the phrase "related to the consumer's application,"[37] as if that language requires the application to be fully *completed* before the regulation applies. 1st Alliance's reading is

---

[35] 1A MTD Br. at 16 (quoting 12 C.F.R. Pt. 1026, Supp. I, Part 2).

[36] 12 C.F.R. Pt. 1026, Supp. I, Part 2 (emphasis added).

[37] *See* 1A MTD Br. at 16; 12 C.F.R. § 1026.19(e)(2).

not required by, or even consistent with, that language (which does not, for instance, refer to a "completed" application). Just as critically, this reading would undermine a key purpose of the regulation, "to prevent overly burdensome documentation demands on mortgage applicants, and to facilitate shopping by the consumer."[38]

Finally, 1st Alliance claims the Bureau did not plead "a single instance, example, or practice" of the alleged conduct in Count Two. The Amended Complaint alleges, among other things, that "[f]ollowing company policy, 1st Alliance employees regularly required consumers to submit documents for verification before issuing the consumer a Loan Estimate, in violation of the Truth in Lending Act and Regulation Z."[39] This is a short and plain statement of the facts underlying the claim in Count Two, specifying, among other things, a practice. No more is required.

Count Two is adequately pleaded and should not be dismissed.

## III. Count Six states a claim for relief under the MAP Rule.

In Count Six, the Bureau pleads that 1st Alliance violated the MAP Rule, which makes it unlawful "'for any person to make any material misrepresentation, expressly or by implication, in any commercial communication, regarding any term of any mortgage credit product.'"[40]

---

[38] Final Rule, Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth In Lending Act (Regulation Z), 78 Fed. Reg. 79730, 79816 (Dec. 31, 2013) (to be codified at 12 C.F.R. Parts 1024 and 1026). *See also id.* ("The Bureau believes that requiring a consumer to submit a purchase and sale contract so that the creditor can obtain information it would otherwise obtain from the consumer or other sources may constitute overly burdensome documentation and inhibit shopping because under such a demand a consumer would be required to become obligated to the purchase of real estate prior to obtaining a reliable estimate of the cost of financing such purchase.").

[39] Am. Compl. ¶ 3.

[40] Am. Compl. ¶ 117 (quoting 12 C.F.R. § 1014.3).

Defendants' discussion of Count Six is founded on the argument that Rule 9(b)'s heightened pleading requirement should apply to the Bureau's claims under the MAP Rule. But as with claims under the CFPA,[41] a heightened pleading standard for the MAP Rule claim is inappropriate. Most courts that have considered the question with respect to consumer-protection laws have declined to apply Rule 9(b).[42] As one court has explained, "Rule 9(b) expressly applies only to claims alleging 'fraud or mistake,' and as the Tenth Circuit and several district courts have reasoned, consumer protection claims are not claims of fraud, even if there is a deceptive dimension to them."[43] And applying Rule 9(b) "to consumer protection claims is not only inconsistent with some of the policy reasons for applying Rule 9(b) in the first place, but is also inconsistent with the remedial nature of consumer protection statutes."[44]

As several courts have noted, Rule 9(b) is particularly inapplicable to claims based on consumer-protection statutes because those statutes, like the MAP Rule, are strict-liability laws that lack any scienter element.[45] The government needn't offer proof of fraud or mistake. It is not surprising, therefore, that the sole case cited by 1st Alliance, *Rombach v. Chang*,[46] is a private securities case, not a consumer-protection case.

---

[41] *See* Section V, *infra*.

[42] *E.g.*, *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 768–69 (S.D.N.Y. 2018), *amended by*, No. 17-CV-890 (LAP), 2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018), *rev'd in part on other grounds*, 828 F. App'x 68 (2d Cir. 2020); *CFPB v. All Am. Check Cashing, Inc.*, No. 3:16-CV-356-WHB-JCG, 2016 WL 11635752, at *3 (S.D. Miss. July 15, 2016); *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1371–74 (N.D. Ga. 2015); *see also FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 n.7 (10th Cir. 2005) (Rule 9(b) does not apply to claim for unfairness/deception under FTC Act).

[43] *CFPB v. Navient Corp.*, No. 3:17-CV-101, 2017 WL 3380530, at *25 (M.D. Pa. Aug. 4, 2017) (quoting *Frederick J. Hanna & Associates*, 114 F. Supp. 3d at 1371–74).

