**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BUREAU of CONSUMER FINANCIAL PROTECTION<br>Plaintiff,<br><br>v.<br><br>1st ALLIANCE LENDING, LLC; JOHN DIIORIO; KEVIN ST. LAWRENCE; AND SOCRATES ARAMBURU,<br>Defendants. | ) | Case No. 3:21-CV-00055-RNC |

**DEFENDANT 1st ALLIANCE'S REPLY**
**IN SUPPORT OF ITS MOTION TO DISMISS**

DATE: June 29, 2021


Mitchel H. Kider, pro hac vice
Michael Kieval, pro hac vice
Jeffrey Blackwood, pro hac vice
WEINER BRODSKY KIDER PC
1300 19th St NW, 5th Floor
Washington, D.C. 20036
Tel: 202-628-2000
Fax: 202-628-2011
Email: kider@thewbkfirm.com
kieval@thewbkfirm.com
blackwood@thewbkfirm.com

Ross Garber
The Garber Group LLC
100 Pearl St., 14th Floor
Hartford, CT 06103
Tel: (860) 983-5145
Fax: (860) 983-5145
Email: rgarber@thegarbergroup.com

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. Count 1 ........ 1

A. The CFPB Has Not Shown Statutory Authority to Add to TILA ........ 2

B. The CFPB's Bare Legal Conclusions Should be Ignored ........ 4

C. The CFPB Failed to Respond Concerning Pennsylvania and Montana ........ 5

D. The CFPB Misinterprets Regulation H ........ 6

II. Count 2 ........ 6

III. Count 6 ........ 8

IV. Count 9 ........ 10

CONCLUSION ........ 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662, (2009)........................................ 7

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
140 S. Ct. 1891 (2020)........................................ 3

*Dimuro v. Clinique Labs., LLC*,
572 F. App'x 27 (2d Cir. 2014) ........................................ 9

*FTC v. Lights of Am., Inc.*,
760 F. Supp. 2d 848 (C.D. Cal. 2010) ........................................ 9

*Meserole v. Sony Corp. of Am., Inc.*,
No. 08 Cv. 8987, 2009 U.S. Dist. LEXIS 42772 (S.D.N.Y. May 18, 2009)........................ 9

**Statutes, Rules, and Regulations**

12 C.F.R. § 1014.3........................................ 9

12 C.F.R. § 1026.2(a)(3)(ii)........................................ 8

12 C.F.R. § 1026.36(f)........................................ 2

12 C.F.R. 1026, Supplement I – Official Interpretations (Part II of V)........................ 8

15 U.S.C. § 1602........................................ 6

15 U.S.C. § 1607........................................ 2

15 U.S.C. § 1639b(b)........................................ 2

15 U.S.C. § 1639b(b)(1)(A)........................................ 2

7 Pa. Cons. Stat. Ann. § 6102 ........................................ 4, 5

78 Fed. Reg. 11279 .......... 3

78 Fed. Reg. 80083 .......... 8

Mont. Code Ann. § 32-9-103 .......... 5

Federal Rule of Civil Procedure 12(b) .......... 5

Federal Rule of Civil Procedure 12(e) .......... 5

Federal Rule of Civil Procedure 8 .......... 6

Federal Rule of Civil Procedure 9(b) .......... 6, 9

Vt. Stat. Ann. tit. 8, § 2200 .......... 5, 6

## INTRODUCTION

Defendant 1st Alliance Lending, LLC ("1st Alliance") has moved to dismiss Counts 1, 2, and 6 (and Count 9 to the extent it incorporates those Counts), for failure to state a claim.

While 1st Alliance strongly disputes the CFPB's allegations in the Amended Complaint (Dkt. 27) as a whole, its Motion to Dismiss (the "Motion") is limited to specific, serious pleading deficiencies in three counts: Count 1, which cites no statutory provision, is based on a regulatory provision that lacks statutory basis, and purports to incorporate the distinct laws of more than forty states without listing them or explaining how any one of them (let alone each one of them) was allegedly violated; Count 2, which tries to extend a regulation concerning when to issue a Loan Estimate in *response* to an application, to cover circumstances in which there *is no* application; and Count 6, a claim for purportedly deceptive communications about loan terms that does not identify a single communication, or a loan term that the communication was supposedly deceptive about, or any of the other elements of that claim as required by Rule 9. (1st Alliance also seeks dismissal of Count 9 to the extent it incorporates Counts 1, 2, and 6, and it appears that the CFPB does not really dispute this argument.)

The CFPB's response to the Motion (the "Opposition"), Dkt. 36, fails to cure these deficiencies and fails even to address some of 1st Alliance's arguments.

