UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CONSUMER FINANCIAL PROTECTION    :
BUREAU,                          :
                                 :
    Plaintiff,                   :
                                 :
v.                               :    Case No. 3:21-cv-55 (RNC)
                                 :
1ST ALLIANCE LENDING, LLC, JOHN  :
CHRISTOPHER DIIORIO, KEVIN       :
ROBERT ST. LAWRENCE, and         :
SOCRATES ARAMBURU,               :
                                 :
    Defendants.                  :

<u>RULING AND ORDER</u>

    The Consumer Financial Protection Bureau ("CFPB") brings this suit against 1st Alliance Lending, LLC ("1st Alliance") and its owners and corporate officers John DiIorio, Kevin St. Lawrence, and Socrates Aramburu ("the individual defendants"), alleging violations of federal consumer financial laws.  1st Alliance has moved to dismiss the Amended Complaint in part, and has moved in the alternative for a more definite statement as to Count One.  The individual defendants have moved to dismiss all claims against them.  For the reasons below, 1st Alliance's motion is denied, and the individual defendants' motions are granted in part and denied in part.

I.   <u>Background</u>

    The Amended Complaint alleges the following.  1st Alliance is a non-depository mortgage company, ECF No. 27 ¶ 1.  At all

relevant times, DiIorio was 1st Alliance's CEO, id. ¶ 13, St. Lawrence was its President of Production, id. ¶ 14, and Aramburu was its President of Capital Markets, id. ¶ 15.

From around 2015 to 2019, 1st Alliance's business model relied on sales employees called Submission Coordinators ("SCs") or Home Loan Consultants ("HLCs"), who were the "primary consumer point of contact throughout the mortgage-origination process." Id. ¶¶ 18-21. As such, the SCs/HLCs performed duties that would have required them to hold a mortgage-originator license in every state in which 1st Alliance operated, id. ¶ 22, but 1st Alliance never required its SCs or HLCs to be licensed in any state, id. ¶ 23. By 2017, 1st Alliance's compliance department began raising concerns to company leaders, including the individual defendants, that SCs were engaging in activities that would require licensing under state and/or federal law. Id. ¶¶ 35-36.

Unlicensed SCs/HLCs held themselves out as licensed via solicitation emails and social media profiles. Id. ¶ 48-50. Further, 1st Alliance representatives required prospective borrowers to submit certain documents before receiving Loan Estimates, id. ¶ 76, denied them credit without giving required written notices, id. ¶¶ 38-41, and made false and misleading statements regarding their eligibility for refinancing programs and those programs' terms, id. ¶¶ 44-47.

Each individual defendant was "responsible for and approved 1st Alliance's business model, including the particular duties assigned under that model to unlicensed personnel such as SCs and HLCs, as well as to licensed MLOs." Id. ¶ 55.  Each one also had "knowledge of and approved" 1st Alliance's "policies and procedures," including those related to federal and state licensing laws, as well as its "sales practices and the specific functions performed by those in particular job roles." Id. ¶¶ 56-57; 62.

DiIorio, as CEO, was responsible for the day-to-day executive management of 1st Alliance, and "frequently interacted with others at 1st Alliance concerning the structure and nature of the company's mortgage-origination business, including the specific roles played in that structure by sales staff and others, including SCs, HLCs, and MLOs.  DiIorio directed and approved changes to those roles and interacted with 1st Alliance's compliance and legal functions in doing so." Id. ¶ 58.  St. Lawrence, as President of Production, was responsible for and oversaw the structure and operation of sales, which included SCs, HLCs, and MLOs.  Id. ¶ 60.  He also controlled the offices where the sales staff worked and where the call center was located.  Id. ¶ 61.

