**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>PLAINTIFF,<br>v.<br><br>1ST ALLIANCE LENDING, LLC, et al.,<br><br>DEFENDANTS. | Civil Action No.: 3:21-0055 (RNC)<br><br>April 16, 2024 |

**PLAINTIFF'S COMBINED**
**REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# CONTENTS


ABBREVIATIONS AND ACRONYMS ... 1

INTRODUCTION ... 1

LEGAL STANDARD: RULE 56 ... 3

ARGUMENT ... 3

I. Defendants Have Not Satisfied Their Burden As The Nonmovant In Summary Judgment, Or As the Party Moving for Summary Judgment. ... 3

A. Defendants' Filing Has Factual, Legal, and Evidentiary Deficiencies, And It Fails to Create Any Genuine Dispute of Material Fact. ... 4

B. The Bureau's Objections to Defendants' Filing. ... 4

II. 1st Alliance Violated 12 C.F.R. § 1026.36(f)(2) By Utilizing HLCs as Loan Originators Without First Ensuring the HLCs were Registered and/or Licensed. ... 5

A. The Bureau's Filing Established That The HLCs' Engaged in the Conduct of a "Loan Originator," Which Required MLO Licensing and/or Registration. ... 6

B. 1st Alliance Is Liable For Violating Reg Z § 1026.36(f)(2) Because It Failed To Ensure Its HLCs Were Licensed and Registered In Compliance With the Federal SAFE Act. ... 7

C. 1st Alliance's Fails To Support Its Contention That The HLCs' Conduct Falls Outside of the Scope Of the Federal SAFE Act and State SAFE Acts. ... 8

D. Defendants Have Materially Misrepresented the State Regulatory Exam Findings That They Repeatedly Reference in Their Filing. ... 10

1. Defendants Provide No Evidence That A State Regulator "Approved" 1st Alliance's Use of Unlicensed HLCs In Loan Origination Process. ... 10

2. Multiple State Regulatory Exams Found Evidence of 1st Alliance's Unlicensed Employees Engaging In Loan Originator Activity That Violated State SAFE Acts. ... 13

E. The Primary Jurisdiction Doctrine Should Not Be Invoked In This Case. ... 15

F. None of 1st Alliance's Remaining Arguments Regarding State SAFE Act Violations Preclude Its Liability Under Reg Z § 1026.36(f)(2). ... 16

III. Each Defendant Is Liable For The Unfair Practice Of Utilizing Unqualified HLCs As Loan Originators. ... 18

A. Defendants' Assertions That The Bureau Was Required to Engage In Rulemaking Prior to Initiating This Action Is Contrary to the Law ... 18

B. 1st Alliance Engaged In an Unfair Practice By Utilizing Unqualified HLCs As Loan Originators. ... 19

1. HLCs Were Not Qualified to Act As Loan Originators. ... 20

2. Using Unqualified HLCs as Loan Originators Caused, or Was Likely to Cause, Substantial Injury to Consumers. ... 23

3. Consumers Could Not Reasonably Avoid The Injury Caused By 1st Alliance's Practice of Using Unqualified HLCs As Loan Originators. .... 25

4. Defendants Fail to Establish The Harm Associated With Unqualified HLCs As Loan Originators Was Outweighed by A Countervailing Benefit to Consumers or Competition. .... 27

C. The Individual Defendants Are Liable For 1st Alliance's Unfair Conduct Because They Knew of the Conduct And Failed to End It. .... 30

1. The Evidence and Undisputed Material Facts Establish the Individual Defendants' Authority to Control, Participation In, and Knowledge of the Unlawful Conduct. .... 30

2. The Bureau Is Not Required to Establish that Defendants Knew the Their Conduct Was Unfair. .... 32

IV. 1st Alliance Violated Reg Z § 1026.19(e)(2)(iii) By Requiring Consumers to Submit Documents Verifying Application Information Before The Company Provided A Loan Estimate (Count 2). .... 35

V. 1st Alliance Violated ECOA And FCRA by Failing to Provide Adverse Action Notices to Consumers After It Denied Their Request for a Loan (Counts 7 and 8). .... 38

VI. The Bureau Has Established Its Entitlement to Summary Judgment Under CFPA § 5536(a)(1) Based on Defendants' Violations Identified in Counts 1, 2, 7, and 8. .... 41

VII. Defendants Fail To Demonstrate That Any Of The Bureau's Claims Are Barred By the Statute of Limitations. .... 42

A. Each Asserted Claim Is Subject To the Statute of Limitations Stated in CFPA § 5564(g)(1). .... 42

B. The Limitations Period Accrues When The Bureau Discovers the Facts Regarding the Violations. .... 43

C. There Is No Factual Basis To Conclude that the Bureau Discovered The Violations At Issue Before January 15, 2018. .... 44

VIII. Defendants' Remaining Arguments Fail to Present Any Genuine Dispute of Material Fact Or Legal Basis Precluding Summary Judgment in The Bureau's Favor. .... 46

A. Under Binding Second Circuit, The Bureau's Statutory Funding Mechanism Is Constitutional; Therefore, Defendants' Arguments Asserting Otherwise Do Not Entitle Them to Summary Judgment. .... 46

B. The Bureau's Request for Application of Nonmutual Collateral Estoppel Is Properly and Fully Articulated In the Bureau's Motion in Limine. .... 47

C. No Additional Discovery Is Necessary Before The Court Resolves Liability Regarding Each Claim. .... 48

CONCLUSION .... 49

# ABBREVIATIONS AND ACRONYMS

| Docket No. | Abbreviation | Citation Form | Description |
|---|---|---|---|
| 232.3 | Bureau's Affirmative Facts | B-SUMF | Bureau's LCvR 52(a)1 statement – Statement of Undisputed Material Facts |
| | Defendants' Responsive Facts | 1A-RSUMF | Defendants' LCvR 52(a)2 statement – Bureau's Statement of Undisputed Material Facts |
| 241-2 | Bureau's Responsive Facts | B-RSUMF | Bureau LCvR 52(a)2 statement – responding to Defendants' Statement of Undisputed Material Facts (i.e., LCvR 52(a)2 statement) |
| | Defendants' Responsive Facts | 1A-SUMF | Defendants' Statement of Undisputed Material Facts |

**Within citations that refer to docketed items, the page numbers correspond to pagination contained in the ECF header, except that citations to a statement of undisputed material facts (SUMF) will cite to paragraph (¶) numbers. Citations to transcripts will cite to the page and line of text (__:__).

# INTRODUCTION

Through an extensive evidentiary record, the Bureau's Memorandum of Law, Statement of Undisputed Material Facts, and supporting documents (collectively, Bureau's Filing) established that 1st Alliance violated Regulation Z, 12 C.F.R. § 1026.36(f)(2), by failing to ensure that its employees who took mortgage loan applications and offered or negotiated mortgage loan terms were licensed and registered as required by the Federal Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (SAFE Act), 12 U.S.C. § 5101, et seq. and/or the State laws implementing the SAFE Act. Similarly, the evidence establishes that 1st Alliance, DiIorio, and St. Lawrence engaged in an unfair practice by utilizing unqualified Home Loan Consultants (HLCs) as loan originators despite knowledge that HLCs routinely made errors resulting in consumers being provided with inaccurate information that they then relied on to their detriment.

In trying to defeat the Bureau's Motion for Summary Judgment and secure summary judgment for itself, Defendants mischaracterizations of the evidence and advance unsupported legal contentions, conclusory assertions, and legally deficient affidavits that frequently contradict record evidence and Defendants' prior admissions. Most notably, Defendants' Filing argues that State regulators "approved" and "bless[ed]" 1st Alliance's use of unlicensed HLCs in their loan origination model, and that this Court should defer to the State regulatory agencies' alleged determinations. In reality, not one of the referenced State regulators stated in their exam results—or in any other document supplied by Defendants—that the State approved of how 1st Alliance used its unlicensed HLCs in loan origination. To the contrary, several State exams reported finding clear instances of unlicensed 1st Alliance employees engaging in conduct that required licensure under the applicable State SAFE Act.

Defendants also argue that the HLCs were qualified to perform the work of mortgage loan originators (MLOs) and, thus, consumers did not suffer substantial harm. But Defendants present

no evidence that HLCs received training on topics necessary to ensure competency when acting as a loan originator, and the record evidence shows this lack of training resulted in HLCs' work being riddled with errors. Further, the evidence shows that consumers faced substantial risk of injury and did in fact suffer injury. Indeed, to suggest that working with an unqualified mortgage loan originator does not expose consumers to harm belies the factual basis for the enactment of the SAFE Act's regulatory regime as well as common sense.

1st Alliance's arguments regarding the Bureau's remaining claims are similarly meritless. The company required consumers to submit documents verifying information in their loan application before 1st Alliance provided a Loan Estimate, which is a violation of Regulation Z, 12 C.F.R. §§ 1026.19(e)(2)(ii), (iii). Defendants' arguments that the Loan Estimate was not required until all portions of a formal application had been received, and they were entitled to "request" the documents have already been foreclosed by this Court's ruling denying Defendants' motion to dismiss this claim. Additionally, that 1st Alliance also failed to provide appropriate and timely "adverse action notices" to consumers when it denied their request for a mortgage is undisputed, and a violation of Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691(d)(1); Regulation B, 12 C.F.R § 1002.9(a)(1)(i); and the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681m(a). Defendants' retort that they later "cured" their failure to provide such notices is of no consequence because they fail to provide record evidence to support this contention.

Finally, Defendants assert multiple arguments, including contending that the statute of limitations precludes most of the Bureau's claims. But Defendants fail to establish that any of the Bureau's claims are time-barred because, among other things, they misstate the law and rely only on conclusory assertions and legally deficient affidavits contradicted by record evidence.

## LEGAL STANDARD: RULE 56

Courts grant summary judgment regarding a claim or defense "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 59 (2d Cir. 2006) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The same legal standards apply to cross-motions for summary judgment. Thus, where, as here, the parties have filed cross-motions, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir. 2004); Fed. R. Civ. P. 56(c).[1]

## ARGUMENT

### I. Defendants Have Not Satisfied Their Burden As The Nonmovant In Summary Judgment, Or As the Party Moving for Summary Judgment.

As detailed herein and reflected in the Bureau's Memorandum of Law and supporting documents, the Bureau has carried its burden of demonstrating its entitlement to judgment as a matter of law, because it has established the undisputed material facts, supported its factual assertions with specific cites to contemporaneous documentary evidence, sworn testimony, and

---

[1] Hereinafter, for clarity, when referencing a section of a statute or regulation in the body of a sentence, this memorandum will employ an acronym (or abbreviation) of the provision's name followed by the section number. For example, "12 C.F.R. § 1026.36(f)(2)" will be referred to as "Reg Z § 1026.36(f)(2)" and "12 U.S.C. § 5531(a)" will be referred to as "CFPA § 5531(a)."

Additionally, as it did in its opening Memorandum, the Bureau uses the terms "Home Loan Consultant" and "HLC" to include also Submission Coordinators (SCs). DiIorio has testified these position titles/terms were used synonymously by 1str Alliance. (SUMF ¶ 15; see CTDOB Order ¶ 30.)

admissions in the record, and properly applied the undisputed material facts to substantive law. Mirlis v. Edgewood Elm Hous., Inc., No. 3:19 CV-700 (CSH), 2021 WL 4125447, at *2-3 (D. Conn. Sept. 9, 2021).

**A. Defendants' Filing Has Factual, Legal, and Evidentiary Deficiencies, And It Fails to Create Any Genuine Dispute of Material Fact.**

Deficiencies in Defendants' Filing render their submission to this Court insufficient to either (i) establish any genuine dispute of material fact precluding summary judgment in the Bureau's favor; or (ii) establish there is no genuine dispute as to any material fact supporting their request for summary judgment. In addition to relying on mischaracterizations of the facts, evidence, and law—much of which is detailed in this memorandum—Defendants' Filing also (i) ignores the voluminous summary judgment record and, instead, relies primarily upon excerpts of their own unsubstantiated prior testimony and self-serving, conclusory affidavits; (ii) asserts legal conclusions unsupported by analysis or citation to relevant legal authority; and (iii) frequently fails to cite supporting evidence or relies exclusively on inadmissible evidence. See Fed. R. Civ. P. 56(a), (c) (moving party must show its entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any meaningful dispute regarding material issues of fact); Bermudez v. City of New York, 790 F.3d 368, 373–74 (2d Cir. 2015) ("non-moving parties must do more than simply show that there is some metaphysical doubt as to the material facts and they may not rely on conclusory allegations or unsubstantiated speculation").

**B. The Bureau's Objections to Defendants' Filing.**

The Bureau asserts numerous objections to Defendants' arguments and evidence. Many of these objections are asserted within this Memorandum of Law; however, because many of the Bureau's objections are based on how Defendants attempt to use the cited evidence to support their alleged material facts, the Bureau has stated most of its objections within its Responsive Facts,

i.e., the Bureau's Local Rule 52(a)2 Statement. To comply with Local Rule 52(a)2(i), the Bureau respectfully requests that each of its objections asserted in its Responsive Facts be deemed incorporated by reference into this Memorandum of Law.

## II. 1st Alliance Violated 12 C.F.R. § 1026.36(f)(2) By Utilizing HLCs as Loan Originators Without First Ensuring the HLCs were Registered and/or Licensed.

