**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br>Plaintiff,<br><br>v.<br><br>1ST ALLIANCE LENDING, LLC, *et al.*,<br>Defendants. | Case No. 3:21-CV-00055-RNC |

**DEFENDANTS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**

DATE: May 30, 2024

Mitchel H. Kider, pro hac vice
Michael Kieval, pro hac vice
Allison Scoggin, pro hac vice
Weiner Brodsky Kider PC
1300 19th St NW, 5th Floor
Washington, D.C. 20036
Tel: 202-628-2000
Fax: 202-628-2011
Email: kider@thewbkfirm.com
kieval@thewbkfirm.com
scoggin@thewbkfirm.com

Ross Garber
The Garber Group LLC
100 Pearl St., 14th Floor
Hartford, CT 06103
Tel: (860) 983-5145
Fax: (860) 983-5145
Email: rgarber@thegarbergroup.com

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION .................... 1
ARGUMENT .................... 2
I. 1st Alliance's Employment of HLCs Was Not an "Unfair" Practice .................... 3
A. HLCs Were Qualified .................... 3
1. Plaintiff's New Training Argument Is Nonsense .................... 3
2. Plaintiff Cannot Refute the Evidence HLCs Were Supervised .................... 6
B. Plaintiff's Inability to Show Consumer Harm Is Fatal to Count Four .................... 7
1. Plaintiff Still Has Not Identified Real Consumer Harm .................... 7
2. Plaintiff Still Has Not Shown Causation .................... 9
C. Plaintiff Fails to Show Consumers Could Not Reasonably Avoid "Harm" .................... 10
D. Plaintiff's Failure to Meet the Countervailing Benefits Prong Is Fatal to Count 4 .................... 11
E. Plaintiff Cannot Show the Individuals' Knowledge of the "Unfairness" .................... 11
1. Plaintiff Must Show Knowledge of the Unfairness, Not Merely of Conduct .................... 11
2. Knowledge Is Not Imputed Backwards in Time .................... 14
3. Plaintiff Also Does Not Establish Knowledge after the 2017 Audit Report .................... 15
4. Plaintiff's Evidentiary Objections Are Without Merit .................... 16
II. Plaintiff Cannot Hide the Ball on State Examination Findings .................... 18
III. Plaintiff's Vague Privilege Complaints Are Meritless, Untimely .................... 21
A. Defendants Have Not Asserted an Advice-of-Counsel Defense .................... 22
B. Plaintiff's Attempt to Object is Procedurally Improper and Untimely .................... 24
IV. Constitutionality .................... 25
CONCLUSION .................... 25

**TABLE OF AUTHORITIES**

**Cases**

*BellSouth Telecommunications, Inc. v. WR Grace & Co.*, 77 F.3d 603 (2d Cir. 1996) ............... 17
*Bryan v. United States*, 524 U.S. 184 (1998)........................................................................ 14
*CFPB v. Community Financial Services Ass'n of Am.*, No. 22-448, 601 U.S. __ (2024) ........... 25
*CFPB v. Stratfs, LLC*, No. 24-cv-40, 2024 U.S. Dist. LEXIS 66735 (Apr. 11, 2024)................ 13
*FTC v. Garvey*, 383 F.3d 891 (9th Cir. 2004)......................................................................... 12
*FTC v. Moses*, 913 F.3d 297 (2d Cir. 2019) ............................................................ 11, 12, 14
*FTC v. Tax Club, Inc.*, 994 F.Supp.2d 461 (S.D.N.Y. 2014) ..................................................... 14
*Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004).................................................................... 22
*In re Axa Equitable Life Ins. Co. COI Litig*., 595 F.Supp.3d 196 (S.D.N.Y. 2022)..................... 14
*In re Prestige Mortg. Svcs., Inc.*, Statement of Charges, No. C-20-2842-23-SC01 (Wash. DFI 2023) ............................................................................................................................ 9
*Modern Home Inst., Inc. v. Hartford Acci. & Indem. Co.*, 513 F.2d 102 (2d Cir. 1975) ............... 8
*SEC v. Present*, No. 14-cv-14692, 2017 U.S. Dist. LEXIS 120351 (D. Mass. July 31, 2017) .... 23
*Spectrum Dynamics Med., Ltd. v. GE*, No. 18-cv-11386, 2021 U.S. Dist. LEXIS 150017 (S.D.N.Y. Aug. 10, 2021) ................................................................................................ 22
*St. Pierre v. Dyer*, 208 F.3d 394 (2d Cir. 2000) ....................................................................... 16
*United States v. Bankman-Fried*, No. 22-cr-0673, 2024 U.S. Dist. LEXIS 21662 (S.D.N.Y. Feb. 7, 2024) ........................................................................................................................ 23
*United States v. DiMaria*, 727 F. 2d 265 (2d Cir. 1984) ........................................................... 16
*United States v. Int'l Mins. & Chem. Corp.*, 402 U.S. 558 (1971) ............................................. 14
*United States v. Scully*, 877 F.3d 464 (2d Cir. 2017)................................................................ 23
*United States v. Weintraub*, 273 F.3d 139 (2d Cir. 2001) ......................................................... 13
*Winskunas v. Birnbaum*, 23 F.3d 1264 (7th Cir. 1994) ............................................................... 8

**Statutes**

12 CFR § 1026.36(f)(3)(iii) ................................................................................................ 4, 6
12 U.S.C. §§ 5104(c) ................................................................................................................ 5
12 USC § 5104.......................................................................................................................... 4
16 C.F.R. §§ 310.3(a), (c), (d) ................................................................................................. 13
310.4........................................................................................................................................ 13
5105(b)...................................................................................................................................... 5

**Rules**

56(a)(2)(i)........................................................................................................................ 21, 24

Fed. R. Civ. P. 56(e) .......................................................................................................... 11

**INTRODUCTION**

This case looks little like it did when Plaintiff filed it to great fanfare, more than three years ago. First, one of Plaintiff's claims against the Individuals was dismissed, and another was significantly limited, by the Court's ruling on their Motion to Dismiss. Dkt. 63. Second, Plaintiff was forced to voluntarily dismiss *all* of its claims alleging "deceptive" conduct (and all claims against Mr. Aramburu). Dkt. 161. Now, unable to substantiate its remaining allegations and theories, Plaintiff retreats again, making a last-ditch adjustment as time winds down, while engaging in misdirection and even outright falsehoods.

In both Counts One and Four, Plaintiff largely abandons the theories that it litigated throughout this case. In Count Four, Plaintiff wholly abandons its central claim that HLCs' lack of licenses was an "unfair" practice under the CFPA, and seeks to fall back on the assertion that the HLCs were purportedly "unqualified" in some other way. Having thus conceded that the lack of licensure cannot support Count Four, Plaintiff finds itself unable to meaningfully dispute the HLCs' qualifications, and instead is reduced to quibbling over the specific training modules which Plaintiff now argues, for the first time, HLCs supposedly lacked.