[44] *Navient Corp.*, 2017 WL 3380530, at *24 (quoting *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1373).

[45] *E.g.*, *All Am. Check Cashing, Inc.*, 2016 WL 11635752, at *3; *Frederick J. Hanna & Assocs.*, 114 F. Supp. 3d at 1371.

[46] 355 F.3d 164, 170 (2d Cir. 2004).

The correct standard to apply is Rule 8's "short and plain statement" standard, and Count Six easily meets it. It alleges that 1st Alliance representatives "repeatedly" told consumers they "would qualify for one of 1st Alliance's mortgages" in situations in which "1st Alliance had already received information from the consumer that would disqualify the consumer from receiving a 1st Alliance mortgage" and 1st Alliance "later disqualified" the consumer.[47] The Amended Complaint alleges further that 1st Alliance representatives "often" told consumers "that after six months of satisfactory payments, the consumer could obtain a significantly better rate through a Streamline refi than under [a] purchase mortgage," when, in fact, the representatives "had no assurance" that with on-time payments "the consumer would qualify for a Streamline refi loan" or "that the rate would be significantly better . . . ."[48] Finally, the Amended Complaint alleges that 1st Alliance representatives "frequently told consumers that the consumer could obtain a Streamline refi at no cost to the consumer when, in fact, this was not true."[49] This is more than sufficient detail to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[50]

## IV. Count Nine is adequately pleaded and should not be dismissed.

1st Alliance argues that because Counts One, Two, and Six must be dismissed, so must Count Nine, which is derivative of those counts. But because, as argued above, the substantive claims in those counts should survive 1st Alliance's motion, the claims in Count Nine should as well. Moreover, 1st Alliance does not even challenge the Bureau's

---

[47] Am Compl. ¶ 121.

[48] Am. Compl. ¶¶ 45, 46; *see also id.* ¶ 122.

[49] Am. Compl. ¶¶ 47; *see also id.* ¶ 122.

[50] *Iqbal*, 556 U.S. at 678 (cleaned up).

ECOA and FCRA claims, which also support the claim in Count Nine. So even if the Court were to dismiss Counts One, Two, and Six, Count Nine would survive.

## V. The Bureau states claims for relief against the Individual Defendants.

The Individual Defendants argue that Rule 9(b)'s heightened standard applies to allegations of deception and unfairness under the CFPA because those allegations "sound in fraud."[51] As discussed above with respect to the MAP Rule,[52] allegations under the CFPA are not subject to Rule 9(b)'s heightened pleading requirements, and Rule 8's "short and plain statement" standard should govern.

Most courts, including one in the Second Circuit, have held that Rule 9(b) does not apply to claims under the CFPA such as those here for deception and unfairness.[53] The logic of the only additional case cited here by the Individual Defendants, *CFPB v. Prime Marketing Holdings, LLC*,[54] was considered and rejected by the court in *CFPB v. Think Finance, LLC*, which noted "the overwhelming weight of precedent" against applying Rule 9(b) to claims under the CFPA.[55]

Thus, the Individual Defendants' motion to dismiss should be granted only if, under Rule 8, the Amended Complaint is "unintelligible" and does not "explain what conduct constituted the violations, which defendants violated which statutes . . . or how the alleged violations harmed the plaintiff."[56]

---

[51] Individual Defs.' Mem. in Supp. of their Mot. To Dismiss (Indiv. MTD Br.) (ECF No. 32-1), at 8.

[52] *See* discussion at Section III, *supra*.

[53] *E.g.*, *RD Legal Funding, LLC*, 332 F. Supp. 3d at 768; *Navient Corp.*, 2017 WL 3380530, at *25; *CFPB v. Think Finance, LLC*, No. cv-17-127-GF-BMM, 2018 WL 3707911, at *8 (D. Mont. Aug. 3, 2018).

[54] No. 16-CV-7111-BRO, 2016 WL 10516097, at *6 (C.D. Cal. Nov. 15, 2016); *see* Indiv. MTD Br. at 8.

[55] 2018 WL 3707911, at *8.