## ARGUMENT

### I. Count 1

The CFPB's arguments fail to rescue Count 1 because no federal statute prohibits the conduct in question and the regulation exceeds the CFPB's authority; the allegations in Count 1 are a conclusory recitation of the elements of the claim, not facts; and the CFPB's insistence that all of the states' laws are the same cannot survive its failure to respond to 1st Alliance's

demonstration that Pennsylvania and Montana, for example, are not the same. Additionally, the CFPB's brief argument concerning Regulation H is irrelevant and incorrect.

A. The CFPB Has Not Shown Statutory Authority to Add to TILA

Nothing in TILA says that the CFPB can sue a company in federal court for employees' alleged violations of one or more states' licensing laws, and the authority to write Regulation Z did not give the CFPB the power to add requirements that TILA does not impose absent a specific statutory grant of authority to do so, which the CFPB has not validly identified. Indeed, neither the Amended Complaint nor the Opposition identifies any statute authorizing it to bring this action under TILA.[1]

The CFPB points to two entirely inapplicable statutory provisions as supporting the regulation underlying Count 1. First, it asserts that "Congress, in 15 U.S.C. § 1639b(b)(1)(A), expressly contemplated that loan originators' compliance with TILA § 129B(b) would be '[s]ubject to regulations' prescribed by the Bureau." Opp. at 4. But that section of TILA covers qualifications for a "mortgage originator," and does not require companies to ensure the licensing of their employees. 15 U.S.C. § 1639b(b)(1)(A). TILA may be "subject to regulations," but that does not resolve whether a given regulation is an explanation or implementation of that statutory provision, or (as is the case here) purports to change the statutory provision or add something to it that Congress did not provide. Indeed, the challenged provision of Regulation Z, unlike the statute, applies to a Bureau-created term, "loan originator," 12 C.F.R. § 1026.36(f), not the statutory term "mortgage originator," 15 U.S.C. § 1639b(b).

[1] In light of this ongoing failing, 1st Alliance continues to assume that the CFPB is proceeding under 15 U.S.C. § 1607; to the extent that the CFPB may later cite a different statute for authority, it should not be permitted to do so.

That belies the CFPB's argument that the Regulation Z provision at issue in Count 1 is interpreting or implementing TILA § 129B(b)—it does not even use the same terminology.

Second, the CFPB asserts that it was authorized "to prohibit or condition terms, acts, or practices . . . *when the Bureau finds* the terms, acts, or practices *are not in the interest of the consumer*." Opp. at 4 (quoting Loan Originator Compensation Rule, 78 Fed. Reg. 11279, 11293 (Feb. 15, 2013) (emphasis added)). But the CFPB does not really claim to have made the required finding. Indeed, rather than finding that a specific practice is "not in the interests of the consumer," the CFPB here merely claims that it thought that "requiring loan originator organizations to ensure that their individual loan originators are licensed '*benefit[s] consumers* by giving them recourse . . . .'" Opp. at 4 & n.9 (emphasis added). That is not enough.[2] *See Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) ("An agency must defend its actions based on the reasons it gave when it acted.").

Finally, the CFPB warns of an imaginary "blueprint for evasion" if the Court fails to approve the CFPB's power grab under Regulation Z, as if the states are powerless to enforce their own laws. Opp. at 5. But it makes no sense to complain that interpreting a federal statute according to its terms could permit a company to evade state law requirements that are enforceable by those states under their own laws, if the states themselves believed that their laws had been violated.

---

[2] First, the quoted sentence from the rulemaking is not framed as a finding. Rather, the Bureau said, without factual support: "In any case, imposing this duty on loan originator organizations will benefit consumers by giving them recourse if an individual who has failed to obtain a loan originator license nonetheless acts as a loan originator for the benefit of the loan originator organization and causes harm to a consumer in originating the loan." 78 Fed. Reg. at 11376. Second, many things might "benefit consumers," such as requiring cash payments to consumers or decreasing interest rates. But that would not permit the CFPB to impose such rules based on the provision that it has cited here. Rather, the statute requires at a minimum a *finding* by the CFPB of a "practice" that is "not in the interests of the consumer." The CFPB did not make such a finding here.

B. The CFPB's Bare Legal Conclusions Should be Ignored

Contrary to the CFPB's assertion that it has pled facts to support Count 1, the "facts" supposedly pled are actually mere recitations of the elements of the claim. *See* Opp. at 6-7 (citing Am. Compl. ¶¶ 17-37, 65-66, 68-70, 72-73). Essential factual assertions—like identifying even a single employee who should have been licensed but was not, or a single state in which he or she should have been licensed but was not, or the factual basis for why that particular state would have required his or her licensure—are completely absent.