Counts One and Two charge 1st Alliance with violating Regulation Z, which implements the Truth in Lending Act

3

("TILA"), by failing to ensure that its loan officers were licensed and requiring verifying documents from the consumer before a Loan Estimate was issued.  Counts Three, Four, and Five charge all defendants with violating the Consumer Financial Protection Act of 2010 ("CFPA") by engaging in deceptive and unfair acts and practices.  Count Six charges 1st Alliance with violating the Mortgage Acts and Practices ("MAP") Rule by making material misrepresentations to consumers.  Counts Seven and Eight charge 1st Alliance with violating the Equal Credit Opportunity Act ("ECOA") and the Fair Credit Reporting Act ("FCRA") by failing to provide required notices to consumers who were denied credit.  Finally, Count Nine charges 1st Alliance with violating the CFPA based on its violations of "federal consumer financial law."

1st Alliance has moved to dismiss Counts One, Two, Six, and Nine (to the extent it incorporates Counts One, Two, and Six) for failure to state a claim.  ECF No. 33.  The individual defendants have moved to dismiss all claims against them.  ECF No. 32.

I.  Legal Standard

Under Rule 12(b)(6), a complaint is properly dismissed when it fails to state a claim upon which relief may be granted.  To withstand a properly supported motion to dismiss under this Rule, a complaint must present a claim that is "plausible on its

face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  The
plausibility standard requires a plaintiff to plead factual
allegations permitting a reasonable inference that the defendant
is liable for the alleged wrong.

   II.  1st Alliance's Motion to Dismiss

   a. Count One: Regulation Z — Failing to Ensure that Loan
      Originators Were Licensed

   The CFPB alleges in Count One that 1st Alliance failed to
ensure that its SCs and HLCs were licensed, in violation of
Regulation Z.  12 C.F.R. § 1026.1.  Regulation Z was promulgated
to implement the Truth in Lending Act ("TILA"), 15 U.S.C § 1601
et seq., which was itself enacted to encourage the informed use
of credit by assuring meaningful disclosure of credit terms to
consumers.  Under Regulation Z, a "loan originator organization"
must ensure that "each individual loan originator who works for
[it] is licensed" to the extent required "under the SAFE Act,
its implementing regulations, and State SAFE Act implementing
law before the individual acts as a loan originator in a
consumer credit transaction secured by a dwelling."  12 C.F.R.
§ 1026.36(f)(2).

   The Secure and Fair Enforcement for Mortgage Licensing Act
of 2008 ("SAFE Act"), 12 U.S.C. § 5101, et seq., encouraged
states to implement state versions of the SAFE Act, with the
minimum standards in the federal statute as a floor.  12 C.F.R.

§ 1008.1(b).  The federal SAFE Act defines "loan originator" as
an individual who (A) takes a residential mortgage loan
application and (B) offers or negotiates terms of a residential
mortgage loan for compensation or gain.  12 U.S.C. § 5102(4)
(emphasis added).  Under its implementing regulations, an
individual engages in the business of a loan originator if the
individual, "in a commercial context and habitually or
repeatedly: (i) takes a residential mortgage loan application;
and (ii) offers or negotiates terms of a residential mortgage
loan compensation or gain."  12 C.F.R. § 1008.103(a)(b)(1)
(emphasis added).

     CFPB alleges that since enactment of the SAFE Act, every
state has enacted implementing legislation that expands the
category of individuals who must be licensed by broadening the
definition of "loan originator" to include an individual who,
for compensation or gain or the expectation of compensation or
gain, either "takes a residential mortgage loan application" or
"offers or negotiates terms of a residential mortgage loan."
ECF No. 27 ¶ 68.  It also alleges that each SC and HLC performed
either or both of the above functions, so that in every state in
which 1st Alliance operated, they should have been licensed
under state SAFE Acts.  Id. ¶ 72.  Because Regulation Z requires
1st Alliance to ensure that its employees are licensed in
compliance with the federal and state SAFE Acts, CFPB alleges,

1st Alliance violated Regulation Z (and therefore TILA, which Regulation Z implements).

1st Alliance contends that this count must be dismissed on the ground that, although TILA and the federal SAFE Act each require licensing for statutorily defined "loan originators" (or "mortgage originators"), neither statute requires a creditor to ensure that its individual employees are licensed and, to the extent Regulation Z does so, it constitutes an impermissible exercise of agency authority.  ECF No. 33 at 9-10.