The undisputed material facts firmly establish that, from December 2016 through October 2019, 1st Alliance violated Reg Z § 1026.36(f)(2), by failing to comply with the regulation's mandate that a "loan originator organization" must "[e]nsure that each individual loan originator who works for the [company] is licensed or registered" to the extent such licensing or registration is required by either the Federal SAFE Act, the Federal SAFE Act's applicable implementing regulation (here, Regulation H, 12 C.F.R. § 1008, et seq.), **or** any applicable State SAFE Act. (See 12 C.F.R. § 1026.36(f) (placing affirmative duty on loan originator organizations to ensure licensure and registration).)

1st Alliance has not advanced any arguments or evidence disputing that it was a "loan originator organization" subject to the provisions of Reg Z § 1026.36(f)(2), nor has it disputed that it did not require its HLCs to be registered and/or licensed as MLOs. Therefore, it has conceded that the Bureau has met its burden on these elements of this claim. See Simons v. Yale Univ., No. 3:19-CV-1547 (OAW), 2024 WL 182208, at *5 (D. Conn. Jan. 17, 2024) (holding that, when a party "does not respond directly" to an argument in the opposing party's brief, "the court considers the point to be conceded"). The only remaining requirement is to establish that the HLCs engaged in conduct that constituted engaging in the business of a loan originator—i.e., taking a mortgage loan application and/or offering or negotiating loan terms within the meaning of the Federal SAFE Act, Regulation H, or an applicable State SAFE Act.

### A. The Bureau's Filing Established That The HLCs' Engaged in the Conduct of a "Loan Originator," Which Required MLO Licensing and/or Registration.

1st Alliance has not genuinely disputed—and, in some instances, has explicitly admitted—that the Bureau correctly identified characteristics of the HLC position and conduct that HLCs engaged in when interacting with consumers. Specifically, the undisputed facts show that:

(i) HLCs were the first and primary employees to interact with consumers seeking a home loan from 1st Alliance (see 1A-RSUMF ¶¶ 48, 64, 66(a));

(ii) HLCs routinely solicited and obtained consumers' personal and financial information, and the information was obtained specifically for the purpose of determining the consumers' potential eligibility for a 1st Alliance loan product (see 1A-RSUMF ¶¶ 49-50; 66(b)-(e));

(iii) HLCs used Byte software's "inquiry screen" (alternatively known as a "purchase inquiry" screen) to record loan eligibility -related information from consumers—including the consumer's income, assets, liabilities, employment information, co-borrower information, social security number (to obtain a credit report), and property address—and this information was used to determine the consumers' prequalification for loan products and to populate portions of 1st Alliance's Form 1003 final loan application (see 1A-RSUMF ¶¶ 55-61, 64(b), 64(f));

(iv) HLCs advised consumers regarding whether they had prequalified for a 1st Alliance loan product, including providing consumers with prequalification letters detailing loan terms—e.g., the type of loan, loan amount, term/length of loan, assumed down payment percentage, interest rate (see 1A-RSUMF ¶¶ 66(h)-(i), 74-77);

(v) HLCs engaged in discussions with consumers regarding detailed loan terms the consumer had been prequalified for, including discussing potentially available loan programs and interest rate ranges of the prequalified loan (see 1A-RSUMF ¶¶ 66(h)-(i), 74).

The Bureau's Filing detailed how the above-described conduct falls squarely within definitions and exemplars that the Federal SAFE Act, Regulation H, and the State SAFE Acts provide to illustrate what it means to take a residential loan application and/or offer or negotiate loan terms—

i.e., to be a "loan originator." (See Bur. Memo, pp. 27-34 (applying undisputed facts to Federal SAFE Act, Regulation H, and State SAFE Acts).)[2]

**B. 1st Alliance Is Liable For Violating Reg Z § 1026.36(f)(2) Because It Failed To Ensure Its HLCs Were Licensed and Registered In Compliance With the Federal SAFE Act.**

Because the Federal and State SAFE Acts mandate that each "loan originator" employed by a non-depository institution like 1st Alliance obtain and maintain an MLO license and NMLS registration before engaging in loan originator activities, 1st Alliance's failure to ensure licensure and registration of its HLCs who engaged in this conduct violates Reg Z § 1026.36(f)(2). 1st Alliance has argued that this Court cannot find the company liable for violating Reg Z § 1026.36(f)(2) without first determining that HLCs were engaged in conduct that a State SAFE Act deemed as "loan originator" conduct that required licensure (see generally Def Memo, pp. 20-26), but the company's contention ignores that the Federal SAFE Act independently prohibits taking loan applications and offering or negotiating loans without first obtaining an MLO license and registration.. (See 12 U.S.C. § 5103(a)(1)(B), (a)(2) ("an individual may not engage in the business of a loan originator without first (1) obtaining[] and maintaining annually . . . (B) a license and registration as a State-licensed loan originator; and (2) obtaining a unique identifier.") The Bureau's Memorandum detailed specific conduct the HLCs engaged in that constitutes taking residential loan applications and offering or negotiating loan terms within the meaning of the Federal SAFE Act. (Bur. Memo, pp. 27-34.) Because they engaged in such conduct, the HLCs are

[2] As reflected in the Bureau's Motion, nearly every State SAFE Act includes a broader definition of "loan originator" than the Federal SAFE Act and—as 1st Alliance has already conceded—the State SAFE Acts should be interpreted to define "taking a loan application" and "offering/negotiating loan terms" in the same manner as the Federal SAFE Act. (See Bur. Memo, p. 32 (quoting 1st Alliance's admission that State SAFE Acts should be interpreted using definitions provided by Regulation H if no definition is provided in the State statutes or regulation).

"loan originators"—within the meaning of the Federal SAFE Act—and were required to be licensed and/or registered in compliance with the statute.

### C. 1st Alliance's Fails To Support Its Contention That The HLCs' Conduct Falls Outside of the Scope Of the Federal SAFE Act and State SAFE Acts.

1st Alliance asserts that the SAFE Acts' licensing and registration regimes do not apply when an individual is engaged in conduct related to preliminary loan eligibility determinations and discussions of conditional loan terms—i.e., what 1st Alliance characterizes as a "prequalification" process.[3] (Def Memo, p. 21.) There is no language in the Federal Safe Act (and Defendants point to no other legal authority) stating or suggesting that the SAFE Acts' licensing and registration regime excludes covered conduct simply because it occurs within the early stages of the mortgage loan process. In any event, 1st Alliance's argument regarding exclusions of prequalifications does not help it escape liability under Reg Z § 1026.36(f)(2) because the incontrovertible evidence shows that unlicensed HLCs were taking residential mortgage loan applications and offering or negotiating mortgage loans even in these so-called "prequalification" interactions. (See Argument: Sec. I.A. (above); Bur. Memo, pp. 11-13 (detailing material facts and legal definitions establishing HLCs took loan applications); see, e.g., Dkt. 210-88, pp. 2-4 (Prequalification App).) That this conduct occurred in the initial or early contacts with the consumer is of no consequence.

Moreover, 1st Alliance's skewed reading of the Federal SAFE Act is inconsistent with the purpose and intended scope of the statute. Congress enacted the SAFE Act with the express purposes of, among other things, (i) increasing uniformity in licensing and reporting requirements, and accountability of individuals who interact with consumers in the mortgage loan industry;

[3] For ease of discussion only, the Bureau uses the phrase "final loan application" to refer to the Form 1003 that 1st Alliance used as its official loan application to collect information to make final loan eligibility determinations with (near) final approved loan terms. This phrase is used only to facilitate discussion of 1st Alliance's argument that "prequalifications" are excluded from the SAFE Acts' grasp. Use of this term is does not convey any meaning of "application" that is inconsistent with the Bureau's other arguments.

(ii) enhancing consumer protection; and (iii) "[e]stablish[ing] a means by which residential mortgage loan originators would, to the greatest extent possible, be required to act in the best interests of the consumer." (See 12 U.S.C. § 5101 (stating statute's purposes).) By completing the Federal SAFE Act mandated licensing and registration process, MLOs establish that they possess good character and have the necessary skills, knowledge, and competency to act in the consumer's best interests when engaging in business of a loan originator. 1st Alliance's reading of the Federal and State SAFE Acts would invite loan originator companies and individual loan originators to circumvent the law by "front loading" their mortgage loan process with unlicensed, inexperienced, and insufficiently trained employees who would complete all but a single task in the application process to avoid licensing and registration requirements for loan originators. Indeed, this is precisely what 1st Alliance has tried to do, and now it hopes to escape liability for its actions.[4]

---

[4] The Superior Court of Connecticut reached the same conclusion when affirming the CTDOB Order and rejecting 1st Alliance's bases for appeal. The Superior Court held, in relevant part:

> The record indicates that the plaintiff . . . instructed the HLCs to avoid taking a residential mortgage application by purposefully avoiding taking the address of the property in question or a copy of a purchase agreement. In this regard the plaintiff reasoned that the address of the property was a necessary element of a mortgage application and by avoiding taking this element, the HLCs would not be taking residential mortgage applications. Second, the plaintiff instructed HLCs not to negotiate or set interest rates or down payment requirements with customers. The plaintiff reasoned that this instruction would avoid the negotiation of terms. The DOB disagreed with the plaintiffs statutory interpretation and disagreed that the foregoing instructions would avoid noncompliance. However, even if we accept the plaintiff's statutory interpretation, for argument's sake, the record here contains substantial evidence that violations occurred because the HLC's repeatedly violated the plaintiffs instructions and did both acquire property addresses and negotiate loan terms.

(Dkt. 210-7: Super. Ct. Order, p. 10 (emphasis added).) The Superior Court then described ways in which 1st Alliance's loan origination model "present[ed] a high risk of non-compliance" and that it was "[u]nsurprising[]" when the "risks manifested into actual violations." (Id. at 11-12.)

### D. Defendants Have Materially Misrepresented the State Regulatory Exam Findings That They Repeatedly Reference in Their Filing.[5]

Defendants' Filing repeatedly misrepresents the findings of State regulatory exams to support their contention that State regulatory agencies specifically investigated 1st Alliance's use of unlicensed HLCs in its loan origination model and found that 1st Alliance's loan origination practices did not violate the State SAFE Act. (See, e.g., Def Memo, pp. 25-26; see also id. at pp. 11-12, 16-17.) This narrative is unsupported by evidence and untethered from the true purpose, function, and meaning of State regulatory exams and their findings.

#### 1. Defendants Provide No Evidence That A State Regulator "Approved" 1st Alliance's Use of Unlicensed HLCs In Loan Origination Process.

Defendants' Memorandum contains multiple representations that State regulators approved its HLC-based origination model, including:

> [T]he state regulators of Georgia; Illinois; Massachusetts; Mississippi; South Carolina; New Hampshire; or Iowa . . . conducted supervisory exams of 1st Alliance, pursuant to their primary jurisdiction to supervise their own licensees for compliance with the laws and regulations that they administer, looking specifically at CT DOB's allegations, and approved the model of using unlicensed HLCs.

(Def Memo, p. 26 (emphasis in original) (citing 1A-SUMF ¶¶ 171-72; 176-84)) and

> [S]tates, such as . . . Pennsylvania, and Vermont conducted parallel exams of 1st Alliance in 2019, with full knowledge of CT DOB's findings, and still found no MLO licensing violations. . . . In sum, until CT DOB first alleged SAFE Act violations in 2018, 1st Alliance's business model had the blessing of every state that regulated the company, and even then, many states still approved of the company's business model.

(Id., p. 49 (citing Dkt. 221-8 at 2; Dkt. 221-4 at 5-7; Dkt. 221-6; Dkt. 221-5.)

[5] This argument refers to "Defendants" rather than "1st Alliance" because the false statements regarding the exam are included in Count 1 and Count 4, with the latter count including the unfairness claims brought against the Individual Defendants.

Defendants cite 12 paragraphs in their Affirmative Facts to support these claims of State regulatory approval; however, none of those paragraphs even imply that the referenced State regulator reviewed the loan origination model and sanctioned its use. Moreover, a review of all 240 paragraphs in Defendants' Affirmative Facts reveals only one allegedly "undisputed material fact" that purports to provide information about a State examiner's opinion of 1st Alliance's loan origination model. The paragraph states, in relevant part:

> On information and belief, the [Non-Depository Supervisory Committee (NDSC) that supports the MMC] rejected CT DOB's position with respect to the need to license 1st Alliance's HLCs.

(1A-SUMF ¶ 175.) Because this statement is pure conclusory speculation, and Defendants have failed to cite any evidence in support of any part of this paragraph, this statement fails to create a genuine dispute regarding any material fact. See Kulak v. City of N.Y., 88 F.3d 63, 71 (2d Cir. 1996) ("Though [the Court] must accept as true the allegations of the party defending against the summary judgment motion, . . . conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment.") (alteration in original)).[6]

Even more striking is that the exam-related documents cited by Defendant either lend no support to—or directly contradict—Defendants' claims that State regulators "approved of the company's business model." Defendants have cited (and filed as exhibits to their brief) the

[6] Defendants unconvincingly try to blame the Bureau and the Massachusetts Department of Banking (Mass. DOB) for their failure to present an adequate argument or any evidence supporting its contention that the NDSC rejected the CTDOB's position. (See 1A-SUMF ¶ 175; Def Memo, p. 12.) First, Defendants claim "[the Bureau] has refused to respond to discovery questions on this issue," but Defendants fail to establish that they requested any discovery on this issue during the 19-month discovery period. Defendants also do not even attempt to articulate how information from the Bureau would establish NDSC's position regarding the results of an exam the Bureau did not even participate in.