And in Count One, Plaintiff responds to the evidence that state regulators disagree with its position concerning those states' licensing laws, by nitpicking those regulators' conclusions and arguing that the Court should ignore Plaintiff's complete failure to come forward with *any* example in most states of even one HLC doing anything that purportedly required a license, based on a new allegation that the HLCs purportedly violated the *federal* SAFE Act. But Plaintiff did not plead this new theory in Count One, and the Record belies its claim.

Finally, Plaintiff seeks to stack the deck against Defendants with an illogical argument for disregarding evidence in this case, which Plaintiff impermissibly wedges into its response to

Defendants' Statement of Facts. Even if the Court considers that improper briefing, however, the argument lacks any factual or legal merit.

After years of litigation, Plaintiff comes nowhere near establishing "unfair" acts or practices, let alone knowledge. The Bureau simply does not understand the mortgage industry or the applicable laws,[1] and the Court should reject the distractions that the Bureau is trying to use to avoid summary judgment on Count Four and partial summary judgment on Count One.

## ARGUMENT

Defendants believe that HLCs—who were vetted, trained, and supervised—did not require individual licensure under the various state licensing laws. Most states agree with Defendants' position. Plaintiff seeks to distract from this key fact by pretending that it did not happen, and by changing legal theories. Each is addressed below. Moreover, even if one or more particular HLCs may have violated state licensing law in particular instances, that does not establish as a blanket proposition that HLCs needed licenses—they did not.

Even if the Court disagrees with Defendants' position as to licensure, however, Plaintiff now admits that the lack of licensure was not an "unfair" practice. Dkt. 241 at 20 n.14 ("the Bureau's unfairness claims are not based on HLC licensure"). Plaintiff therefore finds itself without any factual basis (other than the now-abandoned reliance on HLCs' lack of licensure) for the claimed lack of qualification. The only thing Plaintiff can come up with is to quibble about the specific training modules that HLCs completed. That desperate argument is raised for the

[1] One example of the Bureau's lack of familiarity with MLO licensing laws is Plaintiff's objection "that the term 'Qualified Individual' is vague and ambiguous." Dkt. 242 at 57 ¶ 216. The Court may take judicial notice that "Qualified Individual" is a well-understood role with respect to mortgage licensing, required in various states. *See, e.g.*, https://mortgage.nationwidelicensingsystem.org/slr/PublishedStateDocuments/NJ-QI-RML-New-Application-Checklist.pdf (New Jersey). Abbreviated "QI," it is also often called a "Qualifying Individual." *See, e.g.*, https://mortgage.nationwidelicensingsystem.org/licensees/resources/LicenseeResources/Individual%20(MU2)%20Form%20Filing.pdf at 1.

first time in Plaintiff's Opposition, relies on sophistry, and contradicts the undisputed evidence.

And Plaintiff's sole claim against the remaining Individual Defendants is even weaker. Having admitted that HLCs' lack of licensure was not "unfair," Plaintiff can come nowhere near showing the requisite knowledge of "unfair" practices required under the FTC Act standard Plaintiff itself advanced. Plaintiff's attempt to argue that it should not need to show knowledge of wrongdoing is not supported by the case law it cites, and the remaining Individual Defendants are entitled to summary judgment on Plaintiff's sole remaining claim against them.

## I. 1st Alliance's Employment of HLCs Was Not an "Unfair" Practice

Plaintiff now concedes—as it must—that HLCs' lack of licensure is not "unfair." Dkt. 241 at 20 n.14. Instead, Plaintiff scrambles to reframe its argument and focus solely on HLCs' qualifications. But this late adjustment lacks factual support. In any case, Plaintiff's claim fails because Plaintiff still cannot carry its burden to establish consumer harm, let alone show that the specific qualifications they contend HLCs lacked actually *caused* any such harm. Finally, Plaintiff inexplicably fails to present *any* evidence to establish the required element of countervailing benefits, which alone entitles Defendants to summary judgment on Count Four.

### A. HLCs Were Qualified

HLCs at 1st Alliance were qualified[2] for the work they did, and were both trained and supervised. The undisputed evidence and the Bureau's own regulations belie Plaintiff's attempt to minimize the HLCs' training. And the evidence shows HLCs *were* supervised.

1. <u>Plaintiff's New Training Argument Is Nonsense</u>

Faced with undisputed evidence that HLCs received significant training, Plaintiff

[2] In addition to dropping its licensing argument, Plaintiff does not renew its earlier, baseless argument that HLCs (and MLOs) needed a college degree and prior mortgage industry experience. *See* Dkt. 214-1 at 9.

responds with a quibble, asserting now, for the very first time, that HLCs should also have had three specific trainings in order to be "qualified": "(i) mortgage loan origination, including relevant state and federal laws and regulations; (ii) lending standards for 'nontraditional' mortgage products, *i.e.*, any mortgage loan other than a 30-year fixed rate mortgage; (iii) and mortgage-related ethics, including instruction regarding consumer protection and fair lending issues." Dkt. 241 at 20. This argument was not raised in Plaintiff's own motion for summary judgment; was not hinted at in a single discovery response; and was not alleged in Plaintiff's Amended Complaint.[3]

Plaintiff's new argument fails as a matter of law. Plaintiff misrepresents that these three categories of training apply equally to state-licensed MLOs and federally-registered MLOs. Dkt. 241 at 21 n.16. They emphatically do not. The SAFE Act provision cited by Plaintiff only applies to state-licensed MLOs. *See* 12 USC § 5104. By contrast, for federally-registered MLOs the sponsoring entity simply must provide "periodic training covering Federal and State law requirements that apply to the individual loan originator's loan origination activities." 12 CFR § 1026.36(f)(3)(iii). Since federally-registered MLOs are not required to obtain the specified pre-licensing training, it cannot be that HLCs would have been *per se* "unqualified" without it, unless every federal depository institution in the country is liable for the same alleged violation.

As Defendants previously showed, it cannot be "unfair" for an HLC working at 1st Alliance to do the same job that everyone agrees would have been permissible for a registered

[3] Plaintiff either hid the ball in discovery or is making these purported "qualifications" up as it goes along. Defendants sought to take testimony regarding Plaintiff's allegations in Count Four during the 30(b)(6) deposition that Defendants noticed (Topic 2(d) sought material facts underlying the allegations in Count 4, *see* Dkt. 141-2 at 9), but Plaintiff obtained a Protective Order precluding the deposition, in part on the basis of Plaintiff's insistence that Defendants were already in possession of all the facts they would need. *See* Dkt. 178. Due to Plaintiff's failure to disclose this theory previously, the Court should disregard Plaintiff's new argument on training.