[56] *RD Legal Funding*, 332 F. Supp. 3d at 770 (quoting *Vantone Grp. LLC v. Yangpu NGT Indus. Co., Ltd.*, No. 13CV7639-LTS-MHD, 2015 WL 4040882, at *4 (S.D.N.Y. July 2, 2015)) (cleaned up).

### A. The Individual Defendants are directly liable for unfair and deceptive acts or practices.

The Individual Defendants do not contest that they are "covered persons" under the CFPA or that the CFPA's unfair, deceptive, or abusive acts or practices (UDAAP) provision prohibits any "covered person" from engaging in "any unfair, deceptive, or abusive act or practice . . . ."[57] Despite detailed factual allegations concerning their roles in the illegal conduct at issue, the Individual Defendants contend that the Bureau has not adequately pleaded that they each "engaged" in the UDAAP violations.[58] The Individuals Defendants' analysis, however, is misguided.

#### 1. The FTC Act standard for individual liability applies to the Bureau's claims against the Individual Defendants.

In construing the CFPA's UDAAP prohibition, courts look to established case law under the FTC Act.[59] Courts have noted the parallels between the language of the CFPA and the FTC Act,[60] and courts have adopted the established meaning of "deceptive" and "unfair" from the FTC Act, in acknowledgment of the two provisions' similarity.[61] Individual Defendants do not contest that the FTC Act's meaning of "deceptive" and "unfair" apply to the CFPA's UDAAP claims.

---

[57] *See* 12 U.S.C. § 5536(a)(1).

[58] Indiv. MTD Br. at 1.

[59] *E.g.*, *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211-CJM, 2016 WL 7188792, at *15–16 (S.D.N.Y. Dec. 2, 2016); *Navient Corp.*, 2017 WL 3380530, at *7.

[60] *See, e.g.*, *CFPB v. ITT Educ. Servs. Inc.*, 219 F. Supp. 3d 878, 903 (S.D. Ind. 2015) (noting that the CFPA's "prohibition on 'any unfair [or] deceptive act or practice' closely mirrors the language employed by Section 5 of the [FTC] Act," and concluding "that longstanding interpretations of the FTCA should inform interpretation of the CFPA as well.").

[61] *E.g.*, *Navient Corp.*, 2017 WL 3380530, at *23 (citing, e.g., *CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016)) ("deceptive"); *ITT Educ. Servs. Inc*, 219 F. Supp. 3d at 903 ("unfair").

Courts have similarly relied on FTC Act precedent in determining when an individual violates the CFPA's prohibition of unfair, deceptive, and abusive acts and practices.[62] This approach makes obvious sense. Under the FTC Act, "unfair or deceptive acts or practices in or affecting commerce" are "unlawful," and the FTC is "empowered and directed to prevent" certain persons "from using . . . unfair or deceptive acts or practices in or affecting commerce."[63] Under the CFPA, it is "unlawful" for a covered person or service provider "to engage in any unfair, deceptive, or abusive act or practice" and the Bureau is authorized "to prevent" such a person "from committing or engaging in" such practices.[64]

Individual defendants may be held liable for violating the FTC Act's prohibition on unfair and deceptive acts or practices when they "participated directly in the practices or acts or had authority to control them" and the individuals "had or should have had knowledge or awareness" of the misconduct.[65] An individual has sufficient knowledge or awareness where he had "actual knowledge" of the misconduct, was "recklessly indifferent" to the misconduct, or "had an awareness of a high probability" of misconduct "and intentionally avoided learning the truth."[66] So, too, courts have held, under the CFPA's parallel prohibition on unfair, deceptive, or abusive acts and practices.[67]

---

[62] *E.g.*, *Gordon*, 819 F.3d at 1193 (citing *Floersheim v. FTC*, 411 F.2d 874, 876–78 (9th Cir. 1969)).

[63] 15 U.S.C. § 45(a)(1), (2).

[64] 12 U.S.C. §§ 5536(a)(1)(B), 5531(a).

[65] *FTC v. Moses*, 913 F.3d 297, 307 (2d Cir. 2019) (cleaned up); *accord NDG Fin. Corp.*, 2016 WL 7188792, at *17.

[66] *Moses*, 913 F.3d at 307.

[67] *Gordon*, 819 F.3d at 1193 n.8; *NDG Fin. Corp.*, 2016 WL 7188792, at *17; *CFPB v. CashCall, Inc.*, No. cv-15-7522-JFW, 2016 WL 4820635, at *11 (C.D. Cal. Aug. 31, 2016).