1st Alliance previously explained (1st Alliance Memo at 13, Dkt. 33-1) the importance of allegations concerning the frequency that would be necessary in order to trigger each state's requirements. The CFPB has responded by noting some general allegations concerning frequency (Opp. at 8-9), but that misses the point. It doesn't matter how often some unlicensed employees in general allegedly did certain things. Rather, because the very state statutes that the CFPB refuses to identify but would have to incorporate into its claims may themselves only be triggered by habitual activity (for example, 7 Pa. Cons. Stat. Ann. § 6102, *see* 1st Alliance Memo at 13 n.4), the CFPB needed to allege that each individual habitually engaged in these acts with respect to the specific state in question. By contrast, if hypothetically a single unlicensed individual supposedly engaged in the activity in question in various states but not habitually in any of them, then none of the state licensing laws that require habitual conduct would be triggered, and therefore the provision of Regulation Z that itself incorporates state licensing thresholds—but does not create any additional licensing thresholds—would not be implicated. Thus, by refusing to provide any detail whatsoever on a state-by-state basis, the CFPB has failed to plausibly allege that Regulation Z was violated at all, let alone to provide enough information

for 1st Alliance to defend itself.

C. The CFPB Failed to Respond Concerning Pennsylvania and Montana

While the CFPB claims it is "enforcing TILA, through Regulation Z," Opp. at 8, the allegations in Count 1 are in fact predicated on state law violations that the CFPB has not pled. *See* 1st Alliance Memo at 10-14. If the CFPB cannot identify any state law violations that would support its claims, they should be dismissed.[3] Yet the CFPB refuses, asserting that, because it is not enforcing state law, it need not enumerate the state laws that form the alleged violations. *See* Opp. at 8. But the CFPB *is* seeking to enforce state law, alleging violations of state licensing laws that are *more restrictive* than the federal SAFE Act. *See* Opp. at 7-8.

1st Alliance cannot adequately respond to the Complaint without knowing what state laws are at issue as there are significant differences in state licensing regimes. *See* 1st Alliance Memo at 12-14. While declining to identify all of the state laws on which its claims are based, the CFPB's Opposition singles out the law of Vermont (one of three states' laws provided as examples by 1st Alliance), arguing that "what Vermont defines as licensable activity *augments*, rather than limits" the federal SAFE Act's designation of licensable activity. *See* Opp. at 7-8 (emphasis added). But this line of argument proves 1st Alliance's point. The CFPB cites Vermont, but disregards the laws of Pennsylvania and Montana, the two other states referenced in 1st Alliance's brief. *Compare, e.g.*, Mont. Code Ann. § 32-9-103 *with* Vt. Stat. Ann. tit. 8, § 2200. For example, in Pennsylvania, an individual may be considered a "mortgage originator" only if he or she engages in specified conduct "in a commercial context and habitually and repeatedly." 7 Pa. Cons. Stat. Ann. § 6102. But Montana contains no such provision. *See* Mont.

[3] Indeed, although 1st Alliance challenged this pleading failure under Rule 12(e), under the authority that 1st Alliance cited previously, (1st Alliance Memo at 7), the Court is free to use either Rule 12(b) or Rule 12(e).

Code Ann. § 32-9-103. And neither does TILA. *See* 15 U.S.C. § 1602.[4]

Simply asserting broadly that 1st Alliance violated the laws of every state does not satisfy pleading standards under either Rule 9(b) or Rule 8 when the potentially applicable laws are different, as 1st Alliance has shown and the CFPB has failed to refute.

D. The CFPB Misinterprets Regulation H

The CFPB asserts that "because 1st Alliance itself performed origination activities 'with a degree of habitualness and repetition,' unlicensed employees acting on its behalf 'engaged in the business of a loan originator' under Regulation H and thus were subject to licensing requirements." Opp. at 8-9. This argument is wrong. The cited provision of Regulation H simply does not resolve the question whether an individual was required to be licensed under any particular state law. That question has to be evaluated under each state's law, because (as explained in 1st Alliance's Motion) the federal SAFE Act does not impose *any* requirements on individuals or companies, but rather applies to the states themselves (and also to a limited extent if a state failed to implement a licensing regime at all). If an individual does not meet the test for needing to be licensed under state law, it is not relevant whether Regulation H considers him or her to be "engaged in the business of a loan originator." The question is ever and always under each state's law, not under the federal SAFE Act (which, as noted previously, actually includes a standard that would *not* require the SCs and HLCs to be licensed).