This argument is unavailing.  TILA, as amended by the Dodd-Frank Act, provides in part that "[s]ubject to regulations prescribed under this subsection, each mortgage originator shall . . . be qualified and, when required, registered and licensed as a mortgage originator in accordance with applicable State or Federal law, including the Secure and Fair Enforcement for Mortgage Licensing Act of 2008."  15 U.S.C. § 1639b(b).  And TILA directs the Bureau to "prescribe regulations to carry out the purposes of [TILA]," which "may contain such additional requirements, classifications, differentiations, or other provisions . . . as in the judgment of the Bureau are necessary or proper to effectuate the purposes of [TILA], to prevent circumvention or evasion thereof, or to facilitate compliance therewith."  15 U.S.C. § 1604(a).  In other words, in order for a mortgage originator to be qualified in compliance with TILA,

it must also comply with requirements promulgated by the CFPB. One such requirement obligates loan originator organizations to ensure that individual loan originators working for them are licensed or registered as required by state and federal laws. This requirement is clearly authorized by the statutory grant of authority — if loan originator organizations were allowed to employ unlicensed loan originators to do work that requires a license under state and federal law, TILA's requirement that mortgage originators comply with state and federal licensing requirements would lack efficacy.

1st Alliance's argument that Regulation Z uses the term "loan originator" rather than "mortgage originator," as TILA does, and therefore cannot be an interpretation of TILA, is unpersuasive.  The SAFE Act, i.e., the main federal statute governing licensing, which TILA references, uses "loan originator."[1]

Alternatively, 1st Alliance moves under Fed. R. Civ. P. 12(e) for a more definite statement of the state licensing laws it allegedly violated.  1st Alliance argues that because the

_____

[1] Because I conclude that Regulation Z is authorized under § 105(a) of TILA, I do not address CFPB's argument based on § 129B(e) of TILA, which authorizes the Bureau "to prohibit or condition terms, acts, or practices relating to residential mortgage loans on a variety of bases, including when the Bureau finds the terms, acts, or practices are not in the interest of the consumer."  ECF No. 36 at 4.

applicable state statutes are not listed in the Amended
Complaint, it is unable to prepare a defense.  ECF No. 33 at 11-
12.  CFPB responds that it is suing under federal law, not state
law, and need not plead each state statute in detail since they
do not differ in ways material to this claim.

1st Alliance's argument has some force.  But there is no
need for repleading because 1st Alliance can obtain the
information it seeks through a contention interrogatory.  See
Fed. R. Civ. P. 33(a)(2).  At oral argument, all counsel
expressed support for this approach.  Accordingly, 1st
Alliance's motion with regard to Count One is denied.

b. Count 2: Regulation Z — Requiring Consumers to Submit
   Verifying Documents Before Providing a Loan Estimate

Regulation Z provides that a creditor "shall not require a
consumer to submit documents verifying information related to
the consumer's application before providing" disclosures known
as a Loan Estimate.  12 C.F.R. § 1026.19(e)(2)(ii), (iii).  1st
Alliance argues that asking for verifying documentation before
providing a loan estimate would not violate Regulation Z for two
reasons: first, because the prohibition on requiring verifying
information is triggered only when the "application" is
complete; and second, because the regulation's Official
Commentary provides that "the creditor . . . may collect from
the consumer any information that it requires prior to providing

9

the early disclosures . . . ." 12 C.F.R. § 1026, Supp. I, Part 2.  Neither argument is persuasive.

Defendant's contention that "the Loan Estimate disclosure requirement is not triggered until a lender obtains all six parts of the 'application,'" ECF No. 33 at 15-16,[2] (because before that moment no completed "application" exists) is untenable.  As CFPB points out, under that interpretation of Regulation Z, lenders "(1) <u>may</u> require verifying documents from a consumer until the consumer submits an application; then (2) <u>may not</u> require such documents until a Loan Estimate is issued; and then (3) <u>may</u> require such documents again."  ECF No. 36 at 10.  This strained reading would undermine the regulation's purpose, which is "to prevent overly burdensome documentation demands on mortgage applicants, and to facilitate shopping by the consumer."  Final Rule, Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth In Lending Act (Regulation Z), 78 Fed. Reg. 79730, 79816 (Dec. 31, 2013) (to be codified at 12 C.F.R. Parts 1024 and 1026).