Defendants also complain that that Magistrate Judge Robinson quashed their subpoena for the deposition of Kevin Cuff (then-Deputy Commissioner of the Mass. DOB), and that their objection to the Magistrate's May 5, 2023, Order is still pending. Defendants fail to acknowledge that it was their own failure to show the deposition was relevant or proportional to the needs of case that caused the subpoena to be quashed. (See Dkt. 240-115: Mag. Minute Order of 6/14/2023, p. 4.)

Multistate Mortgage Committee (MMC) Report of Exam (MMC Report) issued on October 25, 2019, and exam -related documents from nine other states. (Dkt. 221-3 to 221-12).[7] Collectively, these documents do not provide a scintilla of evidence that any State approved 1st Alliance's loan origination model. For example, the MMC Report contains exam findings of five of the seven states identified by Defendants (in the above-quoted passage) as having "approved the model of using unlicensed HLCs"—Georgia, Illinois, Massachusetts, Mississippi, and South Carolina.

While the report does not state that those exams found violations, it includes no affirmative statement—or even any implicit suggestion—that the absence of an identifiable violation within the State's exam results is an endorsement of the company's practices. (See generally Dkt. 221-12: MMC Report.) In fact, the MMC Report explicitly warns not to interpret the lack of a violation as affirmative evidence that the company has not committed violations, explaining that "[t]he violations listed [in the MMC Report] . . . are based on the review of a sample of 1st Alliance loan records. As a result, other violations may exist." (Dkt. 221-12: MMC Report, p. 12 (emphasis added).) Similarly, Defendants assert that Iowa, New Hampshire, Vermont, and Pennsylvania examiners "approved" or "bless[ed]" their loan origination model, but there is no evidence that compliance with licensing laws was within the scope of any of these four exams.[8] If the exams'

---

[7] The Multistate Mortgage Committee (MMC) is a representative body of state mortgage regulators appointed by the Conference of State Bank Supervisors (CSBS) and American Association of Residential Mortgage Regulators (AARMR) to represent the exam interests of the combined states under the "Nationwide Cooperative Protocol and Agreement for Mortgage Supervision." The MMC's primary focus is on nationwide mortgage lenders and servicers operating in 10 or more states. (Dkt. 109 at p. 9 (MMC Exam Manual.) The MMC exam of 1st Alliance was a limited-scope, off-site, mortgage lender exam performed by examiners from thirteen states: Alabama, Georgia, Illinois, Maryland, Massachusetts, Mississippi, Montana, North Carolina, Ohio, South Carolina, Texas, Virginia, and Washington. Collectively, the 13 state examiners reviewed a total of 513 loans (comprised of a mixture of closed loan files and "fallout" loan files). (Dkt. 221-12: MMC Report, p. 6.)

[8] The "scope" of a State regulatory exam dictates, among other things, (i) the review period; (ii) the type and volume of records and information the examiners are required to review; (iii) the procedures that must be followed by examiners when conducting the exam; and (iv) the subject matter expertise of the specific examiners who will designated to conduct the exam. (Dkt. 109: MMC Exam Manual, p. 14); see also id. at pp. 2-14 (providing information regarding mortgage-related State regulatory exams.)

scope did not include a review of compliance with State and Federal licensing laws and regulations that prohibit unlicensed employees from engaging in loan originator activity (e.g., the Federal SAFE Act and State SAFE Acts), then State regulators would have been unconcerned with requesting the type and volume of records necessary to identify licensing-related violations. (See generally, Dkt. 221-4: NH Report; Dkt. 221-8: Iowa Report.)[9]

### 2. Multiple State Regulatory Exams Found Evidence of 1st Alliance's Unlicensed Employees Engaging In Loan Originator Activity That Violated State SAFE Acts.

Even within the relatively small sample of loan files reviewed by each of the thirteen states that participated in the MMC Exam, eight States did find evidence that unlicensed 1st Alliance employees engaged in loan originator activities within the meaning of the applicable State SAFE Act. (See, e.g., Dkt. 221-12: MMC Report, p. 12 (reporting that North Carolina identified 12 loan files with documentation reflecting 14 different unlicensed employees engaged in loan originator activities); id. at p. 22 (reporting that Alabama "identified at least six loans (Table 09) where individuals were engaging in the business of a mortgage loan originator, on dwellings in Alabama, who did not obtain and maintain a mortgage loan originator license.")

The MMC's overall "Regulatory Compliance Component Rating" for 1st Alliance also paints a far bleaker picture than 1st Alliance does when discussing results of the multi-state exam:

> 1st Alliance is assigned a rating of 3 [out of 5] for Regulatory Compliance which reflects that the Institution is deficient at managing consumer

---

9 Like the MMC Report, the Iowa report warns that any "violations listed in [the report] are partly based on the review of a sample of loan records. As a result, other violations may exist." (Dkt. 221-8: Iowa Report, pp. 6, 8 (emphasis added).) • The Vermont Report contains a detailed paragraph identifying the issues within the scope of the exam; compliance with licensing laws is not listed. (Dkt. 221-5: Vermont Report, p. 3). • Additionally, Defendants' evidence regarding the Pennsylvania examination consists of a single sheet of paper that provides no information about the exam scope (or anything else) other than a single sentence stating no violations were found. (Dkt. 221-6: Pennsylvania Exam Doc, p. 2).

> compliance risk in its products and services and at limiting violations of law and consumer harm. . . .
>
> Eight of the [13] participating states cited findings related to unlicensed mortgage loan Coordinators and/or Home Loan Consultants presents a significant risk for unlicensed origination activity. Management has failed to adequately comprehend and identify this compliance risk, or has disregarded it, allowing the company to operate in a manner that permits unlicensed Submission Coordinators and/or Home Loan Consultants to engage in origination activities that require licensure in certain states.

(Dkt. 221-12: MMC Report, p. 11.)

Finally, but significantly, Defendants have touted the fact that neither the MMC nor any state (other than Connecticut) determined that taking an enforcement action against the company was "warranted." (Def Memo, pp. 10-12 (citing 1A-SUMF ¶¶ 170-75). But the reason multiple states chose not to initiate further action after the exam is because 1st Alliance had requested to voluntarily surrender its state mortgage license and represented that it would no longer be operating in those states. (See, e.g., Dkt. 221-3: MMC Closeout Letter, pp. 2-3.)[10] Thus, the lack of an enforcement action does not suggest that the non-enforcing state determined that 1st Alliance's conduct was not severe enough to warrant an enforcement action.[11]

---

[10] One example the unequivocal language state agencies used when discussing its decision to close the exam without further action:

> The Commonwealth of Virginia's Bureau of Financial Institutions ("Bureau") is] is confident with its findings included in the Report and disagrees with 1st Alliance's assertion that the findings are subjective. The Virginia examiner reviewed emails, phone conversations and loan file documentation that indicate that the business model utilized by 1st Alliance allowed "submission coordinators" and "home loan consultants" to act as mortgage loan originators without a license.
>
> 1st Alliance requested surrender of its lender license in Virginia, and the Bureau accepted the surrender, effective December 11, 2019. Since 1st Alliance has shut down, the Bureau will not pursue regulatory action as a result of the Exam. Please be aware, however, that any application submitted by 1st Alliance, a successor entity, affiliated entity or any of its principals would include a review of the activities, business practices and any violations cited in the Report, when evaluating that application.

(Dkt. 221-3: MMC Closeout Letter, p. 3.)

[11] Defendants assert that the "CT DOB was not satisfied [with taking its own enforcement action" so it "lobbied other state regulators to take enforcement action against 1st Alliance" but "[n]one did so." (Def Memo, p. 11.) The Court should disregard such statements, because they are conclusory, speculative, unfounded, and—even if true—would be wholly immaterial to issues in this case.

**E. The Primary Jurisdiction Doctrine Should Not Be Invoked In This Case.**

1st Alliance relies on a meritless contention that the "primary jurisdiction" doctrine bars the Bureau's Reg Z § 1026.36(f)(2) claim and bars this Court from determining, in the first instance, whether HLCs were required by a State SAFE Act to be licensed and registered as MLOs. (Def Memo, pp. 11, 17, 26.) 1st Alliance does not address any factors the Second Circuit has identified as relevant to determining whether the primary jurisdiction doctrine should be invoked. (See id.) Indeed, other than making conclusory assertions about the alleged effect the doctrine would have on the Bureau's claims, 1st Alliance does not engage with the doctrine at all. Accordingly, this Court should reject each argument that 1st Alliance has made premised on the primary jurisdiction doctrine.

Further, even if Defendants had properly invoked it, the primary jurisdiction doctrine does not require this Court to abdicate final decision-making authority over legal questions regarding State SAFE Act applicability to an administrative agency. The primary jurisdiction doctrine is merely a means for a federal court to 'refer a matter to an agency and obtain an "advisory opinion" if the matter (i) "extend[s] beyond the 'conventional experiences of judges'" and (ii) "fall[s] within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co., 46 F.3d 220, 222–23 (2d Cir. 1995) (quoting Far East Conference v. United States, 342 U.S. 570, 574 (1952)). The doctrine "is not designed to secure . . . advice from agencies every time a court is presented with an issue conceivably within the agency's ambit." DeCostanzo v. GlaxoSmithKline PLC, 643 F. Supp. 3d 340, 350 (E.D.N.Y. 2022).

Moreover, the doctrine "does not apply where, as here, the issue [before the court] is 'legal in nature and lies within the traditional realm of judicial competence.'" Belfiore v. Procter & Gamble Co., 311 F.R.D. 29, 75 (E.D.N.Y. 2015). Thus, Defendants' assertions that the doctrine

must be invoked for interpretations of the State SAFE Acts is contrary to established law. See Palmer v. Amazon.com, Inc., 51 F.4th at 507 (2d Cir. 2022) (holding that the doctrine generally should not be invoked for issues of "statutory interpretation").

### F. None of 1st Alliance's Remaining Arguments Regarding State SAFE Act Violations Preclude Its Liability Under Reg Z § 1026.36(f)(2).

The company claims that the Bureau was required by this Court's March 31, 2022 order resolving Defendants' Motion to Dismiss to produce examples of unlicensed HLCs engaging in transactions that violate the State SAFE Act for each State 1st Alliance operated in. (See Def Memo, pp. 16-17 (discussing Dkt. 63: MTD Order of 3/31/2022, pp. 8-9).) Defendants also assert that Magistrate Robinson's May 24, 2023 discovery order that instructed the Bureau to produce "a large sample of examples" of HLCs' unlawful conduct required that the Bureau provide examples of specific transactions of unlawful HLC conduct for each State where 1st Alliance operated. (See id. at pp. 24-25 (discussing Dkt. 177: Order on Mot. to Compel).

These arguments are fatally flawed. First, as discussed above, the Bureau's claim under Reg Z § 1026.36(f)(2) does not require that the Bureau establish any State SAFE Act violation because HLCs' violations of the Federal SAFE Act are sufficient to find 1st Alliance liable under Reg Z § 1026.36(f)(2). Second, even if the Bureau was required to establish a predicate State SAFE Act violation, the Bureau has met this standard. The Bureau's discovery responses—by 1st Alliance's own admission—provided examples of unlicensed HLCs engaged in loan originator activities in 12 states (see Def Memo, pp. 24-25), and the Bureau's Filing has established that the conduct the unlicensed HLCs engaged in constitutes taking loan applications or offering or negotiating loans within the meaning of the Federal and State SAFE Acts. (Bur Memo, pp. 24-25). Neither Regulation Z nor TILA predicate liability under Reg Z § 1026.36(f)(2) on making a showing that the loan originator organization failed to ensure MLO licensure and NMLS

registration for employees in each state where the organization operated. Thus, to the extent the Bureau is required to show a State SAFE Act violation—which it is not—that showing is more than satisfied here.

Third, no order of this Court required the Bureau to provide examples of State SAFE Act violations for each state. For example, 1st Alliance claims the Court's order resolving the Motions to Dismiss instructed the Bureau to provide Defendants with information identifying "which HLCs [the Bureau] contend[s] required licensure in which states, or based on which actions with respect to those states." (Def Memo, p. 16). But the Court's Order was much narrower, instructing that because "the applicable state [SAFE Act] statutes [were] not listed in the Amended Complaint[,] . . . 1st Alliance c[ould] obtain the information . . . through a contention interrogatory," (Dkt. 63: MTD Order of 3/31/2022, p. 9). The Bureau produced this information on March 11, 2022. (See Def Memo, p. 24.)

Similarly, although 1st Alliance asserts that Magistrate Judge Richardson's May 24, 2023, discovery-related order required the Bureau to produce information disclosing "specific instances of conduct that [the Bureau] contends violated the law," the Magistrate's Order explicitly rejected Defendants' request that the Court compel the Bureau to make such a production, holding that "the interrogatories requesting such detailed information are unduly burdensome and irreconcilable with the proportionality limitation set forth in Rule 26(b)(1)." Instead, the Bureau was ordered to "provide Defendants with a large sample of examples of th[e] [unlawful] conduct" because "asking [the Bureau] to provide facts regarding thousands of violations is unduly burdensome and not proportional to the needs of the case[.]" (See Dkt. 177: Mag. Order, pp. 6 (resolving Motion to Compel arguments regarding 1st Alliance's Interrogatory No. 1.) Nothing in the Magistrate Judge's May 24, 2023, even hints that the Bureau was required or expected to provide examples

of unlawful conduct for each State. And this makes sense because, during the discovery period, Defendants did not serve any discovery request on the Bureau specifically seeking examples of unlawful conduct for each State. Additionally, Defendants' disingenuous complaints that the Bureau failed to comply with the May 23, 2023, Order is belied by that fact that Defendants did not respond with objections or allege noncompliance after receiving the supplemental discovery on June 24, 2023. (See Dkt. 199-2: Def Mot for Disco Conf, filed 1/09/2024 (admitting Defendants did not object to the Bureau's response until after September 7 hearing).)