(but not licensed) MLO with the same qualifications at a non-depository lender that is a subsidiary of a federally-regulated bank or credit union. Dkt. 232-2 at 30. Yet, the only source for the three additional categories of training Plaintiff now argues an MLO needs to be "qualified" is a provision that *only applies to state-licensed MLOs*. 12 U.S.C. §§ 5104(c), 5105(b) (describing pre-licensing education requirements for state-licensed MLOs). An MLO at a depository institution—or even, in many states, at a mortgage company just like 1st Alliance that happened to be a subsidiary of a depository institution—would have been registered, rather than licensed, and would not have been subject to these requirements. Just as it is self-evidently not "unfair" for a registered MLO to lack these specific training modules, Plaintiff cannot begin to explain how the same level of training would magically become "unfair" for an HLC.

In any case, 1st Alliance *did* provide this training to HLCs. 1st Alliance's Training Policy, Dkt. 222-2 at 2, shows on its face that HLCs received training regarding compliance with federal and state laws and fair lending (the first two categories listed by Plaintiff). *See* Dkt. 232-1, 1A-SUMF ¶¶ 63-64, 66-67; Dkt. 222-2 at 2 (screenshot below). *See also* Dkts. 249 ¶¶ 2-3, 249-2 (HLCs did take all the disputed courses).

2. Compliance Training
   a. All Employees must complete annual training in the following areas:
      i. Fair Lending Laws
      ii. Safe Guarding Customer Information (Gram-Leach-Bliley)
      iii. Fair Credit Reporting Act
      iv. Money Laundering
      v. Office of Foreign Asset Control
      vi. Bank Secrecy Act
      vii. Equal Credit Opportunity Act
      viii. Unfair, Deceptive, or Abusive Acts and Practices
      ix. Real Estate Settlement Procedures Act
      x. Consumer Financial Protection Bureau
      xi. Home Mortgage Disclosure Act
      xii. Truth in Lending Act
   b. MLO SAFE Act training and continuing education provided by TrainingPro (based upon individual state requirements)
   c. Education regarding state and federal laws (and changes thereto) is further described in the Regulatory Compliance section below

And as to training regarding non-traditional mortgage products, Plaintiff does not explain why it would be "unfair" not to provide such training since 1st Alliance did not generally make non-traditional loans during the relevant time period. *See* Dkt. 232-1, 1A-SUMF ¶ 9; CFPB's Official Commentary to Regulation Z, 12 CFR § 1026.36(f)(3)(iii) ("The training must take into consideration the particular responsibilities of the individual loan originator and the nature and complexity of the mortgage loans with which the individual loan originator works. *An individual loan originator is not required to receive training on requirements and standards that apply to types of mortgage loans that the individual loan originator does not originate*.") (emphasis added). Thus, Plaintiff's strained new argument fails on both the facts and the law. In any case, as addressed *infra*, even if there were any merit to this hairsplitting over specific training modules, Plaintiff has not attempted to tie *these* narrow distinctions to any "substantial injury," as required to establish "unfairness."

2. Plaintiff Cannot Refute the Evidence HLCs Were Supervised

HLCs were also supervised by MLOs and other licensed individuals who reviewed their work and interactions with consumers. Dkt. 232-2 at 31. Unable to counter the evidence that Defendants presented regarding supervision, Plaintiff attempts to minimize that evidence.

For example, Defendants presented uncontested testimony of an MLO saying her job was to do exactly what Plaintiff had alleged 1st Alliance did not do: review the intake work of HLCs and issue prequalification letters to consumers. *See* Dkt. 232-2 at 34. Plaintiff argues that "a single employee providing an overview of her alleged personal practice" routinely supervising the work of HLCs is insufficient to establish that it happened. Dkt. 241 at 22. But the evidence Plaintiff cites does not effectively contradict her testimony. Aside from the 2017 Internal Audit, which Defendants have previously addressed (*see* Dkt. 232-2 at 43), Plaintiff's argument relies

on a typo. *See* Dkt. 210-42 at 3 ("The MLO review is **not** being completed before the app is taken") (emphasis added). Although the quoted words do appear in the meeting minutes, it is obvious from the entire paragraph (including what Plaintiff left out), that the word mistyped as "not" should in fact be "**now**," since the discussion is of an updated process where "prequalification docs" were being collected earlier, in order to streamline borrowers' experience, necessitating an *earlier* MLO review ("before the app is taken" rather than only *when* the app was taken):

> 86% of the pipeline has prequalification docs. The MLO review is not being completed before the app is taken. If there are some documents, but not all, they won't be sent in for review. **There are no files that are sent in and not reviewed**. There is going to be lots of focus on this.

Dkt. 210-42 at 3 (emphasis added). *See also* Grice Dep. Tr. at 197, Dkt. 222-36 at 199 (1st Alliance's response to the 2017 Internal Audit enhanced "oversight, authority, supervision")

**B. Plaintiff's Inability to Show Consumer Harm Is Fatal to Count Four**

1. <u>Plaintiff Still Has Not Identified Real Consumer Harm</u>

Plaintiff cannot dispute Defendants' refutations of the examples of alleged consumer harm. *See* Dkt. 232-2 at 29-32. Instead, Plaintiff attempts to sidestep the lack of consumer harm by insisting (while failing to show) that there is "ample other evidence that the HLCs routinely committed significant errors," "the CFPA does not require the Bureau to produce hordes of consumer complaints," and "evidence has already established the practice was likely to cause substantial injury." Dkt. 241 at 24, n.22. Hogwash. Plaintiff's claim of "unfairness" requires Plaintiff to establish "substantial injury" to consumers *at a minimum*. It cannot do so.[4]

---

[4] Plaintiff claims that Defendants did not respond to, and therefore conceded their argument regarding an email where prequalifications were described as "seriously flawed." Dkt. 241 at 24 n.20. That is plainly false, *see* Dkt.

After a pre-filing investigation and years of discovery, Plaintiff has not uncovered *any* consumer harm and is instead reduced to suggesting why it hypothetically may have occurred. For example, in a footnote, Plaintiff vaguely references "time spent investigating or seeking refunds," but does not argue that any consumers actually spent money seeking refunds from 1st Alliance, let alone provide any evidence to support such a claim. Dkt. 241 at 23, n.19.