The Individual Defendants attempt to resist this straightforward result in three ways. Each fails.

First, the Individual Defendants point to a recent Supreme Court case that did not involve individual liability under either the FTC Act or the CFPA.[68] In *AMG Capital Management LLC v. FTC*, the Court held that the section of the FTC Act authorizing the FTC to obtain injunctive relief does not also authorize it to seek equitable monetary relief directly from a court in lieu of the administrative process.[69] The Court did not say anything about the standard for determining when an individual can be held liable for violating the FTC Act.

Second, the Individual Defendants assert that to "engage" in an unfair, deceptive, or abusive act or practice, "a covered person must take an active part in and directly participate in the act."[70] But none of the dictionary definitions the Individual Defendants cite defines "engage" as requiring direct participation.[71] "Engag[ing]" in an "act" or "practice" denotes a broad set of conduct: not just doing the acts themselves, but also participating in a scheme that might be carried out by someone else.[72]

And, in any event, binding circuit precedent demonstrates that a defendant can "engage" in an unfair or deceptive act or practice without directly participating in it. In

[68] Indiv. MTD Br. at 15.

[69] 141 S. Ct. 1341, 1344 (2021).

[70] Indiv. MTD Br. at 10.

[71] Indiv. MTD Br. at 9, 10 n.4 (collecting definitions, including "to employ or involve oneself; to take part in; to embark on," and "to begin and carry on an enterprise or activity; to do or take part in something"); *see also United States v. Graham*, 305 F.3d 1094, 1102 (10th Cir. 2002) ("The term 'engage' is commonly defined as 'to occupy or involve oneself; take part; be active.'" (quoting Webster's New World College Dictionary, at 450 (3d ed. 1997)).

[72] *Cf. Jim Walter Corp. v. FTC*, 625 F.2d 676, 681 (5th Cir. 1980) (where company that did no commercial activity except through its subsidiaries was "actively involved in the management of its subsidiaries," court had "no difficulty concluding that it was engaged in interstate commerce").

*FTC v. LeadClick Media, LLC*, the Second Circuit applied the FTC Act's test for individual liability to a company whose affiliates made deceptive statements. The court of appeals rejected the company's arguments that it could not be held liable for deceptive content that the company did not create, concluding

> that a defendant acting with knowledge of deception who either directly participates in that deception *or* has the authority to control the deceptive practice of another, but allows the deception to proceed, engages, *through its own actions*, in a deceptive act or practice that causes harm to consumers.[73]

Thus, contrary to the Individual Defendants' contention,[74] the Bureau has adequately pled that the Individual Defendants are directly—not vicariously—liable for the unfair and deceptive acts and practices because they "engaged" in them.

Third, the Individual Defendants claim that the CFPA's substantial-assistance provision precludes the conclusion that an individual can engage in an unfair, deceptive, or abusive act or practice when that individual has knowledge and the authority to control an unlawful practice. But as the Second Circuit explained in *LeadClick*, "applying a test that imposes liability based on direct participation in or authority to control deceptive practices" reflects "principal liability," not "aiding and abetting liability . . . ."[75] Nothing in the CFPA suggests that Congress silently limited the scope of a covered person's principal liability for unfair, deceptive, or abusive acts and practices

---

[73] 838 F.3d 158, 170 (2d Cir. 2016) (first emphasis added, second in original); *accord id.* ("[A] defendant who knows of another's deceptive practices and has the authority to control those deceptive acts or practices, but allows the deception to proceed, may be held liable for *engaging* in a deceptive practice injurious to consumers.") (emphasis added); *id.* at 168 ("[W]e hold that under the FTC Act, a defendant may be held liable for *engaging* in deceptive practices or acts if, with knowledge of the deception, it either directly participates in a deceptive scheme or has the authority to control the deceptive content at issue.") (emphasis added).

[74] *See* Indiv. MTD Br. at 17–19 (arguing that the corporate form shields them from liability for their individual involvement).

[75] *LeadClick Media, LLC*, 838 F.3d at 170.

when it established aiding-and-abetting liability for any person that knowingly or recklessly provides substantial assistance to a covered person's unlawful conduct.