## II. Count 2

The CFPB has three arguments on Count 2, none of which overcomes the deficiencies in

[4] Confusing the issue further, Vermont has a different standard. Vermont states that "engaging in the business of a mortgage loan originator" means to "to hold oneself out as acting as, or to represent to the public that one can provide the services of, a mortgage loan originator, in a commercial context, and with *some* degree of habitualness or repetition." Vt. Stat. Ann. tit. 8, § 2200 (2) (emphasis added).

the Amended Complaint: that the motion to dismiss 1) “cites to no case law”; 2) “is premised on a misreading of the CFPB regulation”; and 3) “omits contrary, controlling language” from the CFPB’s commentary. Opp. 9-11. No court appears to have addressed the specific Regulation Z provision at issue here, 12 C.F.R. § 1026.19(e)(2)(iii), which is why the CFPB itself also cites no case law. In any case, the CFPB’s strained interpretation of the regulation should be rejected.[5]

Section 1026.19(e)(2)(iii) is a single sentence.[6] According to the plain language of Regulation Z, the CFPB’s theory in Count 2 is missing a critical condition needed for Section 1026.19(e)(2)(iii) to apply: The CFPB did not allege that 1st Alliance received an application—defined very narrowly in Regulation Z—which would have triggered the Loan Estimate requirement. 1st Alliance Memo at 15-16. Regulation Z only prohibits “requir[ing] a consumer to submit documents verifying information *related to the consumer’s application* before providing the disclosures.” 12 C.F.R. § 1026.19(e)(2)(iii) (emphasis added). Moreover, this condition is reinforced in the CFPB’s own commentary (ignored by the CFPB in the Opposition), which directs the reader to “[s]ee also § 1026.2(a)(3) and the related *commentary regarding the definition of application*.” 12 C.F.R. 1026, Supplement I – Official Interpretations

---

[5] The CFPB also contends that it has provided a “short and plain statement of the facts underlying the claim in Count 2” because it alleges that “following company policy, 1st Alliance employees regularly required consumers to submit documents for verification before issuing the consumer a Loan Estimate.” Opp. at 11 (citing Am. Compl. ¶ 3). With nothing more, this single conclusory allegation is exactly the type of “[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements” that the Supreme Court has held “do not suffice.” *Ashcroft v. Iqbal*, 556 U.S. 662, 678-9 (2009).

[6] The “critical passage” and purported “contrary, controlling language” from the commentary that the CFPB complains was omitted by 1st Alliance, *see* Opp. at 9-10, merely recites and rearranges the single sentence provision of Section 1026.19(e)(2)(iii). *Compare* 12 C.F.R. § 1026.19(e)(2)(iii) (“The creditor or other person shall not require a consumer to submit documents verifying information related to the consumer’s application before providing the disclosures required by paragraph (e)(1)(i) of this section”) *with* 12 C.F.R. § 1026, Supplement I – Official Interpretations (Part II of V) (“[T]he creditor or other person is not permitted to require, before providing the disclosures required by § 1026.19(e)(1)(i), that the consumer submit documentation to verify the information collected from the consumer.”).

(Part II of V) (emphasis added). The CFPB claims 1st Alliance's interpretation of Section 1026 is "nonsensical," but fails to explain why the application condition should not apply here.

Rather, the CFPB argues that the requirement of an application is not dispositive because the regulation in question does not speak of a "completed application." Opp. at 11. But that proves 1st Alliance's point—the regulation does not define an incomplete "application" as opposed to a hypothetical "completed" application. Rather, the regulation recognizes that to have an "application" *at all*, a lender must receive six pieces of information. 12 C.F.R. § 1026.2(a)(3)(ii).

This makes sense in the context of the changes that the TRID Rule as a whole made. Previously, an application under RESPA required seven elements—the six that are still in the regulation, plus a seventh catch-all that permitted a lender to impose any other conditions that it wanted before providing the initial disclosures of estimated settlement costs.[7] TRID removed the ability to delay those initial disclosures based on company-specific requirements, and specifically prohibited delaying an LE under circumstances that would have been permissible previously.[8] That is what the cited provision was for—not an attempt to vaguely and indirectly regulate a lender's requirement of information (which the Commentary specifically notes was still permitted) *prior* to an "application"—as defined—being received.