---

[2] These components are "the consumer's name, the consumer's income, the consumer's social security number to obtain a credit report, the property address, an estimate of the value of the property, and the mortgage loan amount sought."  12 C.F.R. § 1026.2(a)(3).

And, while the rule's commentary says a lender can collect "information," prior to providing a loan estimate, "the creditor . . . is not permitted to require, before providing the [Loan Estimate], that the consumer submit <u>documentation to verify</u> the information collected from the consumer," 12 C.F.R. Pt. 1026, Supp. I, Part 2 (emphasis added), which is what the Amended Complaint alleges 1st Alliance did.  ECF No. 27 ¶ 76.

Finally, 1st Alliance asserts that the Amended Complaint fails to plead "a single instance, example, or practice" of the conduct at issue in Count Two.  But the Amended Complaint alleges, among other things, a practice: "Following company policy, 1st Alliance employees regularly required consumers to submit documents for verification before issuing the consumer a Loan Estimate, in violation of the Truth in Lending Act and Regulation Z."  ECF No. 27 ¶ 3.  Accordingly, 1st Alliance's motion is denied as to Count Two.

  a. Count Six: MAP Rule

The MAP Rule prohibits "any person" from "mak[ing] any material misrepresentation, expressly or by implication, in any commercial communication, regarding any term of any mortgage credit product."  12 C.F.R. § 1014.3.  CFPB alleges that 1st Alliance representatives violated the MAP rule by making false and misleading statements to prospective borrowers regarding

their eligibility for refinancing programs and those programs'
terms.

        As a threshold matter, it is necessary to determine the
applicable pleading standard.  While the Federal Rules of Civil
Procedure generally require that a complaint include "a short
and plain statement of the claim showing that the pleader is
entitled to relief," Fed. R. Civ. P. 8(a)(2), Rule 9(b) provides
that "[i]n alleging fraud or mistake, a party must state with
particularity the circumstances constituting fraud or mistake."
Specifically, Rule 9(b)'s heightened standard requires a
complaint to "(1) specify the statements that the plaintiff
contends were fraudulent, (2) identify the speaker, (3) state
where and when the statements were made, and (4) explain why the
statements were fraudulent."  Rombach v. Chang, 355 F.3d 164,
170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12
F.3d 1170, 1175 (2d Cir. 1993)) (internal quotation marks
omitted).  1st Alliance urges me to apply Rule 9(b)'s standard,
because the conduct alleged "sounds in fraud."  Rombach, 355
F.3d at 171.  CFPB argues that claims based on consumer
protection laws, even if they involve elements of deception, are
not subject to Rule 9(b), in part because they are strict
liability laws with a remedial purpose.  ECF No. 36 at 12.

        The Second Circuit in Rombach held that Rule 9(b) applies
to securities claims brought under Section 11 and Section

12

12(a)(2) of the Securities Act of 1933 "when premised on averments of fraud," even though allegations of negligence would also trigger liability under the statute.  355 F.3d at 170.  In other words, under Rombach, Rule 9(b)'s applicability depends on "the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  Id. at 171.

But, as CFPB points out, Rombach is a private securities fraud case, and is therefore distinguishable from this consumer protection action.  Courts within this Circuit have declined to apply Rule 9(b)'s requirements in the context of consumer protection claims.  See Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC, 332 F. Supp. 3d 729, 768 (S.D.N.Y. 2018), amended, No. 17-CV-890 (LAP), 2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018), vacated and remanded, 828 F. App'x 68 (2d Cir. 2020), and aff'd in part, rev'd in part and remanded, 828 F. App'x 68 (2d Cir. 2020); see also People v. Debt Resolve, Inc., 387 F. Supp. 3d 358, 365 (S.D.N.Y. 2019) ("As other courts have reasoned, Rule 9(b) by its terms applies only to 'fraud or mistake,' and therefore its application to claims brought under consumer protection statutes is inappropriate, even if those claims have a 'deceptive dimension.'" (quoting Consumer Financial Protection Bureau v. Navient Corp., 3:17-CV-101, 2017 WL 3380530 at *24 (M.D. Pa. Aug. 4, 2017)).  But see Meserole v.