## III. Each Defendant Is Liable For The Unfair Practice Of Utilizing Unqualified HLCs As Loan Originators.

### A. Defendants' Assertions That The Bureau Was Required to Engage In Rulemaking Prior to Initiating This Action Is Contrary to the Law

Defendants insist that they were allegedly "deprived of fair notice" that 1st Alliance's conduct could violate the unfair acts and practices prohibitions of the CFPA and that the Bureau is "regulating by enforcement." (Def Memo, pp. 41-42.)[12] Defendants are wrong. Courts have repeatedly rejected the argument that the Bureau must engage in rulemaking prior to initiating an enforcement action regarding a specific topic because "[t]he plain meaning of the [CFPA's] statutory language . . . is that the CFPB may proceed via rulemaking or an enforcement action." CFPB v. Navient Corp., 2017 WL 3380530, at *8 (M.D. Pa. Aug. 4, 2017); CFPB v. Ocwen Fin. Corp., No. 17-80495-CIV, 2019 WL 13203853, at *17 (S.D. Fla. Sept. 5, 2019) ("The Court finds that the CFPB was not required to engaged in rulemaking prior to bringing an enforcement action."); CFPB v. D & D Mktg., 2016 WL 8849698, at *7 (C.D. Cal. Nov. 17, 2016) (finding

[12] Defendants once again deliberately mischaracterize the Bureau's unfairness claim as relating to the use of "unlicensed" staff. The Court should summarily reject Defendants' fair notice argument for its failure to address the true basis of the Bureau's claims, which relates to 1st Alliance's use of unqualified HLCs.

"[t]he CFPB here has chosen to proceed through litigation. It did not abuse its discretion in so deciding.").

### B. 1st Alliance Engaged In an Unfair Practice By Utilizing Unqualified HLCs As Loan Originators.

A practice is unfair when it: (i) "causes or is likely to cause substantial injury"; (ii) the injury "is not reasonably avoidable by consumers"; and (iii) the injury is "not outweighed by countervailing benefits to consumers or to competition." CFPB v. Ocwen Financial Corp., No. 17-cv-80495, 2019 WL 13203853, at *17 (S.D. Fla. Sept. 5, 2019); 12 U.S.C. § 5531(c)(1) (stating required elements for unfairness claims); see id. § 5536(a)(1)(B) (stating prohibition against engaging in "in any unfair . . . practice").[13] As established in the Bureau's Filing, Defendants' practice of using unqualified HLCs to take mortgage loan applications and offer or negotiate mortgage loan terms was an unfair practice under the CFPA. (Bur. Memo, pp. 36-45.)

1st Alliance's use of HLCs in this manner was likely to, and did, cause consumers harm through the expenditure of money, time, and effort to find a home after receiving an erroneous prequalification letter, and it required consumers to rely on someone without the proper training and experience to explain and help them navigate 1st Alliance's mortgage programs and loan terms. (See Bur. Memo, pp. 36-40.) Consumers could not reasonably avoid these injuries because they had no reasonable way to anticipate or learn that the HLCs were unqualified and would generate erroneous prequalification letters. And 1st Alliance's conduct provided no countervailing

[13] Defendants' Filing does not dispute that the Bureau has established the following three threshold elements to its unfairness claim against 1st Alliance: (i) 1st Alliance is a "covered person" within the meaning of the CFPA; (ii) 1st Alliance offers or provides a "consumer financial product or service" and "extend[s] credit" within the meaning of the CFPA; and (iii) 1st Alliance's conduct that is the subject of this claim constitutes acts or practices performed "in connection with a[] transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." (See Bur. Memo, pp. 35-36 (discussing elements and definitions establishing applicability of the CFPA).)

benefit to consumers or competition; indeed, the cost savings Defendants enjoyed likely put their lawful competitors at a competitive disadvantage.

### 1. HLCs Were Not Qualified to Act As Loan Originators.

Defendants state that the practice of using HLCs as loan originators cannot be unfair under the CFPA because, according to Defendants, "HLCs were not unqualified" and they were "thoroughly vetted and well-trained[] and had all of the qualifications of an MLO."[14] (See Def Memo, pp. 7, 9 (citing 1A-SUMF ¶¶ 62-69).) Neither Defendants' Affirmative Facts nor the evidence cited in support establishes that HLCs possessed the requisite knowledge, skills, and training regarding (i) mortgage loan origination, including relevant state and federal laws and regulations; (ii) lending standards for "nontraditional" mortgage products, i.e., any mortgage loan other than a 30-year fixed rate mortgage; or (iii) mortgage -related ethics, including instruction regarding consumer protection and fair lending issues. (See 12 U.S.C. § 5104(c) (detailing mandatory pre-licensing education as part of state-licensing regime); id. § 5105(b) (detailing mandatory training topics and minimum hours of instruction for state-licensed loan originators).).[15] Competency in these subject areas is essential for loan originators working for origination companies—like 1st Alliance—that service subprime borrowers and "underserved populations."

[14] Defendants repeatedly and intentionally mischaracterize the Bureau's unfairness claim as asserting that the HLCs were per se unqualified because they were unlicensed (Def Memo, pp. 7, 27, 34-36); however, this is not the basis for the Bureau's unfairness claims. Instead, the Bureau's asserts that HLCs were unqualified because they lacked adequate mortgage origination-related education, testing, and other tools that would have ensured they possessed the knowledge, skills, and ability to consistently perform loan originator duties accurately. (Bur. Memo, pp. 36-40.) Because the Bureau's unfairness claims are not based on HLC licensure, it will not respond to most of Defendants' arguments on that point and, where reasonable, will interpret Defendants' argument as addressing the claim asserted by the Bureau.

[15] Defendants' Affirmative Facts contain only generalized statements regarding training requirements—e.g., "Training for all employees included new hire training and ongoing compliance training" and the materials cited to establish the scope of the training provide little more than a list of broadly-stated topics and a snippet of testimony stating the company considered SAFE Act compliance when providing HLCs with "specialized training on borrower relations and problem solving." (Def Memo, p. 47 (citing 1A-SUMF ¶¶ 62-69).)

Despite the clear significance of these qualifications, Defendants cite no evidence showing that HLCs are offered or required to complete such training.

Licensed MLOs and registered MLOs are required by Federal law to complete a statutorily defined number of education hours regarding mortgage loan origination, nonstandard mortgages, and ethical issues related to mortgage loan origination before becoming an MLO and each year while working as an MLO.[16] Numerous other distinctions exist between the qualifications of 1st Alliance HLCs and qualifications of licensed or registered MLOs. However, comparing training requirements for the preceding three topics illustrates the much broader, more salient point: Defendants have failed to produce any evidence that HLCs are educated on topics critical to serving as a loan originator—including instruction on mortgage loan origination. This, by itself, is fatal defect in Defendants' contention that HLCs were just as qualified as MLOs—or even remotely qualified to act as loan originators.[17]

Defendants also assert that HLCs' lack of knowledge, training, and skills could not cause consumers harm because HLCs "were trained and supervised by experienced MLOs and other production supervisors." (Def Memo, p. 36 (citing 1A-SUMF ¶¶ 72-78).) Defendants' supply no

---

[16] In some sections of Defendants' Filing, they compare the HLCs' qualifications to those of licensed MLOs and other sections compare the HLCs to registered MLOs. As a reminder: the SAFE Act separates MLOs into two categories: (i) "registered loan originators", which includes MLOs employed by banks and other depository institutions and (ii) "[s]tate-licensed loan originator[s]," which encompasses individuals employed as MLOs by a non-depository institution like 1st Alliance. (See 15 U.S.C. §§ 1504-1507 (discussing licensing and registration requirements for both categories of loan originators).)

Although registered MLOs and licensed MLOs do not have identical training requirements, both are required to complete periodic training, including with respect to Federal law. Further, although registered loan originators are not required to obtain a state-issued license, the employing institution must provide the registered MLO with training relevant to the MLO's loan origination activities.

[17] Defendants also contend that HLCs were not "inexperienced," and imply that the only time there were a large number of inexperienced HLCs was when 1st Alliance hired a large number of unlicensed intake staff in short period in connection with and the Connecticut Department of Economic and Community Development ("DECD"), but this is belied by Defendants prior testimony and their responses to the Bureau's Affirmative Facts, which unequivocally admit that 1st Alliance "experienced high turnover." (1A-RSUMF ¶ 17(b).)

evidence that establishes HLCs' work product (including prequalifications completed by HLCs) was routinely and substantively reviewed by a licensed MLO before a prequalification letter was issued to a consumer. Instead, the cited paragraphs of Affirmative Facts and cited evidence do little more than provide an organizational chart and position hierarchy within 1st Alliance. (See, e.g., Dkt. 222-12 (Chart showing supervisors/supervisees by name and title); Dkt. 222-26 (position description for Assoc. VP of Sales).) Indeed, the only document conceivably relevant to this issue contains a short excerpt of hearing testimony by Amy Charlton (a former HLC, and later licensed MLO) in which she asserts that, when she was an MLO, HLCs would email her the prequalification information gathered from the consumer, which she would review and consider in connection with the credit profile of the consumer. (See Dkt. 222-29 at 31:10-32:6; 35:23-25 (Charlton CTDOB testimony).)[18] But, a single employee providing an overview of her alleged personal practice as a MLO fails to establish that 1st Alliance employed any routine or systematic practice requiring each HLC's work to be substantively reviewed and corrected by qualified and/or licensed MLOs.

Even more telling is undisputed evidence showing that MLOs did not perform this supervisory function on a routine basis and in connection with each HLCs' prequalifications and applications. For example, in May 2018, 1st Alliance's compliance department expressed its concern that the company did not have enough licensed MLOs to "touch" every prequalification and recommended that 1st Alliance hire more licensed MLOs. (Dkt. 210-48: 2017 Internal Audit, pp. 12-14.) The lack of routine review by licensed MLOs was raised again during a 1st Alliance Executive Committee Meeting that St. Lawrence and DiIorio attended on September 11, 2018. It

[18] The acronym "CTDOB" refers to the Connecticut Department of Banking. On April 16, 2021, after a lengthy administrative proceeding brought against 1st Alliance, the CTDOB issued its "Findings of Fact, Conclusions of Law, and Order" (CTDOB Order), which found 1st Alliance liable for committing violations of state licensing laws and other mortgage-related violations liable. (See generally Dkt. No. 210-3: CTDOB Order.)

was explicitly noted that "The MLO review is not being completed before the app is completed." (Dkt. 210-42: Meeting Minutes, p. 3 (emphasis added.).)

**2. Using Unqualified HLCs as Loan Originators Caused, or Was Likely to Cause, Substantial Injury to Consumers.**

The "substantial injury" prong of an unfairness claim is satisfied by establishing that the practice has already caused a substantial harm, or that the practice was likely to cause substantial harm. See 12 U.S.C. § 5531(a). An act or practice can cause "substantial injury" by doing a "small harm to a large number of people" or large harm to a small number of people. See F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1157–58 (9th Cir. 2010) (internal citation omitted); Langan v. Johnson & Johnson Consumer Cos., 95 F. Supp. 3d 284, 290 (D. Conn. 2015) (finding overcharges of $3 to $6 were "rather small for each individual consumer," but caused "substantial" injury when considering "the cumulative injury" to class members). Although "[a] 'substantial injury' is generally a financial one, other types of injuries are cognizable as well," Consumer Fin. Prot. Bureau v. NDG Fin. Corp., No. 15-cv-5211 (CM), 2016 WL 7188792, at *13 (S.D.N.Y. Dec. 2, 2016), including that "in certain circumstances emotional impacts may amount to or contribute to substantial injury,'" Beider v. Retrieval Masters Creditors Bureau, Inc., 146 F. Supp. 3d 465, 471-72 (E.D.N.Y. 2015).[19]

Defendants' admissions provide much of the evidence establishing that 1st Alliance's use of unqualified HLCs was likely to cause consumers substantial injury. Defendants have conceded

[19] Time spent investigating or seeking refunds for unauthorized purchases can also constitute a substantial injury. See, e.g., FTC v. Amazon.com, Inc., No. C14-1038-JCC, 2016 WL 10654030, at *8 (W.D. Wash. July 22, 2016) (finding substantial injury in FTC Act unfair case where consumers' children made purchases without adult consent and the adults spent time pursuing refunds); FTC v. Kennedy, 574 F. Supp. 2d 714, 721 (S.D. Tex. 2008) (finding that time spent seeking a refund for and cancellation of unrequested services was injury sufficient to support an unfairness claim under the FTC Act).

that HLCs routinely produced prequalifications that were "seriously flawed."[20] This fact is not surprising considering that, in May 2018, the compliance department explicitly advised DiIorio that "[the company's] willingness to work with consumers with FICO scores as low as a 500 inevitably create[d] a greater need for upfront assessment, a task that cannot be performed by [HLCs]." (Dkt. 210-48: 2017 Internal Audit, pp. 12-13.)[21]

Defendants also understood and expected that consumers would shop for a home after receiving a 1st Alliance prequalification letter. (See Def Memo, p. 37 (asserting that "a prequalification is . . . intended to provide consumers and sellers with a basic understanding of the consumer's likelihood of obtaining financing so that the consumer may shop for a home.").)[22] The letters led consumers to reasonably believe that 1st Alliance was likely to provide financing, thus prompting consumers to expend time, money, and other resources shopping for a new home. When that prequalification fell through due to errors made by unqualified HLCs, consumers were likely

[20] Defendants concede this fact because they do not respond to or dispute the Bureau's argument and evidence establishing it. See Simon, 2024 WL 182208, *5 (holding that, when a party "does not respond directly" to an argument in the opposing party's brief, "the court considers the point to be conceded").