In response to Defendants' refutation of Plaintiff's attempt to show consumer harm related to closing costs, Dkt. 232-2 at 35-36, Plaintiff claims that it is "inconsequential to the unfairness analysis" that consumers did not pay costs before selecting a home because "the undisputed facts establish that consumers incur other significant pecuniary losses while home shopping." Dkt. 241 at 25 n.23. But once again, Plaintiff fails to cite these supposedly "undisputed facts," point to a single instance of this "pecuniary loss," or even describe what type of "pecuniary loss" consumers supposedly incurred. Plaintiff simply cannot support this element of the "unfairness" analysis, and since Plaintiff's claim fails on that element, Defendants are entitled to summary judgment. *See Modern Home Inst., Inc. v. Hartford Acci. & Indem. Co.*, 513 F.2d 102, 110 (2d Cir. 1975) ("If the most that can be hoped for is the discrediting of defendants' denials at trial, no question of material fact is presented. Even if we were to disregard the denials as incredible, plaintiffs would still be required to come forward with evidence . . . . Absent such evidence, there is no issue for trial.") (internal citations omitted); *see also Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994) ("When . . . a defendant moves for summary judgment on the ground that the plaintiff lacks evidence of an essential element of his claim, the plaintiff is required . . . to present evidence of evidentiary quality . . . demonstrating the existence

---

232-2 at 45 ("at no point in this email does Mr. DiIorio identify any consumer harm or otherwise indicate his knowledge of the allegations underlying Count 4"), and the email in question does not show any consumer harm.

of a genuine issue of material fact.”).

2. Plaintiff Still Has Not Shown Causation

Plaintiff misunderstands Defendants’ argument regarding causation. Dkt. 241 at 25. Defendants do not argue that no HLC could theoretically have harmed a consumer. *After all, a licensed MLO (or processor or underwriter) could also theoretically have harmed a consumer*. Rather, Defendants established that Plaintiff has not shown and cannot show that HLCs *did* or were likely to *cause consumers harm.* It is Plaintiff’s burden to meet each element of its claim, and its failure to present evidence of causation in response to the evidence and argument presented by Defendants shows that Defendants are entitled to summary judgment on Count Four. *See* Dkt. 232-2 at 27-29.

Unable to refute Defendants’ arguments, Plaintiff is reduced to rehashing an argument that Defendants have already disposed of. The fact that some prequalifications did not result in a closed loan was attributable to several possible reasons, such as an MLO making a mistake or consumers changing their mind. Plaintiff makes no attempt to connect prequalification “fallout” to the conduct of HLCs. *See* Dkt. 232-2 at 28-29.[5]

It is remarkable that at the end of the CFPB’s own investigation and the extended discovery period in this case, Plaintiff cannot credibly tie a single instance of consumer harm to the HLC position, during the relevant period. This despite HLCs interacting with tens of thousands of consumers during that period. The lack of any harm during this time is strong

[5] The Court may take judicial notice that mistakes in originations made by fully-qualified and licensed MLOs can and have led to supervisory activity by regulators. *See, e.g., In re Prestige Mortg. Svcs., Inc.*, Statement of Charges, No. C-20-2842-23-SC01 (Wash. DFI 2023) (enforcement based on licensed MLO errors on Loan Estimates, Rate Lock Agreements, Anti-Steering Disclosures, and state-specific notices), *available at* https://dfi.wa.gov/sites/default/files/consumer-services/enforcement-actions/C-20-2842-23-CO01%20Prestige%20Mortgage%20Services%20%26%20Ivan%20Jensen_web.pdf.

evidence that it also was not *probable* that HLCs would cause consumer harm.

**C. Plaintiff Fails to Show Consumers Could Not Reasonably Avoid "Harm"**

Plaintiff is grasping at straws, claiming that 1st Alliance withheld critical information from consumers, but does not even attempt to support the three examples of "critical information" supposedly withheld by citing the record, let alone explaining how such information is "critical" or why 1st Alliance had an obligation to disclose it. *See* Dkt. 241 at 26.

Plaintiff claims that consumers would not know to ask about HLCs' licensure status or qualifications. Dkt. 241 at 27 n. 26. HLCs had comparable training and qualifications to MLOs. *See supra*, I.A.1. But in any case, Plaintiff has now conceded that HLCs' lack of licensure is not the basis for its "unfairness" claim. So how could not highlighting the HLCs' lack of licensure have prevented consumers from avoiding the harm that Plaintiff insists is not the HLCs' lack of licensure? And it is not clear what other "qualifications" Plaintiff thinks should have been disclosed, or why Plaintiff thinks such disclosure would have been salient. Plaintiff's failure to support these already weak arguments with evidence is fatal to Plaintiff's claim in Count Four. Moreover, Plaintiff's suggestion that HLCs made "frequent errors" resulting in inaccurate prequalification was never supported, has been sufficiently debunked, *see* Dkt. 232-2 at 24-27, and cannot be revived to try to defeat Defendants' Motion for Summary Judgment by claiming "each of these facts has been established" without any citation to the record. Dkt. 241 at 26 n.25.

Plaintiff concedes that consumers knew that HLCs and MLOs had different job titles and roles, and has not shown how despite that concession, consumers supposedly could not avoid any putative harm. Indeed, if, as Plaintiff claims, reference to MLOs' and HLCs' different job titles were insufficient to inform consumers of MLOs' and HLCs' differing roles, Plaintiff fails to distinguish how telling consumers that some employees are licensed loan officers and others are

not (as they were indeed informed, in any case) make the difference? Moreover, the Record shows that the consumers frequently shopped around, and had no difficulty deciding to go with another lender besides 1st Alliance. *See, e.g.*, DiIorio Dep. Tr. p.203:13-15, Dkt. 210-12 at 52 ("The reality is most of those fallouts were because consumers went with other lenders, not because our origination process failed.").

**D. Plaintiff's Failure to Meet the Countervailing Benefits Prong Is Fatal to Count 4**

Plaintiff misconstrues its burden in opposing summary judgment. Because the underlying burden to establish each element is Plaintiff's, once Defendants came forward with some evidence that there were countervailing benefits to consumers and competition, it became Plaintiff's burden to respond with evidence. Defendants presented evidence, explaining that the use of HLCs benefitted consumers and the mortgage market "because that system insulated the MLOs from any financial incentive for a loan closing, which strengthened their commitment to quality control." Dkt. 225 ¶ 14. Yet Plaintiff has not come forward with any evidence in response. Plaintiff cannot rest on conclusory allegations from its Amended Complaint to satisfy this element. Dkt. 27 ¶ 101. *See* Fed. R. Civ. P. 56(e).

**E. Plaintiff Cannot Show the Individuals' Knowledge of the "Unfairness"**

Plaintiff fails to engage with its need to show knowledge by the Individual Defendants, and instead argues that it should not need to do so. But *Moses* is clear on this point.

1. <u>Plaintiff Must Show Knowledge of the Unfairness, Not Merely of Conduct</u>

Plaintiff seeks to save its last remaining count against the Individuals by rewriting the "knowledge" standard for individual liability under the FTC Act, articulated in *FTC v. Moses,* 913 F.3d 297, 307 (2d Cir. 2019), which this Court has already applied. *See* Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, Dkt. 63 at 22 ("[K]nowledge 'may be

established by showing that the individual [defendant] had actual knowledge of the deceptive conduct, [or] was recklessly indifferent to its deceptiveness, or had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth.'").