### 2. The Individual Defendants had both the authority to control 1st Alliance and knowledge of the unfair and deceptive acts or practices.

The Amended Complaint sufficiently alleges that the Individual Defendants had the authority to control 1st Alliance. "Authority to control a company 'can be evidenced by active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer.'"[76] Contrary to the Individual Defendants' assertion that the Bureau is bringing claims "based merely on the Individuals' titles and ownership interests,"[77] the Amended Complaint alleges a variety of significant facts that collectively establish that each Individual Defendant had authority to control the company. In addition to being 1st Alliance's owners, the Amended Complaint alleges, among other things, that each Individual Defendant: (1) actively managed 1st Alliance as one of its top executives; (2) was responsible for and approved 1st Alliance's business model, including the particular duties assigned under that model to unlicensed personnel such as SCs and HLCs, as well as to licensed MLOs; (3) approved 1st Alliance's policies and procedures; and (4) approved 1st Alliance's sales practices and the specific functions performed by those in particular job roles, including SCs, HLCs, and MLOs.[78] These allegations, if proven, would support a finding that each Individual

---

[76] *NDG Fin. Corp.*, 2016 WL 7188792, at *17 (quoting *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008)).

[77] Indiv. MTD Br. at 17.

[78] Am. Compl. ¶¶ 1, 54–57.

Defendant was actively involved in the business affairs and the making of corporate policy, and thus that each had the requisite authority to control 1st Alliance.

The Amended Complaint also sufficiently alleges that the Individual Defendants knew of the unfair and deceptive acts and practices. Contrary to the Individual Defendants' assertion that the Bureau is alleging only that "knowledge can be inferred merely from their role in the company and awareness of the underlying general practices,"[79] the Amended Complaint alleges actual knowledge of the illegal conduct at issue in Counts Three,[80] Four,[81] and Five.[82] Specifically, it alleges that the Individual Defendants knew the sales practices and specific functions performed by the SCs and HLCs[83] and knew that 1st Alliance's chief compliance officer had concerns that the activities engaged in by SCs could require licensing.[84] Thus, the Amended Complaint alleges that the Individual Defendants had actual knowledge of the facts central to Counts Three, Four, and Five.

The Amended Complaint alleges additional facts to support DiIorio and St. Lawrence's control of 1st Alliance and knowledge of the conduct that underlies Counts Three, Four, and Five. Contrary to the Individual Defendants' assertions, the Bureau

---

[79] Indiv. MTD Br. at 19–20.

[80] "The Individual Defendants had actual knowledge of how 1st Alliance used unlicensed SCs and HLCs in the mortgage-origination process as part of its business model, including the particular acts and practices detailed [in Count 3], and encouraged, directed, or failed to prevent such conduct from occurring even though they had the authority to do so." Am. Compl. ¶ 90.

[81] "The Individual Defendants had actual knowledge that 1st Alliance's unqualified SCs and HLCs failed to provide critical, accurate, and timely information about loan terms to potential borrowers, and encouraged, directed, or failed to prevent such conduct from occurring even though they had the authority to do so." Am. Compl. ¶ 106.

[82] "The Individual Defendants had actual knowledge of how the SCs and HLCs were misrepresenting the Streamline refi program to consumers and encouraged, directed, or failed to prevent such conduct from occurring even though they had the authority to do so." Am. Compl. ¶ 114.

[83] Am. Compl. ¶¶ 55, 57.

[84] Am. Compl. ¶ 35.

distinguishes the conduct among the Individual Defendants. For instance, DiIorio: (1) was responsible for the day-to-day executive management of 1st Alliance,[85] and (2) directed and approved changes to the roles of SC, HLC and MLO, and interacted with 1st Alliance's compliance and legal functions in doing so.[86]

Similarly, the Amended Complaint contains additional allegations that support the claims against St. Lawrence. St. Lawrence was President of Production and responsible for and oversaw the structure and operation of sales, which included SCs, HLCs, and MLOs.[87] He also controlled the offices where the call center was located.[88]

Finally, the Amended Complaint alleges that in 2017, DiIorio and St. Lawrence were directly notified by 1st Alliance's Compliance Manager that an internal audit had found that SCs were engaging in activities that could require licensing, including providing credit-repair advice, discussing interest rates and other loan terms with consumers, making credit decisions, and disqualifying consumers.[89] While illustrative of DiIorio and St. Lawrence's participation in the unfair and deceptive practices alleged in the Amended Complaint, the Bureau is not required to allege that the Individual Defendants knew that the underlying conduct was illegal.[90]

The Individual Defendants falsely assert that the Bureau makes no factual allegations against Aramburu. On the contrary, the Amended Complaint contains

---

[85] Am. Compl. ¶ 58.