## III. Count 6

Count 6 of the Amended Complaint asserts that "1st Alliance committed material

---

[7] *See* Integrated Mortgage Disclosures under the Real Estate Settlement Procedures Act (Regulation X) and the Truth In Lending Act (Regulation Z), 78 Fed. Reg. 80083 (December 31, 2013) ("The seventh item could allow creditors and mortgage brokers to delay providing the integrated Loan Estimate until after collection of the six specific items, to collect any information they deem 'necessary.' The final rule removes the seventh item ('any other information deemed necessary by the creditor') from the definition of 'application.'").

[8] *Id.*

misrepresentations in commercial communications with consumers, in violation of the MAP Rule." Am. Compl. ¶ 123. The CFPB argues that application of the Rule 9(b) heightened pleading standard to claims brought under the MAP Rule is "inappropriate" and claims instead that "consumer-protection statutes . . . like the MAP Rule, are strict-liability laws that lack any scienter element." Opp. at 12. But as previously explained, under Second Circuit precedent, Rule 9(b) applies to claims alleging fraud or mistake even if they lack a scienter element. 1st Alliance Memo at 17.[9] Furthermore, application of 9(b) to consumer protection claims that sound in fraud aligns with the policy reasons for both Rule 9(b) and the remedial nature of consumer protection statutes, contrary to the CFPB's argument. Opp. at 12. In fact, Rule 9(b) has been applied in a broad range of cases involving consumer protection issues, including alleged UDAP violations under the FTC Act.[10]

In any case, the CFPB has not pled facts to plausibly allege a single material misrepresentation in violation of the MAP Rule. The CFPB vaguely references nonspecific communications with consumers without explaining how they were misleading or material. *See* Am. Compl. ¶¶ 45-47, 121-22. The MAP Rule's concrete elements—"commercial communication" and "material misrepresentation," 12 C.F.R. § 1014.3—are entirely neglected in

---

[9] In the interests of judicial economy, 1st Alliance adopts and incorporates by reference the Individual Defendants' briefing on the applicability of Rule 9(b) to consumer protection claims in Argument Section I of the Individuals' Reply brief, rather than repeating those arguments here.

[10] *See, e.g., Dimuro v. Clinique Labs*., LLC, 572 F. App'x 27 (2d Cir. 2014) (putative class action involving allegations of false advertising) ("The complaint is riddled with repeated conclusory labels that Clinique's claims are 'false, misleading, and/or deceptive'. . . But no matter how many times Plaintiffs use these labels, they are not facts, and certainly not facts sufficient for Rule 9(b)."); *FTC v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 854 (C.D. Cal. 2010) ("a claim does not need to include all of the elements of a claim for fraud or negligent misrepresentation in order for it to trigger the heightened pleading standard of Rule 9(b)"); *Meserole v. Sony Corp. of Am., Inc.*, No. 08 Cv. 8987, 2009 U.S. Dist. LEXIS 42772, at *9 (S.D.N.Y. May 18, 2009) (collecting consumer protection act cases where 9(b) applies).

favor of indefinite filler language: "often," "could," "better," "no assurance," "frequently," and "repeatedly." *See* Am. Compl. ¶¶ 45-47, 121-22. Indeed, the CFPB does not identify a single specific misrepresentation, any particular speaker or consumer involved, when any misrepresentation may have occurred, or any other facts that would provide 1st Alliance enough information to prepare a defense, let alone establish the required elements of the alleged violation. For those reasons, Count 6 should be dismissed.

## IV. Count 9

Finally, the CFPB does not really dispute that Count 9 should be dismissed to the extent that the underlying claims are dismissed. Opp. at 14 (arguing because "the substantive claims in those counts should survive 1st Alliance's motion, the claims in Count Nine should as well.").

## CONCLUSION

For the reasons set forth above, Counts 1, 2, 6, should be dismissed, and Count 9 should be dismissed to the extent it incorporates any other dismissed Count.

DATE: June 29, 2021

Respectfully submitted,

*/s/ Mitchel H. Kider*

Mitchel H. Kider, *pro hac vice*
Michael Kieval, *pro hac vice*
Jeffrey Blackwood, *pro hac vice*
WEINER BRODSKY KIDER PC
1300 19th St NW, 5th Floor
Washington, D.C. 20036
Tel: 202-628-2000
Fax: 202-628-2011
Email: kider@thewbkfirm.com
kieval@thewbkfirm.com
blackwood@thewbkfirm.com

Ross Garber
The Garber Group LLC
100 Pearl St., 14th Floor

Hartford, CT 06103
Tel: (860) 983-5145
Fax: (860) 983-5145
Email: rgarber@thegarbergroup.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2021, a copy of the foregoing Motion was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Mitchel H. Kider*
Mitchel H. Kider