13

Sony Corp., No. 08 Cv. 8987, 2009 U.S. Dist. LEXIS 42772, at *9
(S.D.N.Y. May 18, 2009) ("[W]hile traditionally associated with
claims of securities fraud, Rule 9(b) has been applied to claims
of consumer fraud as well as claims relating to consumer
protection statutes").  Since Rombach, the Second Circuit has
declined to apply Rule 9(b) to state consumer protection law
claims when the cause of action "d[id] not require proof of the
same essential elements (such as reliance) as common-law fraud."
Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir. 2005).
Though the CFPB alleges 1st Alliance made misrepresentations "to
induce consumers to obtain a purchase mortgage," ECF No. 27 ¶ 9,
an allegation that may "sound in fraud," any material
misrepresentation would constitute a MAP Rule violation,
regardless of intent or reliance.  Accordingly, I will apply
Rule 8, not Rule 9(b).

1st Alliance argues that the Amended Complaint fails to
state a claim, given "CFPB does not identify a single specific
misrepresentation, any particular speaker or consumer involved,
when any misrepresentation may have occurred, or any other facts
that would provide 1st Alliance enough information to prepare a
defense, let alone establish the required elements of the
alleged violation." ECF No. 39 at 10.

The Amended Complaint alleges that 1st Alliance
representatives "repeatedly" told consumers they "would qualify

for one of 1st Alliance's mortgages" in situations in which "1st Alliance had already received information from the consumer that would disqualify the consumer from receiving a 1st Alliance mortgage" and 1st Alliance "later disqualified" the consumer. ECF No. 27 ¶ 121.  According to the Amended Complaint, 1st Alliance representatives "often" told consumers "that after six months of satisfactory payments, the consumer could obtain a significantly better rate through a Streamline refi than under [a] purchase mortgage," when, in fact, the representatives "had no assurance" that with on-time payments "the consumer would qualify for a Streamline refi loan" or "that the rate would be significantly better . . . ." Id. ¶¶ 45, 46; see also id. ¶ 122. Finally, the Amended Complaint alleges that 1st Alliance representatives "frequently told consumers that the consumer could obtain a Streamline refi at no cost to the consumer when, in fact, this was not true."  Id. ¶¶ 47; see also id. ¶ 122. These allegations are more than sufficient to meet the pleading standards of Rule 8.  Accordingly, the motion to dismiss Count Six is denied.

 b. Count Nine: CFPA Violations Based on Violations of Federal
    Consumer Financial Law

Count Nine claims that each violation alleged in counts one through eight "is also a violation of § 1036 of the CFPA."  ECF No. 27 ¶ 134.  Section 1036 of the CFPA contains a "catch-all"

provision that makes unlawful "any act or omission in violation
of a Federal consumer financial law[.]" 12 U.S.C.
§ 5536(a)(1)(A).  Because the counts alleging predicate
violations survive, so does Count Nine.

   III. Individual Defendants' Motion to Dismiss

      Counts three, four, and five allege that the defendants
violated the CFPA's prohibition on unfair, deceptive, or abusive
acts or practices ("UDAAP"). 12 U.S.C. §§ 5531(a),
5536(a)(1)(B).  The individual defendants have moved to dismiss
all three counts for failure to state a claim.

   a. Applicable Pleading Standard

   Here again, the parties disagree as to the applicable pleading
standard.  Courts are divided on the issue. See CFPB v. Prime
Mktg. Holdings, LLC, 2016 WL 10516097 at *16 (C.D. Cal. Nov. 15,
2016).  But "the overwhelming weight of precedent" militates
against applying Rule 9(b) to CFPA claims, CFPB v. Think Fin.,
LLC, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *8 (D. Mont. Aug.
3, 2018), including at least one case from within this circuit,
CFPB v. RD Legal Funding, LLC, 332 F. Supp. 3d at 768.
Therefore, I will apply the Rule 8 standard.