[21] Defendants admit to receiving a draft of the 2017 Internal Audit in October 2017. (Def Memo, pp. 36-37.) Although Defendants try to minimize language within the audit as "overly dramatic" and only expressing "the emotions of . . . middle management," Defendants do not present any argument or evidence that disputes the report was factually accurate. (Id.) Thus, regardless of how Defendants characterize the recommendations within the 2017 Internal Audit, it does not invalidate the audit's findings that multiple unlicensed HLCs were engaged in the conduct of a "loan originator" within the meaning of the Federal and/or State SAFE Acts. (See Dkt. 210-48: 2017 Internal Audit, pp. 6-7, 12-13.)

[22] Defendants attempt to discredit the consumer complaint the Bureau discussed as an example of a consumer receiving a prequalification letter, then relying on the letter to commence home shopping. This Reply memorandum does not further discuss the details of this consumer complaint because, among other things, (i) the summary judgment record reflects ample other evidence that the HLCs' routinely committed significant errors that led to consumers experiencing substantial injury and a likelihood of substantial; and (ii) contrary to Defendants' implications otherwise (see Def Memo, pp. 31, 47), the CFPA does not require the Bureau to produce hordes of consumer complaints to establish a practice was unfair, particularly where (as here) evidence has already established the practice was likely to cause substantial injury. To be clear, the Bureau does not concede that Defendants have accurately stated the events that transpired with his consumer, and the Bureau objects to the evidence relied on in Def's Exhibit 46 (Dkt. 222-45).

to suffer substantial injury.[23] Moreover, for most consumers, buying a home is the largest and most complicated purchase of their lifetime. Consumers rely on a loan originator to navigate a financing process that involves products and terms that they might be totally unfamiliar with. To suggest that working with someone untrained and unqualified puts consumers at no risk of harm strains credulity.

**3. Consumers Could Not Reasonably Avoid The Injury Caused By 1st Alliance's Practice of Using Unqualified HLCs As Loan Originators.**

"In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." F.T.C. v. Com. Planet, Inc., 878 F. Supp. 2d 1048, 1079 (C.D. Cal. 2012), aff'd in part, 642 F. App'x 680 (9th Cir. 2016) (quoting Neovi, Inc., 604 F.3d at 1158); see also FTC v. Windward Mktg., Inc., No. Civ. A 1:96-CV-615F, 1997 WL 33642380, at *11 (N.D. Ga. Sept. 30, 1997) ("the Court focuses on whether the consumers had a free and informed choice that would have enabled them to avoid the unfair practice"). "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1168-69 (9th Cir. 2012) (quoting Orkin Exterminating Co. v. FTC, 849 F.2d 1354, 1365-66 (11th Cir. 1988)). In contrast, if evidence establishes that consumers "were injured by a practice for which they did not bargain., then the injury was not reasonably

[23] Defendants assert that, contrary to statements in the Bureau's Memorandum, consumers did not routinely pay appraisal fees, inspection costs, or closing costs between receiving a prequalification and loan approval. (Def Memo, p. 38.) Even assuming for the sake of argument that this is true, it is inconsequential to the unfairness analysis because the undisputed facts establish that consumers incur other significant pecuniary losses while home shopping in reliance on an erroneous prequalification letter.

avoidable. Fed. Trade Comm'n v. Windward Mktg., Inc., No. 1:96-cv-615F, 1997 WL 33642380, at *11 (N.D. Ga. Sept. 30, 1997).

Defendants assert that consumers had a free and informed choice because: (i) HLCs "did not deceive consumers into believing they were licensed[,]" (Def Memo, p. 38), and "[the Bureau] does not argue that 1st Alliance kept critical information from consumers or in any way prevented them from going to a competitor," (id. at p. 36).[24] As an initial matter, "[w]hile courts should look to any deception on the part of businesses [when evaluating an unfairness claim], the absence of deceit is not dispositive." Fed. Trade Comm'n v. Amazon.com, Inc., No. C14-1038-JCC, 2016 WL 10654030, at *8 (W.D. Wash. July 22, 2016). But here 1st Alliance did withhold critical information from consumers, including failing to disclose to consumers that:

1. HLCs did not possess the same (or comparable) training, qualifications, and ability to perform loan originator tasks that qualified MLOs possessed;

2. the unqualified HLCs—not the qualified MLOs—routinely performed the loan originator work and analysis that served as the basis for consumers' prequalification and application determinations; and

3. unqualified HLCs made frequent errors when performing loan originator tasks (e.g., prequalification determinations, assessing credit worthiness and income-to-debt ratio), which resulted in consumers often being inaccurately informed that 1st Alliance had prequalified them for a loan.[25]

Only by knowing these facts could a consumer reasonably avoid the injury caused by Defendants' conduct. For example, while Defendants assert that consumers could easily avoid any

[24] Defendants also assert that "[c]onsumers were told that the HLC was not licensed, and that a licensed MLO would take their loan application[.]" (Def Memo, p. 38; 1A-SUMF ¶ 38 (citing Dkt. 222-29, 52:2-10 (Charlton testimony); Dkt. 222-41.) Neither the transcript nor email cited by Defendants establishes that consumers knew HLCs were not licensed (and not qualified) to work as MLOs. These documents reflect only that a single MLO introduced herself as an MLO when talking to consumers and an HLC referred to the organizational title "loan officer" in emails with a consumer. These documents have little import because there no evidence supporting 1st Alliance's apparent contention that a 1st Alliance employee's reference to organizational titles of "Home Loan Consultant" and "loan officer" or "MLO" would impart to the consumer knowledge of the stark difference in qualifications between HLCs and MLOs.

[25] As previously discussed, each of these facts has been established within the Bureau's Filing based on substantial evidence provided by the Bureau.

alleged injury because "consumers have a choice of lenders" (Def Memo, pp. 36-37), this ignores the critical fact that withholding the facts about the HLCs' lack of qualifications and the quality of their work product deprived the consumer of the ability to make an informed choice. Had consumers known this information, they could have made other choices: e.g., the consumer could have requested to work only directly with a qualified and licensed MLO at 1st Alliance or sought out a lender who permitted only licensed MLOs to work with consumers seeking loans; or the consumer could have minimized the money and time spent traveling to potential properties by (for example) viewing homes and conducting research via the internet rather than visiting the properties and neighborhoods of interest. See, e.g., Windward, 1997 WL 33642380, at *11 (finding consumer could not reasonably avoid injury caused by practice consumers did not have a "free and informed choice that would have enabled them to avoid the unfair practice").[26]

**4. Defendants Fail to Establish The Harm Associated With Unqualified HLCs As Loan Originators Was Outweighed by A Countervailing Benefit to Consumers or Competition.**

"The [countervailing benefits] prong of the [unfair acts] test is easily satisfied when a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition." F.T.C. v. Commerce Planet, Inc., 878 F.Supp.2d 1048, 1078 (2012); FTC v. RCG Advances, LLC, No. 20-CV-4432 (JSR), 2023 WL 6281138, at *7 (S.D.N.Y. Sept. 27, 2023). Defendants identify three alleged benefits of 1st Alliance's practice; however, neither the evidence nor the material facts establish that any of the alleged benefits existed or outweighed the harm to consumers.

[26] Defendants assert that "[t]here is no evidence that consumers were ever told they couldn't speak to an MLO if they preferred to do so" (Dkt. 232-2 at 39), but Defendants again ignore that an average consumer would not know to ask to work with an MLO if that consumer did not have adequate knowledge of the stark difference in qualifications and skill level between the HLC and the MLO.

First, Defendants assert that their "business model was developed to meet needs of underserved, 'high-touch' consumers seeking loss mitigation loans" and allowed it to "'serve the underserved' and reach minority consumers to a higher-than-average degree'" (Def Memo, pp. 41-44 (citing Dkt. 210-18: Def NORA Resp. Letter, dated 5/29/2020, pp. 8-10).)[27] Even assuming that this is true—which the Bureau does not concede because it is only supported by conclusory, self-serving statements in a NORA response—it is wholly irrelevant. By December 2016 1st Alliance had fully transitioned away from offering loss mitigation loans to offering purchase money mortgage loans. (1A-RSUMF at ¶ 33 (admitting that "in 2016, 1st Alliance shifted most of its business from the FHA Short Refinance Program to more traditional FHA, USDA, and Conventional products.").) And Defendants make no showing that 'underserved' or 'minority' consumers benefitted from working with unqualified HLCs when seeking traditional purchase mortgages.

Next, 1st Alliance claims it provided dozens of "new entry level jobs to support the local economy" in Connecticut and this should be considered a countervailing benefit. (Def Memo, p. 36). Defendants fail to explain how placing individuals in a position that will ultimately require them to perform tasks for which they have not been adequately trained—and which they lack a

[27] The "NORA response" was drafted and produced to the Bureau by Defendants and their counsel as part of the Bureau's Notice and Opportunity to Respond and Advise (NORA) process wherein Bureau staff outlines for subjects of an investigation the evidence supporting its decision to recommend the Director initiate an enforcement action. The subjects under investigation—here, 1st Alliance, DiIorio, and St. Lawrence—are provided an opportunity to present their position regarding the allegations in a written response to the Bureau and its Director. The written submission is known as the "NORA response." See CFPB, Lifecycle of an Enforcement Action, https://www.consumerfinance.gov/enforcement/life-cycle-of-enforcement-action/ (last accessed 04/14/2024).

To the extent that Court deems Defendants' NORA response admissible and akin to affidavit submitted by Defendants, the NORA response must he held to the same standard as other affidavits supporting summary judgment—i.e., "[a]A conclusory, self-serving affidavit, lacking in detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." See F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) The cited portions of Defendants' NORA response fail to meet that standard with respect the information cited by Defendants in support of their argument regarding countervailing benefits.

statutorily-required license to perform—provides a benefit to either the consumers or competition. Moreover, that 1st Alliance purposely built up its cadre of insufficiently trained, unqualified HLCs in lieu of onboarding additional qualified, licensed personnel only contributed to the number of consumers that were put at risk of substantial injury resulting from inaccurate prequalifications and analyses performed by HLCs.

Finally, Defendants assert that "the undisputed evidence demonstrates that the use of HLCs benefited consumers and the mortgage market as a whole," but the only evidence cited for this contention are statements in the legally inadequate affidavit of John DiIorio (Def Memo, p. 41 (citing Dkt. 225: DiIorio Aff., ¶¶ 12-14).) DiIorio merely lists alleged benefits of the unfair practice without providing any explanation, or details—or corroborating evidence—establishing that using unqualified HLCs as loan originators is connected to, or results in, any of the alleged benefits he identifies. Such vague and conclusory statements are wholly insufficient to create a dispute of material fact at the summary judgment stage. See Hubb, 788 F.3d at 61 ("vague and conclusory statements in [an] affidavit" are insufficient to defeat summary judgment).

DiIorio's conclusory statements are also contradicted by record evidence. While DiIorio's affidavit claims that using HLCs in the loan origination process provided "timely and accurate disclosures [and] a good customer experience," contemporaneously written emails and other documents plainly reflect that the well-established fact that HLCs frequently produced flawed analysis and inaccurate prequalifications. (See, e.g., Dkt. 210-72 at p. 2 (DiIorio email of 10/26/2017 reflecting that HLCs had a "difficult and challenging time" transitioning to traditional purchase loan products); see also SUMF ¶¶ 117-121 (detailing management discussion of HLCs' errors). Similarly, DiIorio's assertions that use of unqualified HLCs increased regarding timeliness and accuracy cannot be reconciled with record evidence establishing that many consumers did not

timely receive Loan Estimates or adverse action notices. These contradictions serve as further evidence that the Court should disregard these portions of DiIorio's affidavit as evidence that 1st Alliance's practices resulted in countervailing benefits that outweighed consumers' substantial injury.

### C. The Individual Defendants Are Liable For 1st Alliance's Unfair Conduct Because They Knew of the Conduct And Failed to End It.

#### 1. The Evidence and Undisputed Material Facts Establish the Individual Defendants' Authority to Control, Participation In, and Knowledge of the Unlawful Conduct.