Although *Moses* involved allegedly "deceptive" conduct (not at issue in this case), its application to allegedly "unfair" conduct is straightforward. If Plaintiff cannot show that each Individual Defendant either had actual knowledge of the unfairness itself, under the Second Circuit standard, they can establish liability only for what may be generically referred to as reckless indifference or willful blindness with respect to the unfairness. Reading the entire paragraph in question from Moses, it is clear that knowledge of innocuous conduct does not establish liability. *See also FTC v. Garvey*, 383 F.3d 891, 902 (9th Cir. 2004) (applying knowledge prong to reject individual liability under FTC Act where individual made or knew of the statements in question, but did not know they were false). Rather, the requisite degree of knowledge of the unfairness (or deceptiveness) of the conduct is what is required.

Plaintiff similarly misreads this Court's Order, Dkt. 241 at 31 (citing Dkt. 63 at 23), to argue that it should not have to meet the legal standard because this Court supposedly held that "if 'the duties assigned to [HLCs] were subject the knowledge and approval of [DiIorio and St. Lawrence],' then they can be held liable for the unfair acts." But that is *not* what the Order says:

> The Amended Complaint plausibly alleges that the duties assigned to SCs and HLCs were subject to the knowledge and approval of the individual defendants. *See* ECF No. 27 ¶¶ 55-57, 62. In this regard, the Amended Complaint alleges that the "unlicensed SCs and HLCs routinely performed mortgage origination activities as part of their core duties." *Id.* ¶ 103. It is reasonable to infer that the defendants were aware of such a routine practice. Moreover, the Amended Complaint plausibly alleges that the individual defendants were on notice that unlicensed employees were performing licensable activities, given the compliance staff's concerns and the results of the internal audit. ECF No. 27 ¶¶ 35-36. Accordingly, the motion is denied as to Count Four.

Dkt. 63 at 23-24. Thus, the Court's Order relied on the CFPB's previous theory that the lack of licensure was unfair and held that the Amended Compliant plausibly alleged that the Individual Defendants were on notice of these wrongful actions. Now, the CFPB has disclaimed reliance on the lack of licensure with respect to Count 4 and will need to demonstrate that each Individual Defendant had knowledge of the *unfairness*—not necessarily as a legal conclusion, but at least as a factual matter.

The cases cited by Plaintiff do not support its aggressive interpretation. *CFPB v. Stratfs, LLC*, No. 24-cv-40, 2024 U.S. Dist. LEXIS 66735 (Apr. 11, 2024), concerns an emergency motion to stay a preliminary injunction, and does not apply the FTC Act standard at issue or cite *Moses* (or any other Circuit authority on point). Rather, *Stratfs* was concerned with the interpretation of the word "knowing" in the substantial assistance provision contained in the Telemarketing Sales Rule, 16 C.F.R. § 310.3(b), a completely separate standard.[6] Some defendants in *Stratfs* argued that believing their conduct was *lawful* "based on a certain statutory exception" defeated the knowledge requirement. *Id*. at *13. *Stratfs* does not establish that knowledge of wrongdoing does not need to be proven as an element of the violation, but rather merely distinguished "legal" from "factual" knowledge. *Id*. Indeed, the cases cited by *Stratfs* support Defendants' position here. *See, e.g.*, *United States v. Weintraub*, 273 F.3d 139, 147 (2d Cir. 2001) ("the phrase 'knowingly violates' requires knowledge of facts and attendant circumstances that comprise a violation of the statute, not specific knowledge that one's conduct is illegal"). Also, *Stratfs*, and the cases it cites, are focused on interpreting specific statutory

---

[6] Moreover, that Regulation deals with knowledge of specific prohibited conduct rather than the extreme generalities of the CFPA. 16 C.F.R. § 310.3(b)(knowledge element limited to specific practices identified in 16 C.F.R. §§ 310.3(a), (c), (d) and 310.4. Not only did it relate to more specific conduct, Defendants also note that Plaintiff did not bring a "substantial assistance" claim in this case. *See* Dkt. 63 at 19.

knowledge requirements, unlike the common law FTC Act standard for liability that Plaintiff has asserted here, as set forth in the controlling authority of *Moses*.[7]

The other case Plaintiff relies upon, *FTC v. Tax Club, Inc.,* 994 F.Supp.2d 461 (S.D.N.Y. 2014), does reference the FTC Act standard, but in fact runs counter to Plaintiff's argument: "The 'knowledge requirement may be fulfilled by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" *Id.* at 472.

Plaintiff cannot identify any legal support for ignoring the Second Circuit standard: Knowledge of the facts that make a practice "unfair" is required.

2. Knowledge Is Not Imputed Backwards in Time

Plaintiff has failed to identify any factual basis on which it can even argue that the Individual Defendants had the requisite degree of "knowledge" for much of the time period that Count Four allegedly covers. *See* Dkt. 214-1 at 15. Plaintiff has come up with an elegant solution to its failure: simply asking the Court to reject Defendants' "framework" for analyzing the different time periods (in particular, distinguishing the period before the October 2017 Audit Report that Plaintiff relies upon so heavily). *See* Dkt. 241 at 31, n.29.

Plaintiff argues illogically that a lack of factual basis for knowledge during the earlier

[7] *See In re Axa Equitable Life Ins. Co. COI Litig*., 595 F.Supp.3d 196, 236 (S.D.N.Y. 2022) ("only [factual knowledge] is required to establish a knowing statutory violation. Section 4226 creates a cause of action against '[a]ny . . . insurer that knowingly violates any provision of this section.' N.Y. Ins. Law § 4226."); *Bryan v. United States*, 524 U.S. 184, 192-93 (1998) ("unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense,' not proof of 'knowledge of the law.'); *United States v. Int'l Mins. & Chem. Corp*., 402 U.S. 558, 562 (1971) (holding that only knowledge of the "specific acts or omissions" constituting the relevant regulatory violation was required to prove a criminal violation, as opposed to knowledge that the acts or omissions were proscribed by law).

period should not matter because "Defendants have not put forward any evidence that their conduct materially differed during those two time periods." Dkt. 241 at 31 n.29. *Id*. That argument fails for three reasons. First, whether Defendant's conduct supposedly changed is irrelevant. Because scienter is an element of Plaintiff's claim, if the Defendants did not have knowledge for a particular period of time, they cannot be liable for violations that allegedly took place during a time that they did not possess the requisite scienter. Second, it is not Defendants' burden to fill in evidence where Plaintiff has none. Third, even if changes in conduct were relevant to the scienter determination, and even if it were Defendants' burden, the undisputed evidence shows that Defendants' conduct *did* change upon learning of the Compliance Department's concerns with the HLC model, as previously established. *See* Dkt. 232-2, 1A-SUMF ¶ 99; Dkt. 213-3, 231:17-233:13; Dkt. 210-29.