[86] Am. Compl. ¶ 59.

[87] Am. Compl. ¶ 60.

[88] Am. Compl. ¶ 61.

[89] Am. Compl. ¶¶ 36–37.

[90] *See CashCall, Inc.*, 2016 WL 4820635, at *11 (recognizing "the common maxim" that ignorance of the law is no excuse).

several significant allegations against Aramburu that establish his authority to control 1st Alliance and his knowledge of the unfair and deceptive acts and practices. These allegations include that: (1) 1st Alliance's chief compliance officer raised concerns to senior company leaders, including Aramburu, that activities SCs were engaging in could require licensing under federal and state SAFE Acts;[91] and that (2) Aramburu knew of and approved all aspects of 1st Alliance's business model (including the duties assigned to SCs, HLCs, and MLOs), policies and procedures, and sales practices that underlie Counts Three, Four, and Five.[92]

### 3. The Amended Complaint adequately distinguishes the Individual Defendants.

Defendants assert that the Amended Complaint should be dismissed because it impermissibly "lumps" the Individual Defendants together.[93] The Amended Complaint refers to the three Individual Defendants collectively, however, because each engaged in the wrongdoing alleged in the Amended Complaint. As the Court in *RD Legal Funding* explained, "[n]othing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant."[94] Further, "[a]t this stage of the proceedings, the Government is not required to plead specific details as to which entity did what during the alleged course of

---

[91] Am. Compl. ¶ 35.

[92] Am. Compl. ¶¶ 90, 106, 114.

[93] Indiv. MTD Br. at 12–14.

[94] *RD Legal Funding*, 332 F. Supp. 3d at 771 (quoting *Vantone Grp. LLC*, 2015 WL 4040882, at *3).

misconduct."[95] The Amended Complaint provides each Individual Defendant with adequate notice of the claims against each of them and thus should not be dismissed.

## Conclusion

The Bureau has adequately pleaded claims against 1st Alliance in Counts One, Two, Six, and Nine, and against the Individual Defendants in Counts Three through Five. The Court should deny Defendants' motions to dismiss.[96]

[95] *RD Legal Funding*, 332 F. Supp. 3d at 771 (citation omitted); *see also Vantone Grp. LLC*, 2015 WL 4040882, at *4 ("'[P]rior to discovery, plaintiff need not explain the details of each defendant's role in the planning, funding, and executing [of] defendant's alleged joint [ ] scheme.'") (quoting *Hudak v. Berkley Grp., Inc.*, No. 3:13-cv-00089-WWE, 2014 WL 354676, at *4 (D. Conn. Jan. 23, 2014)).

[96] If the Court grants the Defendants' motion to dismiss, it should also grant leave to amend the Amended Complaint. Leave to amend a complaint should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).

Respectfully submitted,

*Counsel for Consumer Financial Protection Bureau*
Cara M. Petersen
*Acting Enforcement Director*
Jeffrey Paul Ehrlich
*Deputy Enforcement Director*
Owen Martikan
*Assistant Litigation Deputy*

/s/ Donald R. Gordon
Donald R. Gordon (Bar No. phv11058)
donald.gordon@cfpb.gov
Phone: (212)328-7011
Amanda Lewis (Bar No. phv11057)
amanda.lewis@cfpb.gov
Phone: (202)360-9204
Fax: (703)642-4585
1700 G Street, NW
Washington, DC 20552

Local Counsel:
Sarah Gruber (Bar No. ct29918)
Assistant United States Attorney
Phone: (203)821-3700
Fax: (203)773-5373
sarah.gruber@usdoj.gov
United States Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510

**Certificate of Service**

I hereby certify that on June 15, 2021, a copy of the foregoing Consolidated Memorandum of Law in Opposition to Defendants' Motion to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Donald R. Gordon
Donald R. Gordon
Counsel for Plaintiff