   b. Individual Liability Standard

      The parties disagree as to the standard for individual
liability for UDAAP violations under the CFPA.  CFPB favors the
standard used to determine individual liability under the

Federal Trade Commission Act ("FTCA").  Under the FTCA, individuals may be liable for unfair or deceptive acts and practices when they "participated directly in the practices or acts or had authority to control them" and "had or should have had knowledge or awareness" of the misconduct."  FTC v. Moses, 913 F.3d 297, 307 (2d Cir. 2019).

CFPB cites several cases, including from within this circuit, applying the FTCA's individual liability standard to CFPA cases.  CFPB v. NDG Fin. Corp., No. 15-CV-5211, 2016 WL 7188792, at *17 (S.D.N.Y. Dec. 2, 2016); CFPB v. Gordon, 819 F.3d 1179, 1193 n.8 (9th Cir. 2016); CFPB v. CashCall, Inc., No. cv-15-7522, 2016 WL 4820635, at *11 (C.D. Cal. Aug. 31, 2016).

Defendants counter that the individuals in those cases did not contest application of the FTCA standard, and they cite the Supreme Court's recent decision in AMG Capital Management, LLC v. FTC, 141 S. Ct. 1341 (2021) for the proposition that "before allowing a common law addition to be grafted onto a statute, the statute's language and structure must be carefully examined to ensure the addition complements rather than conflicts."  ECF No. 32-1 at 16.  See also Pennsylvania v. Think Fin., Inc., No. 14-cv-7139, 2016 U.S. Dist. LEXIS 4649, at *80 (E.D. Pa. Jan. 14, 2016) (declining to "superimpose" a common-enterprise theory of liability from the FTCA onto the CFPA because 1) the FTCA limits

17

enforcement to the FTC and 2) the CFPA "is more expansive, including abusive claims as well as unlawful and deceptive.")

The defendants argue that the FTCA's individual liability standard should not be applied because the word "engage" in the CFPA has a different meaning than the word "use" in the FTCA.[3] To "engage" in an unfair, deceptive, or abusive act or practice, defendants argue, "a covered person must take an active part in and directly participate in the act."  ECF No. 32-1 at 10.  As support for their textual argument, defendants rely on dictionary definitions of "engage."  But those definitions do not require direct participation.

Second, defendants argue that because the CFPA already includes a provision under which an individual can be liable for rendering "substantial assistance" to a corporate defendant engaging in UDAAP violations, allowing individual liability under the FCTA's standard in addition to that would undermine the enforcement scheme designed by Congress.  ECF No. 32 at 16. However, "a defendant acting with knowledge of deception who

---

[3] Under the FTC Act, "unfair or deceptive acts or practices in or affecting commerce" are "unlawful," and the FTC is "empowered and directed to prevent" certain persons "from using . . . unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1), (2).  Under the CFPA, it is "unlawful" for a covered person or service provider "to engage in any unfair, deceptive, or abusive act or practice" and the Bureau is authorized "to prevent" such a person "from committing or engaging in" such practices.  12 U.S.C. §§ 5536(a)(1)(B), 5531(a).

either directly participates in that deception or has the
authority to control the deceptive practice of another, but
allows the deception to proceed, engages, <u>through its own
actions</u>, in a deceptive act or practice that causes harm to
consumers." <u>FTC v. LeadClick Media, LLC</u>, 838 F.3d 158, 170 (2d
Cir. 2016).  In other words, the parties here are arguing over
the standard for <u>direct</u> liability – the fact that a separate
theory of liability exists for substantially assisting a
corporate defendant's UDAAP violations has no bearing on how
courts evaluate whether an individual defendant himself engaged
in a UDAAP violation.[4]  Accordingly, the FTCA standard applies.