Individuals may be liable in their individual capacity for unfair acts and practices when the evidence establishes that the individual (i) "participated directly in the practices or acts or "had authority to control them" and (ii) "had or should have had knowledge or awareness of the misconduct." (Dkt. 63: MTD Order, pp. 16-17 (stating elements for individual liability under FTC Act unfairness claim, and holding that same standard applies to CFPA unfairness cases.) Defendants admit—and the Bureau has independently established through evidence—that the first prong is satisfied because the Individual Defendants "had authority to control" 1st Alliance's use of HLCs to engaged in loan originator conduct for which they were not qualified.[28] (See Def Memo, p. 44 (admitting "that the CFPB could establish the first prong of the" test for individual liability under the CFPA"); Bur. Memo, pp. 42-43 (establishing authority and control).) The first prong is also satisfied because, contrary to Defendants' assertions, the Bureau did assert and

---

[28] Defendants assert that "[e]ven if the CFPB could establish that 1st Alliance engaged in unfair acts or practices . . . the Individuals are still entitled to summary judgment on Count 4 because the CFPB cannot show that either of the Individuals is personally liable for the underlying alleged compliance violations by 1st Alliance." (Def Memo, p. 43.) The Bureau does not understand what this is intended to convey but, as best the Bureau can tell, Defendants are asserting that DiIorio and St. Lawrence cannot be held personally liable under Count 4 (CFPA unfairness claims) because they cannot be held liable in connection with the "compliance-related" claim asserted in Count 1 (Reg Z § 1026.36(f)(2) claim based on SAFE Act violations). This argument is illogical both because (i) the Bureau has never asserted an individual capacity claim under Count 1, and (ii) liability under Count 4 is not predicated on 1st Alliance's liability under Count 1.

establish that the Individual Defendants "participated in" the unfair conduct. Where, as here, an individual has the authority to control the conduct of another but allows it to proceed the individual "engages[] through its own actions" in the act or practice that causes harm to consumers. (Dkt. 63: MTD Order, pp. 18-19 (discussing direct liability standard for individuals with authority to control the conduct) (emphasis in original) (citing FTC v. LeadClick Media, LLC, 838 F.3d 158, 170 (2d Cir. 2016). (See generally Bur. Memo, pp. 41-45.).[29]

The second prong requires only that the individual had knowledge of the conduct at issue. Thus, as this Court previously explained, if "the duties assigned to [HLCs] were subject to the knowledge and approval of [DiIorio and St. Lawrence]," then they can be held liable for the unfair acts. (Dkt. 63: MTD Order, p. 23); see also CFPB v. Stratfs, LLC, No. 24-cv-40, 2024 WL 1565310, at *2 (W.D.N.Y. Apr. 11, 2024) (explaining that "defendants confuse factual knowledge with legal knowledge; only the former is required to establish a knowing statutory violation" and collecting cases (brackets and quotation marks omitted)); F.T.C. v. Tax Club, Inc., 994 F. Supp. 2d 461, 472 (S.D.N.Y. 2014) ("[I]t is beyond doubt that the Amended Complaint sufficiently alleges Johnson's knowledge of the Enterprise's wrongful practices" (emphasis added)). DiIorio (1st Alliance's CEO) and St. Lawrence (VP of Production) were fully aware of the unlicensed HLCs routine engagement in loan originator duties, and they were aware of the numerous errors and inaccurate prequalification determinations made by unqualified HLCs (see Dkt. 210-51, pp. 2-3 (DiIorio email of 1/9/2018, copying St. Lawrence, acknowledging process was plagued with "sloppy originations" and HLC errors creating a "burden on management and MLO staff");

[29] Defendants appear to believe that the Court should evaluate their liability separately for two separate time periods (i.e., December 2016 through 2017, and 2018 through 2019). (See Def Memo, pp. 45-55.) But Defendants have not put forward any evidence that their conduct materially differed during those two time periods. Thus, the Court should reject this framework when assessing the parties' summary judgment motions.

Dkt. 210-53, p. 2 (DiIorio email of 4/6/2018 acknowledging and complaining that the HLC's routinely produced prequalifications that were seriously flawed or that simply should not have been completed due to obvious disqualifying information in the file); see also SUMF ¶¶ 114–127).

Despite this knowledge, they rejected the compliance department's 2018 recommendation that the company hire additional licensed MLOs and, instead, they continued to employ the business model built on using unqualified HLCs as loan originators. (B-SUMF ¶¶ 95-104; Dkt. 210-29, p. 3 (2017 Internal Audit); CTDOB Order ¶¶ 34-36, 49-53.) Additionally, despite knowledge that the HLC position was primarily occupied by employees with no former mortgage-related experience or training and the turnover rate for HLCs was high, DiIorio and St. Lawrence permitted the use of sales quotas, contests, and other financial incentives to encourage the HLCs to increase the number of leads that resulted in a prequalification determination. (B-SUMF ¶¶ 89–92). While Defendants try to minimize the significance of these quotas and production numbers by claiming" incredibly common in the mortgage industry" (Def Memo, p. 52), Defendants cite no evidence that such quotas, compensation, and incentives are commonplace for employees who are not loan originators.

### 2. The Bureau Is Not Required to Establish that Defendants Knew the Their Conduct Was Unfair.

The Individual Defendants claim that, to establish their liability under the CFPA's unfairness provision, the Bureau must establish that they knew that the conduct at issue was unfair. (Def Memo, pp. 44-48.) They are wrong. As this Court stated when resolving the Motions to Dismiss, the only knowledge standard applicable to the Bureau's CFPA unfairness claims against the Individual Defendants is the requirement to establish that each Defendant "had or should have had knowledge or awareness of the misconduct." (Dkt. 63: MTD Order at 17-19 (emphasis added).) But even if the Bureau was required to establish that the Individual Defendants had

knowledge that using unqualified HLCs as loan originators was unfair, the Bureau would still be entitled to summary judgment because the evidence satisfies this test as well. Under Defendants' formulation, the Bureau would only need to establish that DiIorio and St. Lawrence (i) had actual knowledge that the practice was likely to cause substantial injury; or (ii) was recklessly indifferent to the fact that the practice was likely to cause substantial injury, or (iii) possessed "an awareness of a high probability of" the practice being likely to cause substantial injury while they intentionally avoided discovering the wrongful nature of the conduct. (See Def Memo, pp. 41-44 (relying, in part, on knowledge standards stated in Moses, 913 F.3d at 307) and FTC v. Quincy Bioscience Holding Co., 389 F. Supp. 3d 211, 220-21 (S.D.N.Y. 2019)).[30]

The undisputed evidence—as discussed above and in the Bureau's Filing—establishes that, at a minimum, DiIorio and St. Lawrence were aware of a high probability that the practice was likely to cause substantial injury and/or they were recklessly indifferent to the possibility of the likelihood that the practice would cause substantial consumer injury. Both Individual Defendants were repeatedly made aware of the high error rate among HLC prequalifications, and they were also aware that some consumers would receive inaccurate prequalification letters as a consequence of 1st Alliance's use of unqualified HLCs as loan originators, and consumers who received inaccurate letters would not know the letter was inaccurate until they returned to complete a final loan application, which could be weeks or months after receiving the prequalification letter.

As DiIorio himself put it, 1st Alliance had "poor customer service[]" and significant numbers of prequalifications "falling out" of the process. (Dkt. 210-53, p. 2 (DiIorio email of

[30] This standard is developed through applying the "knowledge" standard that Defendants rely on to the first essential element of a CFPA unfairness claim. See Moses, 913 F.3d at 307 (stating three ways to establish knowledge in FTC Act deceptiveness claim) and 12 U.S.C. § 5531(c)(1) (an act or practice is unfair if it "causes or is likely to cause substantial injury" that is neither reasonably avoidable nor outweighed by countervailing benefits to consumers or competition (emphasis added)).

4/16/2018.) This is analogous to the type of evidence other courts have found to be probative of knowledge. See, e.g., Tax Club, Inc., 994 F. Supp. 2d at 62 (crediting allegations that individual defendants were aware of consumer complaints and business "had unusually high chargeback and return rates"); FTC v. Primary Group, Inc., 713 F. App'x 804, 807-08 (11th Cir. 2017) (determining that individual, at a minimum, intentionally avoided discovering wrongdoing despite knowing there was a high probability of unlawful debt collection practices, based on evidence that individual had kept herself informed of day-to-day operations and knew about, but failed to investigate, several complaints).

The Individual Defendants also make the conclusory averment that they "cannot be said to be recklessly indifferent to the unfairness of 1st Alliance's [conduct] because the practice was repeatedly reviewed by authoritative sources and never disputed prior to the state of Connecticut in 2019." (Def Memo, p. 46.) Defendants evidence consists solely of statements they made in their NORA response regarding disclosure of the loan origination model at their inception (in approximately 2004) and during their first few years of operation. (Dkt. 210-18, pp. 6-9.) Nothing cited by Defendants establishes an "authoritative source[]" reviewed and approved the use of unqualified HLCs as loan originators for purchase mortgage loans in 2016 or thereafter. Additionally, any alleged approval of the loan origination model at 1st Alliance's inception (in approximately 2005) is immaterial, because it is undisputed that 1st Alliance used a different loan origination model prior to 2016, i.e., the year the at-issue conduct began. The Individual Defendants also fail to cite legal authority establishing that a State regulatory exam of 1st Alliance's loan practices can shield them from liability for unfair acts or practices. Indeed, the referenced State exams are immaterial because the State regulators were (at most) only reviewing the company's compliance with licensing provisions of the SAFE Acts and related regulations.

They did not determine that 1st Alliance's practices were not "unfair" within the meaning of the CFPA.

Finally, to the extent the Individual Defendants assert that they cannot be held liable in their personal capacity because they relied on State regulators' (nonexistent) approval of the loan origination model, this argument must also fail. Believing the company's business model was compliant with the law is not a defense against CFPA unfairness claims. See Med. Billers Network, 543 F. Supp. 2d at 321–22 (rejecting claim that individual defendant believed his business model was consistent with a court order and analogizing to the principle that "[r]eliance on advice of counsel [is] not a valid defense on the question of knowledge"). Moreover, as the Tenth Circuit noted, a state regulator's approval of a business' actions does not speak to an individual defendant's knowledge of wrongdoing, where the actions reviewed by the regulation process "didn't include a legal review" of the relevant conduct under applicable law. See Integrity Advance, LLC v. CFPB, 48 F.4th 1161, 1175 n.18 (10th Cir. 2022), cert. denied, 143 S. Ct. 2610, 216 L. Ed. 2d 1208 (2023).[31]

## IV. 1st Alliance Violated Reg Z § 1026.19(e)(2)(iii) By Requiring Consumers to Submit Documents Verifying Application Information Before The Company Provided A Loan Estimate (Count 2).

Pursuant to Reg Z § 1026.19(e)(2)(iii), a creditor may not require a consumer "to submit documentation to verify information collected from the consumer" (e.g., income, assets, etc.)

[31] Within their Affirmative Fact, Defendants impermissibly attempt to assert an "advice of counsel" and/or "advice of professionals" defense by (for example) asserting that John McGaffigan, esq. (an attorney that served as 1st Alliance's Chief Compliance Officer) and other of 1st Alliance's compliance professionals and/or attorneys provided advised 1st Alliance that it did not need to license the HLCs. (See, e.g., 1A-SUMF ¶¶ 79-84.) Defendants waived this defense because, despite multiple requests from the Bureau, Defendants have withheld documents and other information relevant to establishing the applicability of the privilege and assessing its applicability. and are thereby impermissibly using privilege as both a sword and a shield. See *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) ("[F]airness considerations arise when the party attempts to use the privilege both as 'a shield and a sword.'" "The quintessential example is the defendant who asserts an advice-of-counsel defense and is thereby deemed to have waived his [attorney-client] privilege with respect to the advice that he received.")

before the consumer has been provided a "Loan Estimate" containing the information required by Reg Z § 1026.37.[32] 1st Alliance asserts—without citation to any legal authority—that "[i]f documents are requested but not required; if documents are not for the purpose of verifying information already provided; or if documents do not relate to the consumer's application (as defined [in the TRID rule]), then" Reg Z § 1026.19(e)(2)(iii)'s prohibition against requiring documents prior to providing a Loan Estimate "is not implicated."[33] 1st Alliance also asserts that it is allowed to request verifying documents from the consumer before the six pieces of information comprising an "application" under the TILA-RESPA integrated disclosures rule (TRID) are collected because Loan Estimates are not required until after an application has been received. (Def Mem, p. 56 (citing 12 C.F.R. Part 1026, Supplement I, at 19(e)(2)(iii)-1).) 1st Alliance asserted these exact arguments in its Motion to Dismiss (see Dkt. 63: MTD Order, pp. 9-11 (summarizing Defendants' arguments)), and this Court's Order resolving that motion rejected both arguments. The Court explained:

> Defendant's contention that "the Loan Estimate disclosure requirement is not triggered until a lender obtains all six parts of the 'application,' ECF No. 33 at 15-16, (because before that moment no completed "application" exists) is untenable. As CFPB points out, under that interpretation of Regulation Z, lenders "(1) may require verifying documents from a consumer until the consumer submits an application; then (2) may not require such documents until a Loan Estimate is issued; and then (3) may require such documents again." ECF No. 36 at 10. This strained reading would undermine the

---

[32] The text of Reg Z § 1026.19(e)(2)(iii) provides that: "The creditor or other person shall not require a consumer to submit documents verifying information related to the consumer's application before providing the disclosures required by paragraph (e)(1)(i) of this section." (Id.) (emphasis added.)

[33] Within TILA-RESPA integrated disclosures rule—also referred to as "TRID"—the term "application" is defined as "the submission of a consumer's financial information for the purposes of obtaining an extension of credit" and for mortgage loans the "application consists of the submission of the consumer's name, the consumer's income, the consumer's social security number to obtain a credit report, the property address, an estimate of the value of the property, and the mortgage loan amount sought." 12 C.F.R. § 1026.2(a)(3) ("Definitions.") The TRID rule was promulgated to provide greater clarity regarding the timing and content of disclosures that creditors must provide to consumers who submit an application for consumer credit. 12 C.F.R. § 1026.1(a) (providing information regarding the regulation's purpose, coverage, organization, enforcement, and provisions for liability).