Plaintiff has offered *no evidence* that the Individual Defendants had any awareness of the alleged unfairness—or indeed of the possibility that HLCs should be licensed—prior to October 2017, nor has Plaintiff offered any valid reason why the Individual Defendants are not entitled to summary judgment for claims preceding October 2017.

3. Plaintiff Also Does Not Establish Knowledge after the 2017 Audit Report

In an attempt to make its argument that the Individual Defendants had the requisite knowledge of unfairness appear stronger than it is, Plaintiff points to already-refuted "evidence." Some of this "evidence" simply lacks the legal significance Plaintiff wishes to assign it. For example, Plaintiff continues to assert that the Individual Defendants' awareness of HLCs' job duties (Dkt. 241 at 31) and the entry-level status of some (Dkt. 241 at 32) are somehow equivalent to knowledge of the elements of unfairness. *See* Dkt. 232-2 at 31; 36. They are not.

Other factual arguments regarding the Individual Defendants' purported knowledge have

already been soundly disproven. For instance, Plaintiff claims that the Individual Defendants "rejected" a recommendation from Compliance to change the business model, Dkt. 241 at 32, but Defendants have presented significant evidence concerning their (correct) belief that the 2017 Internal Audit was neither procedurally sound or factually supported, and thus their cautious approach to attempting to validate and refine its recommendations was a reasonable response. *See* Dkt. 232-2 at 43-44. Similarly, although Plaintiff asserts that the Individual Defendants knew that HLCs were making mistakes, Dkt. 241 at 29, the email Plaintiff relies upon actually reflects Mr. DiIorio's goals to improve business metrics, customer service, and employee morale—not any knowledge of purported consumer harm. *See* Dkt. 232-2 at 45. And Plaintiff has no factual support for its general assertions that that there was a "high error rate among HLC prequalifications" Dkt. 241 at 33, or that "some consumers would receive inaccurate prequalification letters." *Id.*

4. <u>Plaintiff's Evidentiary Objections Are Without Merit</u>

Unable to establish the Individual Defendants' knowledge of the elements of their unfairness claim, Plaintiff resorts to taking pot shots at Defendants' evidence. Those objections are without merit. For example, Plaintiff takes issue with Defendants' NORA response as "self-serving," but ignores two key points: First, Plaintiff does not cite evidence that contradicts its statements. Dkt. 241 at 28. *See St. Pierre v. Dyer*, 208 F.3d 394, 405 (2d Cir. 2000) ("the self-serving nature of a witness's statements goes not to their admissibility but to their weight. The weighing of St. Pierre's evidence is a matter for the finder of fact at trial; it was not the prerogative of the court on a motion for summary judgment.") (internal citation omitted); *United States v. DiMaria*, 727 F. 2d 265, 272 (2d Cir. 1984) (noting that the Federal Rules of Evidence rejected a policy of excluding allegedly self-serving statements); *compare BellSouth*

*Telecommunications, Inc. v. WR Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) ("mere conclusory allegations or denials . . . without supplying supporting arguments or facts," were "insufficient to raise a triable issue of material fact"). Second, the NORA response is valid evidence on summary judgment as it was signed by each of the Individual Defendants under penalty of perjury, *see* Dkt. 210-18 at 59-61, and Plaintiff itself relied on the NORA letter in Plaintiff's own Statement of Undisputed Material Facts. Dkt. 214-2, ¶ 7.

Plaintiff is also wrong to assert that no "authoritative source" approved 1st Alliance's business model, seemingly arguing that the dozens of states who examined the company during the relevant time period aren't "authoritative sources." Dkt. 241 at 34-35. Plaintiff claims that state regulators' examinations are immaterial because state regulators were only reviewing "the company's compliance with licensing provisions of the SAFE Acts and related regulations" and "did not determine that 1st Alliance's practices were not 'unfair' within the meaning of the CFPA." *Id.* What an odd assertion, given that all states have UDAP laws of some sort that they enforce. *See* "Unfair, Deceptive and Abusive Practices (UDAP)," National Consumer Law Center, *available at https://www.nclc.org/topic/unfair-deceptive-and-abusive-practices-udap/*. And Plaintiff does not even suggest that any state found the use of HLCs to be "unfair."

Indeed, during each of these exams, including a 2013 investigation of 1st Alliance's origination operations by Plaintiff, 1st Alliance provided regulators with a full overview of its business practices. *See* Dkt. 225, ¶ 3-5; Dkt. 232-2 at 59; 1A-SUMF ¶¶ 138-40. Moreover, until its most recent brief, even Plaintiff was relying on state SAFE Acts in its attempt to establish this CFPA claim. Defendants certainly believed the state regulators to be "authoritative sources" of state law, and when state regulators told them their business model did not run afoul of the law, Defendants believed them. *See* Dkt. 232-2; Dkt. 225, ¶ 16; Dkt. 221-8 at 2; Dkt. 221-4 at 5-7;

Dkt. 221-6; Dkt. 221-5. State examinations are discussed further in Section II, *infra*.

## II. Plaintiff Cannot Hide the Ball on State Examination Findings

Plaintiff spent most of Discovery trying to avoid providing meaningful answers to discovery from Defendants, including in particular concerning communications with the state examinations that the Bureau now claims not to know anything about. Now, Plaintiff is trying to run out the clock, not exactly denying the facts about state examinations that Defendants have proffered, but also not engaging forthrightly with the examination conclusions, because they severely undermine Plaintiff's case. Many of the additional details that Plaintiff now demands in its Opposition are things that Plaintiff knows (or that the various states would testify to, but Plaintiff has worked to have subpoenas to the states quashed). The examples below, rebutting the Bureau's too-cute denials and half-denials, show that Defendants' posture is correct and that Plaintiff is simply hiding the ball.[8]

For example, 1st Alliance's verified Interrogatory responses establish the number of times that 1st Alliance was audited or examined, and by which states. 1A-SUMF ¶138. Plaintiff objects, without explanation, that the responses do not support the facts in that paragraph. Dkt. 242 at 40. But the chart in Dkt. 222-18 at 11-12, plainly lists the state examinations and audits.[9]

More troubling are Plaintiff's responses to statements of undisputed material fact that

---

[8] These responses are part of the Bureau's overall litigation tactics, interposing unnecessary objections to impede summary judgment. For example, Plaintiff makes dozens of hearsay objections in response to Defendants' SUMF. *See* Dkt. 242, *passim*. Most are to copies of certified transcripts of sworn witness testimony from the CT DOB administrative proceedings, although Plaintiff was working actively with CT DOB, and although Plaintiff often does not advance any evidence contrary to the facts asserted. Worse, several of these objections, both to CT DOB testimony and to other documents, are to Plaintiff's *own* summary judgment exhibits! *See, e.g.*, Dkt 242 ¶¶ 15, 16, 64, 67, 84. Plaintiff makes no effort to address whether the documents are business records, or to address the fact that on summary judgment, the evidence does not necessarily need to be in its fully-admissible form.