  c. Collective Allegations

    Defendants argue that the Amended Complaint "lumps" them
together and therefore fails to provide notice of what each
defendant allegedly did wrong.  ECF No. 32 at 12, citing <u>Howard
v. Mun. Credit Union</u>, 2008 U.S. Dist. LEXIS 124085, at *40
(S.D.N.Y. Jan. 24, 2008).  This argument is unavailing.
"Nothing in Rule 8 prohibits collectively referring to multiple
defendants where the complaint alerts defendants that identical

---

[4] To the extent defendants argue that holding them liable would
violate principles of Connecticut corporate law governing
piercing the corporate veil and <u>respondeat superior</u> liability,
the argument misses the point.  CFPB is not seeking to impose
liability on the individual defendants for the actions of
others; it seeks to hold them liable for their own actions.  <u>See</u>
<u>LeadClick Media</u>, 838 F.3d at 170.

claims are asserted against each defendant." Hudak v. Berkley
Grp., Inc., No. 3:13-CV-00089-WWE, 2014 WL 354676, at *4 (D.
Conn. Jan. 23, 2014).  That is the case here.  The Amended
Complaint alleges that, consistent with the responsibilities of
their leadership positions at 1st Alliance, each of the
individual defendants knew of and approved 1st Alliance's
"business model," "sales practices," and "policies and
procedures," ECF No. 27 ¶¶ 53-62, and knew of and failed to stop
the alleged UDAAP violations, even though they had authority to
do so, id. ¶¶ 89-90, 105-06, 113-14.[5]  These allegations do not
"force the various defendants to guess" which of them is accused
of each alleged wrong.  Ochre LLC v. Rockwell Architecture
Planning & Design, 2012 U.S. Dist. LEXIS 172208, at *17
(S.D.N.Y. Nov. 28, 2012).  Cf. Bardwil Indus. Inc. v. Kennedy,
No. 19 CIV. 8211 (NRB), 2020 WL 5633159, at *3 (S.D.N.Y. Sept.
21, 2020) (granting motion to dismiss where defendants were
"corporate officers who had different positions and
responsibilities within the company" and complaint lacked

---

[5] I take judicial notice of the fact that, although CFPB alleges
that all three individual defendants were "Managing Members,"
public records list only DiIorio as a "managing member" – St.
Lawrence and Aramburu are listed as "members."  ECF No. 32 Ex.
A.  See iMerchandise Llc LLC v. TSDC, LLC, No. 3:20-cv-248, 2021
U.S. Dist. LEXIS 62134, at *16 n.5 (D. Conn. Mar. 31, 2021)
(taking judicial notice of website).

"factual allegations to plausibly explain how the defendants were working in concert").

Having addressed these common issues, I now address each count in turn.

   d. Count Three: Deceptive Mortgage-Origination Acts or
      Practices

Count three alleges that, in violation of the CFPA's prohibition on deceptive practices, "unlicensed SCs and HLCs presented themselves to consumers as licensed mortgage-loan originators by, among things, using a licensed employee's signature block and including their NMLS licensing number in e-mail solicitations to consumers to refinance their mortgages" ECF No. 27 ¶ 80, and "SCs and HLCs created the impression that they were licensed loan originators through social-media profiles and solicitations to consumers for preapprovals." Id. ¶ 81.  It also alleges that "[w]hen unlicensed SCs and HLCs performed various tasks and took various information from the consumer, all of which required licensing, they caused consumers reasonably to believe that the SCs and HLCs were legally authorized to do those things when, in fact, the SCs and HLCs were not legally authorized." Id. ¶ 82.

Defendants argue that, even under the FTCA standard, the CFPB fails to state a claim because it "has not alleged that the Individuals had knowledge of the deceptive nature of any alleged

21

conduct." ECF No. 32 at 19-20. "[K]nowledge 'may be
established by showing that the individual [defendant] had
actual knowledge of the deceptive conduct, [or] was recklessly
indifferent to its deceptiveness, or had an awareness of a high
probability of deceptiveness and intentionally avoided learning
of the truth.'" Moses, 913 F.3d at 307 (citations
omitted). "An individual's degree of participation in business
affairs is probative of knowledge." FTC v. Med. Billers Network,
Inc., 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008).