> regulation's purpose, which is "to prevent overly burdensome documentation demands on mortgage applicants, and to facilitate shopping by the consumer." Final Rule, Integrated Mortgage Disclosures Under the Real Estate Settlement Procedures Act (Regulation X) and the Truth In Lending Act (Regulation Z), 78 Fed. Reg. 79730, 79816 (Dec. 31, 2013) (to be codified at 12 C.F.R. Parts 1024 and 1026).
>
> And, while the rule's commentary says a lender can collect "information," prior to providing a loan estimate, "the creditor ... is not permitted to require, before providing the [Loan Estimate], that the consumer submit documentation to verify the information collected from the consumer[.]" 12 C.F.R. Pt. 1026, Supp. I, Part 2 (emphasis added).

(Id. at pp. 9-10.) 1st Alliance has not identified any change in law or other cogent reason for the Court to revisit this ruling. Accordingly, 1st Alliance's attempt to relitigate matters already decided by this Court should be rejected. See Musacchio v. United States, 577 U.S. 237, 244-45 (2016) (explaining that, under the "law of the case doctrine," once a court "decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case").

1st Alliance also falsely asserts that—despite the arguments made by the Bureau in its opposition to 1st Alliance's Motion to Dismiss—the Bureau now agrees with the company's contentions that it was entitled to request documents from consumers if it did not withhold the Loan Estimate after it received the six pieces of information the TRID rule uses to define "application." To support this, 1st Alliance relies exclusively on a conclusory assertion that the Bureau "implicit[ly]" took this position—but the Bureau did no such thing. (See Def Memo, pp. 56-58.) (See id.)

Next, 1st Alliance tries to discredit the Bureau's partial reliance on the "Prequalification Forms" that HLCs used to solicit and obtain extensive consumer information that collectively constituted an application and triggered the requirement to provide a Loan Estimate to the

consumer. (See Def Memo, pp. 57-59.)[34] 1st Alliance asserts that the Individual Defendants testified that they were not aware of the prequalification form at the time it was used, but this is immaterial to the Bureau's claim under Reg Z § 1026.19(e)(2)(iii). (See Def Memo, pp. 58-59.) It matters only that 1st Alliance received loan applications, did not timely issue the mandated Loan Estimate, and required submission of executed sales and purchase contracts (and other verifying documents) before providing the Loan Estimate. 1st Alliance's final argument—that it only "encouraged" consumers to submit verifying documents—also collapses under scrutiny. When 1st Alliance "strongly encouraged" consumers to submit documents, the company did not advise the consumers that they were not required to submit documents to proceed in the loan process, thus leaving consumers with the impression that document submission was required. (See Dkt. 210-6: 1A CTDOB Hearing Br. (dated 7/24/2020) admitting "HLCs strongly encouraged potential borrowers to send verification documents as early as they were available, as reflected in the 1st Alliance flowchart.").)

## V. 1st Alliance Violated ECOA And FCRA by Failing to Provide Adverse Action Notices to Consumers After It Denied Their Request for a Loan (Counts 7 and 8).

1st Alliance argues that, for the Bureau to succeed on either its FCRA claims or its ECOA claims, the Bureau was required to identify specific transactions in which 1st Alliance failed to issue an adverse action notice that was required under FCRA or ECOA. (See Def Memo, pp. 61-63.) 1st Alliance does not cite legal authority establishing that such a standard generally applies, let alone that it applies in a case where, as here, the party has already admitted its wrongdoing. 1st Alliance has repeatedly admitted that it violated FCRA and ECOA when the

[34] 1st Alliance also tries to discredit the "process flowchart" (Dkt. 210-63) reflecting 1st Alliance's instructions for timing of when certain actions should occur in the loan origination process, but the only argument they can muster is that sworn testimony the Bureau uses to discuss the flowchart was obtained during an Investigative Hearing instead of a deposition taken during discovery in this matter. (Def Memo, pp. 59-60.)

company "'failed to provide the written adverse action notices required by FCRA and ECOA for a limited period of time to customers who were disqualified from receiving a loan at a very early stage (such as due to a credit score below 1st Alliance's programmatic cutoff) before a full [Uniform Residential Loan Application (URLA): Form 1003] was taken." (Dkt. 210-6: 1A CTDOB Hr'g Br. (dated 7/24/2020), p. 61); Dkt. 210-6: 1A Super. Ct. Appeal Br. (dated 11/17/2022), id. at p. 42 (admitting that 1st Alliance failed to provide written adverse action notices.)[35] The company's admissions—combined with testimonial and documentary evidence cited by the Bureau—establish that no genuine dispute of material fact exists with respect to 1st Alliance's violations of FCRA and ECOA.[36]

While 1st Alliance does not present additional arguments regarding the Bureau's ECOA claims, it does present an additional attack on the FCRA claims. 1st Alliance asserts that it cannot be held liable for violations of FCRA because, pursuant to its action plan implemented in 2019, the company sent FCRA-compliant notices to those consumers were had previously not received them. (Def Memo, pp. 61-62.) According to 1st Alliance, these curative notices prevent them from being held liable for their admitted violations of FCRA. (Id.) This argument fails to preclude summary judgment for the Bureau because a conclusory statement in a legal memorandum asserting that 1st Alliance cured all failures to send a FCRA notice—which it admits amounted to

[35] ECOA, as implemented by Reg B § 1002.9(a)(1)(i), requires creditors to provide all applicants written notice of the creditor's decision on an application within 30 days, regardless of whether the application is accepted or rejected. (See 15 U.S.C. § 1691(d)(1); 12 C.F.R. § 202.9(a)(1)(i).) In contrast, FCRA's notification/disclosure requirements are triggered when a "person" takes an adverse action against a consumer that is "based in whole or in part on any information contained in a consumer report[.]" (15 U.S.C. § 1681m(a) (emphasis added).)

[36] 1st Alliance asserts the ECOA claim cannot succeed because "[t]he curative notices sent by 1st Alliance were not an admission that ECOA had been violated—they were based on a reasonable and conservative process to identify instances in which ECOA may have been violated." The Bureau's Motion for Summary Judgment has not, and does not, assert that sending curative notices is evidence of 1st Alliance's ECOA violations. (See generally Bur. Memo, pp. 47-49.)

tens of thousands of transactions—is insufficient to overcome the evidence of the company's liability. See Johnson v. Sears Roebuck & Co., No. 3:05-cv-0139 (JCH), 2007 WL 2491897, at *2 (D. Conn. Aug. 29, 2007) (citing Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) ("[M]ere conclusory allegations or denials in legal memoranda . . . are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.")).

1st Alliance has provided nothing but vague assertions to "prove" that it sent all required FCRA notices. The facts it asserts in its briefing establishes that it cannot even confirm with a reasonable degree of certainty that it cured all its FCRA notice failures. For example, 1st Alliance asserts that it "ran reports to identify [the] transactions that were potentially impacted," then mailed notices to consumers involved in those transactions. (See Def Memo, pp. 61-62). However, the company has not—and admittedly cannot—provide any details regarding the criteria or process employed to determine which transactions were "potentially impacted." There is no evidence in the record from which this Court (or the Bureau) could even determine if 1st Alliance's process for identifying those "potentially impacted" transactions was, in fact, reasonably likely to identify the transactions that warranted a FCRA-required notice that had not been issued. In short, we are left with little more than 1st Alliance's unsupported assertions that they cured their admitted failure to issue the required notices, and mere assertions are insufficient to overcome the Bureau's summary judgment motion. See Williams v. Rodriguez, No. 3:20-cv-00806 (VLB), 2023 WL 372782, at *1 (D. Conn. Jan. 24, 2023) (to survive a properly supported summary judgment motion, the opposing party "must offer some hard evidence showing that its version of the events is not wholly fanciful").

**VI. The Bureau Has Established Its Entitlement to Summary Judgment Under CFPA § 5536(a)(1) Based on Defendants' Violations Identified in Counts 1, 2, 7, and 8.**

The Bureau is entitled to judgment on its claims brought under the CFPA § 5536(a)(1), which makes it unlawful for "any covered person . . . to offer or provide to a consumer any financial product or service not in conformity with Federal consumer financial law, or otherwise commit any act or omission in violation of a federal consumer financial law." (12 U.S.C. § 5536(a)(1).) 1st Alliance does not dispute that (i) it is a covered person under the CFPA; and (ii) TILA, Regulation Z (which implements TILA), FCRA, and ECOA are federal consumer financial laws within the meaning of CFPA § 5536(a)(1). (See Def Memo, p. 66.)[37]

1st Alliance's argues that "Count 9 appears to violate Rule 10's admonition not to lump multiple claims in a single count," but Count 9 does not combine multiple claims so 1st Alliance's argument is inapposite. 1st Alliance also asserts "since Plaintiff has not explained what specific judgment it is seeking on Count 9, the Court should not grant summary judgment on Count 9 at this time, even if it were warranted on one or more of the underlying counts." This argument is illogical, as it is clear the Bureau seeks a determination that 1st Alliance has violated CFPA § 5536(a)(1) through its commission of other violations of federal financial laws and any further discussion of the "specific judgment" requested was not required because, as instructed by the Court, this brief does not address damages that the Bureau may be entitled to upon conclusion of this case.

---

[37] 1st Alliance asserts that, to the extent the Bureau is not entitled to summary judgment on Counts 1, 2, 4, 7, and 8, it is not entitled to summary judgment on Count 9. (Def Memo, p. 66) To the extent this is intended to assert that that the Bureau must earn summary judgment on all five of those Counts to earn summary judgment on Count 9, this is inaccurate. Instead, if the Bureau earns summary judgment on Count 1, 2, 4, 7, or 8, it is entitled to summary judgment on Count 9.

## VII. Defendants Fail To Demonstrate That Any Of The Bureau's Claims Are Barred By the Statute of Limitations.

### A. Each Asserted Claim Is Subject To the Statute of Limitations Stated in CFPA § 5564(g)(1).

Defendants concede that the Bureau's claims brought under the CFPA (i.e., Counts 4 and 9) are subject to a 3-year date of discovery-based statute of limitations, but they contend that the TILA-based claims brought under Regulation Z (i.e., Count 1 and 2) are governed by the one-year limitations period of TILA § 1640(e). (Def Memo, pp. 64-65.) Defendants' argument fails because TILA § 1640(e) applies to actions initiated by individual private plaintiffs, but not to actions initiated by the Bureau. (See generally 15 U.S.C. § 1640 (outlining requirements for damages awards to an "individual.") Instead, the Bureau's Regulation Z claims are authorized by TILA §1607(b), which instructs that "[s]ubject to subtitle B of the [CFPA], compliance with the requirements imposed under [TILA] shall be enforced under . . . subtitle E of the [CFPA], by the Bureau." 15 U.S.C. § 1607(a)(6); see also id. § 1607(b) ("For the purpose of the exercise by [the CFPB] of its powers under [the CFPA], a violation of any requirement imposed under this subchapter shall be deemed to be a violation of a requirement imposed under [the CFPA].")

Subtitle E of the CFPA, in turn, authorizes the Bureau to bring suit "to impose a civil penalty or to seek all appropriate legal or equitable relief," 12 U.S.C. §§ 5564(a), 5565(a), and it instructs that an action may not be brought "more than 3 years after the date of discovery of the violation." (12 U.S.C. § 5564(g)(1).) When read together, these statutory provisions give the Bureau three years to bring suit from the date it discovers a violation of TILA and Regulation Z—not the one-year period asserted by Defendants. See CFPB v. Citizens Bank, N.A., 504 F. Supp. 3d 39, 49 (D.R.I. 2020); CFPB v. Ocwen Fin. Corp., 2019 WL 13203853, at *28 (S.D. Fla. Sept. 5,

2019) (unpublished), adhered to on denial of reconsideration, 2019 WL 13211630 (S.D. Fla. Nov. 13, 2019).[38]

### B. The Limitations Period Accrues When The Bureau Discovers the Facts Regarding the Violations.

Defendants do not dispute that the CFPA's statute of limitations permits the Bureau to file an action up to "3 years after the date of discovery of the violation," but Defendants argue the limitations period begins either when the Bureau knows of the facts establishing the violations or when the Bureau allegedly should have discovered the violations. (Def Memo, pp. 64-66.) The "should have known" standard that Defendants want to apply is merely a version of an "inquiry notice" standard that would have the limitations period accrue when the Bureau possesses "a quantum of information" indicating there was wrongdoing that "should" have prompted the Bureau to conduct a further inquiry. Reading an inquiry notice standard into CFPA § 5564(g)(1) is contrary to the plain language of statute and the case law that has interpreted the statute's plain language. If Congress had intended the limitations period to begin running as soon as a violation should have been discovered (rather than when it was actually discovered), then it could have said so, as it has in other statutes. See, e.g.,15 U.S.C. § 77m (barring actions "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" (emphasis added)); 21 U.S.C. § 335b(b)(3)(B) (barring actions initiated "more than 6 years after the date when facts material to the act are known or reasonably should have been known by the Secretary" (emphasis added)).