[9] Similarly, Plaintiff frequently makes objections to undisputed facts and then states, "[t]o the extent a response is required, admitted." *See, e.g.*, Dkt. 242 at 41-42. Thus, Plaintiff admits that particular undisputed facts are true, but nonetheless interposes objections, to impede resolution of the case on the basis of facts it admits are not disputed.

Plaintiff knows are true, and tellingly does not deny. For example, Plaintiff coordinated closely with CT DOB, and resisted producing documents or giving testimony relating to that. So Plaintiff is unable to deny 1A-SUMF ¶ 167, regarding CT DOB referring 1st Alliance to the MMC and CFPB. But the CFPB also does not admit fact 167. Rather, it tries to run out the clock while continuing to withhold the answer. Dkt. 242 at 46.[10]

It is against this backdrop of obfuscation and interference that Plaintiff's arguments regarding state examination findings should be viewed. *See* Dkt. 241 at 14-18. There is no genuine dispute that licensing concerns were within scope of the examinations Defendants cited, and Plaintiff knows full well (but will not disclose) that all of the 2019 examinations occurred against a backdrop of Connecticut lobbying the states to investigate 1st Alliance's use of HLCs specifically. *See* Dkt. 210-17 at 4-6 (9:5-19:10) (non-sealed portion of testimony of former VP of Operations Credit and Compliance, Christine Branciforte, discussing these exams); Dkt. 248-1 at 6-12 (sealed portion of same testimony, discussing scope and conclusions of state exams).[11] The Scope of the Vermont examination included "compliance with all applicable sections of Vermont Statutes." Dkt. 221-5 at 3. In its report dated August 22, 2019, Vermont *did* look at MLO licensing (*id*. at 5), found no licensing violations, and rated 1st Alliance a 2 composite compliance rating, the second-highest possible rating. *Id*. at 8. Contrary to Plaintiff's characterization, the 2019 New Hampshire Report of Examination specifically discusses the

---

[10] Interestingly, Washington DFI recently produced documents in response to an open records request that confirms CT DOB's role in driving other states' examinations of 1st Alliance. *See* Dkt. 294-3 at 3.

[11] The Washington DFI documents provide additional details to rebut Plaintiff's contentions, demonstrating that CT DOB was contacting states to influence their treatment of 1st Alliance, and did in fact influence Washington's examination. Dkt. 294-3 at 3. But Washington nonetheless ended up making no company-level findings, and instead determining to "send . . a nasty note" to one rogue individual who held an MLO license, but who was not licensed in Washington specifically. Dkt. 294-4 at 1.

Connecticut suspension, and notes that 1st Alliance asked to maintain licensure rather than surrender based on Connecticut. Dkt. 221-4 at 3-4. Moreover, the scope of the examination is extremely broad, covering both "operational practices" and "regulated business activities." Dkt. 221-4 at 5. This examination, like the other 2019 examinations, occurred during the time that CT DOB was lobbying other states to take action against 1st Alliance, and New Hampshire pointedly declined to do so. And the CFPB's position is further rebutted by internal Washington DFI emails, related to their involvement with the MMC, showing that they planned to write up an individual 1st Alliance employee, but not take any action *vis á vis* the company. Dkt 294 at 1.

Similarly, and contrary to Plaintiff's obfuscation, the 2017 Massachusetts on-site exam had an extremely broad scope, covering "compliance with Massachusetts statutes and regulations, as well as federal regulations applicable to mortgage lenders and brokers," including "an assessment of 1st Alliance's business model, policies and procedures, training, monitoring, and the placement of qualified individuals within the compliance management program . . . ." Dkt. 221-10 at 4.

Finally, Plaintiff did not plead a violation of Regulation Z based on the federal SAFE Act, and so Plaintiff's new theory should be rejected. *See* Dkt. 27 at 13-14 (alleging that "SCs and HLCs were therefore required under 'State SAFE Act implementing law'—that is, the state SAFE Act of the applicable state—to be licensed. But they were not licensed."). Plaintiff's opposition to 1st Alliance's Motion to Dismiss confirms that reading of the Amended Complaint. Dkt. 36 at 7 ("In Count One, the Bureau alleges that 1st Alliance violated Regulation Z by failing to ensure that individuals working for it were licensed *under the applicable state SAFE Act.*") (emphasis added). Plaintiff chose not to plead or litigate a theory under the federal SAFE Act, and indeed, did not include Regulation H in the list of federal regulations included in Count

Nine, either. It is too late for Plaintiff to change course now, long after the deadline to amend.

## III. Plaintiff's Vague Privilege Complaints Are Meritless, Untimely

Although asserted nowhere in its opposition memorandum, Plaintiff briefs an argument in its Local Rule 56(a)(2) Statement of Facts that the Court should prevent Defendants from relying on evidence concerning communications with compliance professionals at 1st Alliance who had law degrees. Dkt. 242 at 2-4. Plaintiff purports to incorporate those arguments into their opposition brief in a footnote, *see* Dkt. 241 at 35 n.31, but that is improper and they should be deemed waived (as should all briefing contained in Dkt. 242). *See* Local Rule 56(a)(2)(i) ("A party shall be deemed to have waived any argument in support of an objection that such party does not include in its memorandum of law.").

In any case, Plaintiff is wrong on the facts and the law. First, Defendants have not pled and do not assert an advice of counsel defense. Rather, scienter is an element of Plaintiff's affirmative claim against the Individual Defendants in Count Four. And it was Plaintiff who introduced the issue of communications with 1st Alliance's attorneys and other compliance professionals. *See, e.g.*, Dkt. 214-2 ¶ 109. Second, Plaintiff has attempted to manufacture a dispute with regard to Defendants' privilege log since November 2022 but has never been able to identify any actual defect in it. Presumably for that reason, Plaintiff never filed a motion to compel during the discovery period. Moreover, Plaintiff did not seek to depose any of the compliance professionals at issue. Third, Plaintiff relies on a document, Dkt. 231-4, which *Plaintiff* introduced into the litigation, having obtained it from CT DOB, using it as an exhibit in Kevin St. Lawrence's deposition.

Courts, including in this Circuit, routinely reject gambits like Plaintiff's here, permitting defendants to introduce evidence concerning communications relevant to their state of mind

where that is an element of the claim, without requiring waiver of any privilege.

**A. Defendants Have Not Asserted an Advice-of-Counsel Defense**

Plaintiff complains that Defendants "impermissibly attempt to assert an 'advice of counsel' and/or 'advice of professionals defense" in their Statement of Facts by referring to recommendations provided by 1st Alliance's Compliance Department. Dkt. 241 at 35 n.31; *see also* Dkt. 242 at 2-4. Defendants have done no such thing. On the contrary, Defendants' reference to the highly relevant advice of 1st Alliance compliance professionals is as reasonable as it is permissible.