CFPB has plausibly alleged that the individual defendants
each had knowledge of the responsibilities assigned to the SCs
and HLCs. See ECF No. 27 ¶¶ 55-57, 62. Moreover, CFPB alleges
that starting "[n]o later than February 2017," 1st Alliance's
chief compliance officer warned the individual defendants "that
activities SCs were engaging in could require licensing under
federal or state SAFE Acts." ECF No. 27 ¶ 35. It further
alleges that "On or about October 2017, 1st Alliance's
Compliance Manager notified senior management, including DiIorio
and St. Lawrence, that an internal audit had found that SCs
'were at times engaged in what may constitute . . . licensed
activity under the SAFE Act.'" Id. ¶ 36. Crediting those
allegations, it is reasonable to infer that the individual
defendants were at least recklessly indifferent to the

possibility that its sales employees were acting as mortgage
loan originators.

Count Three therefore survives insofar as it is based on
allegations of unlicensed HLCs and SCs performing duties that
would require them to be licensed.  See id. ¶ 82.  However, the
allegations do not support a plausible inference that the
individual defendants knew HLCs and SCs were engaging in
activities to make it appear they were actually licensed.  If
CFPB wants to replead this count to provide a stronger basis for
such an inference, it may do so.

e. Count Four: Unfair Mortgage-Origination Acts or Practices

In Count Four, The CFPB alleges that 1st Alliance used
"unqualified" SCs and HLCs for loan-origination activities that
required a license, which was "likely to cause substantial
injury to potential borrowers because these employees did not
provide critical, accurate, and timely information about loan
terms."  Id. ¶ 96.

The Amended Complaint plausibly alleges that the duties
assigned to SCs and HLCs were subject to the knowledge and
approval of the individual defendants.  See ECF No. 27 ¶¶ 55-57,
62.  In this regard, the Amended Complaint alleges that the
"unlicensed SCs and HLCs routinely performed mortgage
origination activities as part of their core duties." Id. ¶ 103.
It is reasonable to infer that the defendants were aware of such

a routine practice.  Moreover, the Amended Complaint plausibly
alleges that the individual defendants were on notice that
unlicensed employees were performing licensable activities,
given the compliance staff's concerns and the results of the
internal audit.  ECF No. 27 ¶¶ 35-36.  Accordingly, the motion
is denied as to Count Four.

   f. Count Five: Deception Regarding the FHA Streamline Program

     According to the Amended Complaint, 1st Alliance
"repeatedly made representations to consumers seeking a purchase
mortgage about the availability of an FHA Streamline refinance
loans, including costs, interest rates, and timing, even though
it was impossible for 1st Alliance to know if its
misrepresentations were true or accurate."  ECF No. 27 ¶ 109.
Further, "[t]he Individual Defendants had actual knowledge of
how the SCs and HLCs were misrepresenting the Streamline refi
program to consumers and encouraged, directed, or failed to
prevent such conduct from occurring even though they had the
authority to do so" because they "approved all aspects of 1st
Alliance's business model, policies and procedures, and sales
practices that underlie this claim."  Id. ¶ 114.

     I conclude that these allegations are insufficient to
support a claim.  In order to plausibly allege that the
defendants knew of the alleged misrepresentations, the complaint
must allege that the HLCs/SCs made the misrepresentations

pursuant to or at least consistent with internal policies. Though this may have been the case, CFPB's current allegations are insufficient.  Accordingly, Count Five is dismissed without prejudice to refiling.

   IV.   Conclusion

      1st Alliance's motion to dismiss is DENIED.  The individual defendants' motion to dismiss is DENIED as to Counts Three and Four and is GRANTED as to Count Five.  To the extent that the claims against the individual defendants are dismissed, the dismissal is without prejudice.

      So ordered this 31st day of March 2021.

                              /s/ RNC
                         Robert N. Chatigny
                      United States District Judge