[38] Defendants only cite to one case—CFPB v. ITT Educ. Servs., Inc., 219 F. Supp. 3d 878 (S.D. Ind. 2015)—to support their assertion that the Bureau's TILA-based claims are subject to a one-year limitations period but that case has been consistently rejected since its issuance. See, e.g., Citizens, 504 F. Supp. 3d at 48 (D.R.I. 2020) ("[T]his Court does not find . . . the ITT Court [analysis] . . . to be persuasive.").

The only case Defendants cite in support of their effort to graft an inquiry notice standard onto the CFPA is CFPB v. NDG Financial Corp., but the court in NDG Financial provided no analysis on this point and relied improperly on a Second Circuit case involving private plaintiffs and a different statute. (See Def Memo, p. 65 (citing CFPB v. NDG Fin. Corp., No. 14-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016)). There is good reason not to apply the discovery standard for injured private plaintiffs to the government, including the unworkability of determining how a resource-constrained government agency should have conducted an investigation. Cf. 3M Co. (Minnesota Min. & Mfg.) v. Browner, 17 F.3d 1453, 1461 (D.C. Cir. 1994) (identifying reasons "[a]n agency may experience problems in detecting statutory violations").

Thus, where, as here, Congress has enacted a statute with a clear discovery-based accrual standard, courts should not undermine that standard by reading into it the much less stringent requirement that a defendant need only establish something akin to a mere "notice" of possible violations standard, as Defendants attempt here. See CFPB v. Chou Team Realty LLC, No. 8:20-CV-00043 (SB-ADS), 2021 WL 4077110, at *5 (C.D. Cal. Aug. 10, 2021), aff'd sub nom. CFPB v. Nesheiwat, No. 21-56052, 2022 WL 17958636 (9th Cir. Dec. 27, 2022); see also CFPB v. Weltman, Weinberg & Reis Co., L.P.A., No. 1:17-cv-817, 2017 WL 4348916, at *6 (N.D. Ohio Sept. 29, 2017) (analyzing 12 U.S.C. § 5564(g)(1)); Integrity Advance, 48 F.4th at 1173 (holding CFPA's limitations period accrues when the Bureau discovers the facts of the violation, and explicitly rejecting application of "inquiry notice" standard).

### C. There Is No Factual Basis To Conclude that the Bureau Discovered The Violations At Issue Before January 15, 2018.

"Because the statute of limitations is an affirmative defense, the burden is on the defendants to establish when the . . . claims accrued and when the limitations period expired." Ingram v.

Sochacki, 2018 WL 4903238, *4, (D. Conn. October 9, 2018). Defendants assert that the Bureau discovered 1st Alliance's violations and became "intimately familiar with 1st Alliance's business model, including the use of unlicensed sales staff, as early as 2013" during a RESPA-related supervisory exam when a 1st Alliance employee allegedly disclosed these details to a Bureau attorney. (Def Mom, p. 64 (citing Dkt 222-17, ¶¶ 3-4, 6-11 (Consent Order of 2/24/2014 resolving RESPA violations).) Defendants rely almost exclusively on statements provided in DiIorio's Affidavit. (See Dkt. 225: DiIorio Aff. ¶¶ 4-6.) The affidavit fails as evidence because its statements are conclusory, uncorroborated, and lacking in critical details (e.g., when was the disclosure was made, who made disclosure, what specific information was provided in the disclosure). It is also contradicted by record evidence (including Defendants' admissions) establishing the at-issue conduct did not begin until early-2016, at the earliest. That is, during 2013 1st Alliance offered loss mitigation loans almost exclusively and was not yet using unlicensed HLCs to originate purchase mortgage loans. (See, e.g., 1A-RSUMF ¶¶ 18, 26, 31.

The only other argument Defendants make in support of their argument that the claims accrued before January 15, 2018 (i.e., three years before the Complaint was filed) is the conclusory and illogical assertion that, because the Bureau scheduled an examination of 1st Alliance for January 2017, but cancelled the exam before it commenced, the Bureau "cannot show that it did not have notice of any purported violations relating to the use of those unlicensed individuals in 2016 or 2017." [39] The scheduling of an exam does not reflect any knowledge on the part of the Bureau and, in any event, the Bureau cannot discover a violation prior to gathering facts and

[39] The exam was not related to loan origination practices and, instead, was a limited-scope exam regarding 1st Alliance's compliance with the Home Mortgage Disclosure Act (HMDA), which is a federal law that requires mortgage lenders to keep records of key pieces of information regarding their lending practices. (See Dkt. 221-1: Bureau Exam Letter, dated October 28, 2016 (providing the following information regarding the exam: "Area(s) of focus: Home Mortgage Disclosure Act," "On-site start date: February 6, 2017").

conducting analysis through an exam or investigation. And, as discussed above, Defendants attempt to apply a notice standard rather than the proper "discovery of the facts" standard. Finally, Defendants' assertion that the Bureau "cannot show that it did not have notice" ignores that the burden to establish when a claim accrued and whether a claim is time-barred rests solely with Defendants; no burden is placed on the Bureau unless Defendants present evidence that meet their burden—which they have not.[40]

## VIII. Defendants' Remaining Arguments Fail to Present Any Genuine Dispute of Material Fact Or Legal Basis Precluding Summary Judgment in The Bureau's Favor.

### A. Under Binding Second Circuit, The Bureau's Statutory Funding Mechanism Is Constitutional; Therefore, Defendants' Arguments Asserting Otherwise Do Not Entitle Them to Summary Judgment.

Defendants finally contend that they are entitled to summary judgment on all counts because the statute funding the Bureau's operations—which authorizes the Bureau to draw up to a capped amount from the Federal Reserve System's earnings each year, 12 U.S.C. § 5497(a), (c)—violates either the Appropriations Clause or separation of powers principles. See ECF No. 224-2 at 61–62. But as Defendants acknowledge, binding precedent directly forecloses this argument. In CFPB v. Law Offices of Crystal Moroney, P.C., the Second Circuit held that because "the CFPB's funding structure was authorized by the CFPA—a statute passed by Congress and signed into law by the President"—it satisfies the Appropriations Clause. 63 F.4th 174, 181 (2d Cir. 2023). The Second Circuit likewise rejected any argument that the Bureau's statutory funding mechanism violates "constitutional separation of powers" principles "underpinning" that

[40] Defendants complain that the Bureau "has refused to provide discovery" regarding the cancelled exam, (Def Memo, p. 65.) but Defendants failed to request such discovery during the allotted 19-month discovery period. Further, as a substantive matter, Defendants fail to establish a need for such discovery. For example, 1st Alliance was notified of the exam on Friday, October 28, 2016, and 1st Alliance was notified no later than Friday, November 4, 2016, that the exam was cancelled. (Dkt. 240.) The reason the exam was cancelled is immaterial, and Defendants fail to establish otherwise.

provision. Id. at 181–82 (quoting Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB, 51 F.4th 616, 642 (5th Cir. 2022)).[41]

As the Second Circuit explained, there is no "Supreme Court decision holding (or even suggesting) that the Appropriations Clause requires more than [a] straightforward and explicit command"—that "the payment of money from the Treasury must be authorized by a statute." Id. at 182 (quoting OPM v. Richmond, 496 U.S. 414, 424 (1990)). Because this Circuit has already determined that the Bureau's statutory funding mechanism is consistent with constitutional text, precedent, and history, see id. at 182–83, Defendants' constitutional challenge does not entitle them to summary judgment on any claim.

### B. The Bureau's Request for Application of Nonmutual Collateral Estoppel Is Properly and Fully Articulated In the Bureau's Motion in Limine.

Defendants make several arguments purporting to respond to the Bureau's request for application of collateral estoppel; however, the only thing their arguments establish is that there is no reason to further delay Defendants' obligation to file a response to the Motion in Limine for Application of Collateral Estoppel (Dkt. 215).[42] Defendants have had a sufficient opportunity to review the Bureau's Motion in Limine, as evidenced by the fact that their summary judgment filing identifies arguments that they "anticipate presenting" in response. (See, e.g., Dkt. 232-2 at 47-50 (reciting collateral estoppel standards, addressing portions of the Bureau's arguments, and

[41] As Defendants note, this Term the Supreme Court is reviewing the Fifth Circuit decision holding the Bureau's funding mechanism unconstitutional. See CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd., No. 22-448 (oral argument held Oct. 3, 2023).

[42] The Bureau filed its Motion in Limine for Application of Collateral Estoppel (Dkt. 215) on January 31, 2024. On February 9, 2024, instead of responding to the Bureau's Motion in Limine, Defendants files a Motion to Strike, which asserted multiple spurious arguments asking this Court to strike the Bureau's Motion in Limine. On February 23, 2024, the Bureau filed its Opposition to the Motion to Strike. Considering this timeline, when Defendants filed their Cross-Motion for Summary Judgment on February 26, 2024, they were fully aware of the bases for the Bureau's request for application of collateral estoppel.

identifying arguments that "Defendants anticipate presenting" in their response to the Motion in Limine).

Beyond those observations—and despite having full access to the Bureau's Motion in Limine (Dkt. 215, filed January 31, 2024) and its Opposition to Defendants' Motion to Strike the Motion in Limine (Dkt. 220, filed February 23, 2024)—Defendants' summary judgment filing continues to feign as if the Bureau's Motion for Summary Judgment sets forth the Bureau's full argument regarding why the doctrine should be applied, as opposed to the brief overview it is intended to be. (See Def Memo, pp. 53-54.) Defendants also reiterate their baseless arguments from their Motion to Strike: namely, that the Bureau's Motion in Limine was, in reality, a supplemental summary judgment brief that should be struck from the record. The argument is as meritless now as it was when their motion was filed. (See Dkt. 220: Opp to Strike (analyzing inapposite case law and inaccurate facts asserted by Defendants in their motion to strike).)

**C. No Additional Discovery Is Necessary Before The Court Resolves Liability Regarding Each Claim.**

On January 25, 2024, at the request of Defendants, the Court held a discovery conference during which it denied Defendants' request to compel the Bureau to respond to a litany of questions and information requests Defendants claimed sought "crucial" information they needed to fully prepare their summary judgment briefing. (See Jan. 25, 2024 Hr'g Tr. at 3.) At the close of the hearing, the Court outlined the procedure it required Defendants to follow, and the showing Defendants were required to make if, after seeing the Bureau's Filing, Defendants maintained that they still lacked "crucial" discovery needed for their defense:

> Once you have formulated your opposition to summary judgment and identified any necessary additional discovery pivotal to summary judgment, you should include in your opposition brief a description of that additional discovery and an explanation of why you believe that it is crucial and that would be sufficient. You don't need to file a motion under Rule 56(d) at that

> point. It will be sufficient if, in your opposition brief, you specifically identify any additional discovery that you believe needs to be allowed in order to determine whether there is a genuinely disputed issue of material fact given what the Plaintiff says in its -- in its papers in support of summary judgment.

(Jan. 25, 2024 Hr'g Tr. at 14.) Defendants fail to identify any discovery they lack that is "pivotal to summary judgment" and similarly fail to explain why any discovery they have not obtained is "crucial;" thus, Defendants should be deemed to have abandoned or otherwise waived their pre-summary judgment demands for additional discovery regarding any issue relating to their liability.[43]

## CONCLUSION

For the reasons stated above and in the Bureau's Motion for Summary Judgment, the Court should grant summary judgment in the Bureau's favor on the issue of whether 1st Alliance, John DiIorio, and Kevin St. Lawrence are liable for violating the statutes and regulations associated with Counts I, II, IV, VII, VIII and IX from the Bureau's Amended Complaint. Similarly, the Court should deny in full Defendants' Cross-Motion for Summary Judgment.[44]

Respectfully Submitted,

*For Plaintiff Consumer Financial Protection Bureau*

Eric Halperin
*Enforcement Director*

---

[43] Throughout Defendants' Filing, their references to discovery they did not obtain are perfunctory and primarily consist of (i) sulking complaints about not having certain information (some of which they never requested from the Bureau during the discovery period); (ii) wholly conclusory (and unfounded) assertions about the information. Within this memorandum, the Bureau has addressed most of Defendants' discovery-related assertions but, to ensure clarity of its position, the Bureau hereby asserts is opposition to any request for discovery that Defendants attempt to assert with respect to issues of liability.

[44] To the extent the Bureau has not directly addressed any argument raised in Defendants' Filing, the Bureau respectfully relies on and reiterates its arguments and evidence submitted in connection with the Bureau's Filing submitted in January 2024. Further, to the extent Defendants' incorporation and reservation of arguments and rights from their Motions to Dismiss are deemed relevant to resolution of either parties' summary judgment motion (see, e.g., Def Memo, p. 44 n. 27; id. at 56, n.34.), the Bureau respectfully requests that this Court incorporates by reference and reserves any arguments and other submissions made by the Bureau in connection with the Motions to Dismiss, which was resolved by this Court on March 31, 2022.

Alusheyi J. Wheeler
*Deputy Enforcement Director*

Julie Bean
*Assistant Litigation Deputy*

*s/April Denise Seabrook*
April Denise Seabrook (CT Bar No. phv207050)
Phone: (202) 557-8822
april.seabrook@cfpb.gov

Paris A. Wynn (CT Bar No. phv206750)
Phone: (202) 815-0783
Paris.wynn@cfpb.gov

*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

*Local Counsel:*

Sarah Gruber (Bar No. ct29918)
Assistant United States Attorney
Tel: (860) 947-1101
Fax: (203)773-5373
sarah.gruber@usdoj.gov
United States Attorney's Office
District of Connecticut
450 Main Street, Room 328
Hartford, CT 06103