For one thing, not all of 1st Alliance's compliance professionals were licensed attorneys. Some of the facts Plaintiff takes issue with relate to Briana Massey, a compliance professional who is not an attorney, and who is irrelevant to Plaintiff's untimely and meritless privilege arguments. *See, e.g.,* 1A-SUMF ¶ 79. Others relate to John McGaffigan, who is a licensed attorney, but do not refer to the provision of legal advice. *See, e.g.,* 1A-SUMF ¶ 83 ("In January 2017, 1st Alliance's Chief Compliance Officer circulated to executive management a "2016 Operational Risk Assessment," which was dated December 2016. Dkt. 210-28."). Attorneys who are employed within companies are often described as wearing "two hats," and the nature of each communication determines whether it is privileged. *See, e.g., Spectrum Dynamics Med., Ltd. v. GE*, No. 18-cv-11386, 2021 U.S. Dist. LEXIS 150017, at *4 (S.D.N.Y. Aug. 10, 2021)

To the extent Defendants might be deemed to rely for their defense on having conferred with John McGaffigan wearing his attorney hat (or with any other attorney), that is akin to arguing "presence of counsel," which does not constitute an "advice of counsel" affirmative defense and does not require waiver of any privilege. *See Howard v. SEC,* 376 F.3d 1136, 1147 (D.C. Cir. 2004); *SEC v. Present,* No. 14-cv-14692, 2017 U.S. Dist. LEXIS 120351, at *2-3 (D.

Mass. July 31, 2017) (permitting evidence regarding defendant's having engaged counsel, relevant to his state of mind, where defendant was not pursuing advice-of-counsel defense). Where scienter is a required element in the government's case, advice of counsel "can raise a reasonable doubt in the minds of the jurors about whether the government has proved the required element of the offense that the defendant had an 'unlawful intent'" but does not rise to level of "an affirmative defense that defeats liability even if the jury accepts the government's allegations as true." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). A recent example may be illustrative. In *United States v. Bankman-Fried*, No. 22-cr-0673, 2024 U.S. Dist. LEXIS 21662, at *6-8 (S.D.N.Y. Feb. 7, 2024), the court rejected the government's argument that testimony regarding counsel's involvement in drafting and implementing policies constituted an advice-of-counsel defense, where it was relevant to state of mind, holding that the normal requirements for a formal advice-of-counsel are "inapplicable" in such circumstances. *Id.* at *6.

Here, the Individual Defendants' knowledge is plainly relevant. Not only does Plaintiff plead several allegations in its Amended Complaint related to the Individual Defendants' "knowledge" of the company's business model. *See, e.g.*, Dkt. 27 ¶¶ 56, 57, 62, 103, 105, 106. But Plaintiff also introduced the issue of their interactions with 1st Alliance's compliance professionals. *See* Dkt. 27 ¶ 35 ("No later than February 2017, 1st Alliance's chief compliance officer began raising concerns to senior company leaders, including the Individual Defendants, that activities SCs were engaging in could require licensing under federal or state SAFE Acts."); ¶ 36 ("On or about October 2017, 1st Alliance's Compliance Manager notified senior management, including DiIorio and St. Lawrence, that an internal audit had found that SCs 'were at times engaged in what may constitute . . . licensed activity under the SAFE Act.'). And Plaintiff itself relies on "the compliance department's 2018 recommendation" to argue that the

Individual Defendants had the requisite knowledge, in its own summary judgment reply brief. Dkt. 241 at 36.

Given that *Plaintiff* is the party who introduced the communications that it now complains of into this litigation, Plaintiff cannot prevent Defendants from responding.

**B. Plaintiff's Attempt to Object is Procedurally Improper and Untimely**

Defendants complied with their discovery obligations, producing more than one hundred thousand pages of documents to the CFPB during discovery. Defendants produced many non-privileged emails involving its compliance professionals, including John McGaffigan who is an attorney and had a hybrid compliance and legal role. Other communications have been withheld as privileged, and properly logged on Defendants' privilege log. Plaintiff has at times suggested it did not agree with some of the privilege assertions for John McGaffigan emails, but Plaintiff has never been able to identify any single communication that it contended was improperly withheld, and Plaintiff has never moved to compel production of any such documents.

Plaintiff also took six fact witness depositions in this case and had the opportunity to take up to ten. *See* Parties' Joint Report of Case and Conference, Dkt. 37 at 9. But Plaintiff did not attempt to depose John McGaffigan, Briana Massey, or in fact *anyone* from Compliance. Instead, Plaintiff chose to brief this issue, not in its Opposition brief, but within its response to Defendants' statement of facts, which is inappropriate. Local Rule 56(a)(2)(i) requires parties opposing a motion for summary judgment to file a statement of facts in opposition to summary judgment and specifically indicates that "[a] party shall be deemed to have waived any argument in support of an objection that such party does not include in its memorandum of law." Plaintiff's footnote in its brief does not comply with this rule, and Plaintiff's argument is waived.

### IV. Constitutionality

Defendants agree that the Supreme Court's intervening decision in *CFPB v. Community Financial Services Ass'n of Am.*, No. 22-448, 601 U.S. __ (2024), requires the Court to deny Defendants' motion for summary judgment to the extent based on Plaintiff's funding structure. *See* Dkt. 245.

## CONCLUSION

No last-minute adjustment can save Plaintiff's case. The use of HLCs was not unfair, and Plaintiff's inability to produce any evidence to support its position on this point is fatal to Count Four. All the more so, Plaintiff's continued inability to point to any knowledge by the Individual Defendants of the purported unfairness of using HLCs—especially now that Plaintiff has disclaimed any argument that their lack of licensure itself was unfair—requires summary judgment to be entered in their favor.

DATE: May 30, 2024

Respectfully submitted,

/s/ *Mitchel H. Kider*

Mitchel H. Kider, *pro hac vice*
Michael Y. Kieval, *pro hac vice*
Allison M. Scoggin, *pro hac vice*
Weiner Brodsky Kider PC
1300 19th St NW, 5th Floor
Washington, D.C. 20036
Tel: 202-628-2000
Fax: 202-628-2011
kider@thewbkfirm.com
kieval@thewbkfirm.com
scoggin@thewbkfirm.com

Ross Garber
The Garber Group LLC
100 Pearl St., 14th Floor
Hartford, CT 06103
Tel: (860) 983-5145
Fax: (860) 983-5145

rgarber@thegarbergroup.com

Counsel for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2024 a copy of the foregoing was filed utilizing the ECF system, which will send notice of this filing to all parties/counsel of record.

/s/ *Mitchel H. Kider*