******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

---

1st Alliance Lending, LLC *v.* Dept. of Banking

---

# 1ST ALLIANCE LENDING, LLC *v.* DEPARTMENT OF BANKING ET AL.
## (AC 46493)

Bright, C. J., and Westbrook and Eveleigh, Js.

*Syllabus*

The plaintiff appealed from the judgment of the trial court dismissing its administrative appeal from the decision of the defendant Commissioner of Banking revoking the plaintiff's license to do business as a mortgage lender in this state and imposing a civil penalty for multiple violations of state and federal law. The plaintiff claimed, inter alia, that the commissioner did not have authority to revoke the plaintiff's license because it had already been revoked in a separate administrative action. *Held*:

The trial court did not err in failing to modify or vacate the commissioner's revocation order because the commissioner had the authority to revoke the plaintiff's mortgage lender license in the present matter after the compelled revocation of the plaintiff's license in a separate administrative action.

The trial court did not improperly defer to the defendant Department of Banking's statutory interpretation of the term mortgage loan originator as defined in the Connecticut SAFE Act (§ 36a-485 et seq.) in reaching its conclusion that substantial evidence supported the commissioner's finding that the plaintiff violated that act by using unlicensed individuals to take residential mortgage loan applications.

The commissioner did not improperly apply a provision (§ 36a-498e (b)) of the Connecticut SAFE Act retroactively because substantial evidence supported the commissioner's finding that the plaintiff's improper conduct continued after the provision's effective date.

The trial court properly concluded that substantial evidence in the record supported the commissioner's finding that the plaintiff failed to cooperate with the department's subpoena in violation of the governing statute (§ 36a-17).

There was no merit to the plaintiff's claim that it was deprived of due process, as the department's hearing procedures complied with the Uniform Administrative Procedure Act (§ 4-166 et seq.), the plaintiff failed to establish any facts indicating that the department's hearing officer or commissioner was biased, and this court reviewed the record to ensure that substantial evidence supported the commissioner's challenged findings.

This court declined to review the plaintiff's inadequately briefed claim that the penalties ordered by the commissioner were unconstitutionally excessive.

Argued September 12—officially released December 17, 2024

1st Alliance Lending, LLC *v.* Dept. of Banking

*Procedural History*

Appeal from the decision of the defendant Commissioner of Banking revoking the plaintiff's license to serve as a mortgage lender in Connecticut and imposing a civil penalty, brought to the Superior Court in the judicial district of New Britain and tried to the court, *Cordani, J.*; judgment dismissing the plaintiff's appeal, from which the plaintiff appealed to this court. *Affirmed.*

*Ross H. Garber*, with whom, on the brief, were *Mitchel H. Kider*, pro hac vice, and *Michael Y. Kieval*, pro hac vice, for the appellant (plaintiff).

*Patrick T. Ring*, assistant attorney general, with whom were *John Langmaid*, assistant attorney general, and, on the brief, *William Tong*, attorney general, for the appellees (defendants).

*Opinion*

WESTBROOK, J. The plaintiff, 1st Alliance Lending, LLC, appeals from the judgment of the trial court dismissing the plaintiff's administrative appeal from the decision of the defendant Commissioner of Banking (commissioner) revoking the plaintiff's license to do business as a mortgage lender and ordering the plaintiff to pay a civil penalty. The plaintiff claims that (1) the commissioner did not have authority to revoke the plaintiff's license that already had been revoked in a separate administrative action, (2) the court improperly deferred to the incorrect interpretation of General Statutes § 36a-485 by the defendant Department of Banking (department), (3) the commissioner improperly applied General Statutes § 36a-498e (b) (1) retroactively, (4) substantial evidence does not support the commissioner's finding that the plaintiff failed to cooperate with the investigation, (5) the court and the department violated the plaintiff's due process rights, (6) the commissioner imposed penalties that are unconstitutionally

1st Alliance Lending, LLC *v.* Dept. of Banking

excessive, and (7) if any of the commissioner's findings of violation were made in error, we must remand the matter for a new penalty hearing. We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. This dispute arises from the plaintiff's policies and procedures regarding its unlicensed employees. The plaintiff is a Connecticut limited liability company that was licensed by the department to engage in business as a mortgage lender. The plaintiff employed two relevant classes of employees that assisted customers in applying for and obtaining mortgage loans: mortgage loan originators (MLOs) and home loan consultants (HLCs).[1] MLOs are licensed by the state to take residential mortgage loan applications and to offer and negotiate terms of residential mortgage loans.[2] HLCs, on the other hand, interact with potential borrowers but are not licensed as MLOs. HLCs are not authorized to take residential mortgage loan applications or to offer or negotiate terms of residential mortgage loans. The plaintiff's HLCs used a software program called Byte[3] to input information received from potential borrowers into a database, which was used to populate a loan application with the information collected by the HLCs.

In 2017, the plaintiff's vice president of compliance, Briana Massey, and its compliance analyst, Brianna Privott, prepared an internal compliance audit to assess

---

[1] Prior to 2018, the class of HLCs held the title of submission coordinators. For the purposes of this appeal, we refer to this class of employees as HLCs.

[2] General Statutes § 36a-485 (20) provides in relevant part that "[m]ortgage loan originator means an individual who for compensation or gain . . . (A) takes a residential mortgage loan application, or (B) offers or negotiates terms of a residential mortgage loan. . . . [T]he [Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (federal SAFE Act), 12 U.S.C. § 5101 et seq.], requires such individual to be licensed as a mortgage loan originator under state laws implementing said [federal SAFE Act] . . . ."

[3] The Byte software program is a loan origination system designed to originate mortgage files including recording mortgage applications, storing documents, and processing and closing loan files.

---

1st Alliance Lending, LLC *v.* Dept. of Banking

---

whether the plaintiff's HLCs were improperly engaging in conduct that required an MLO license and whether the plaintiff was otherwise complying with Connecticut's lending requirements. The audit report, published on February 1, 2018, expressed concerns that the plaintiff was violating, inter alia, General Statutes § 36a-485 et seq. (Connecticut SAFE Act); the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 et seq.; the Truth in Lending Act (TILA), 15 U.S.C § 1601 et seq.; and the TILA-RESPA[4] Integrated Mortgage Disclosure Rule (TRID), 12 C.F.R. §§ 1024 and 1026. Specifically, the report stated that "[HLCs] were at times engaging in what may constitute as licensed activity under the [Connecticut] SAFE Act. Further, instances of [HLCs] failing to meet the requirements of the ECOA permissible credit [inquiries] were found." The audit report also found that "[t]he transaction testing found instances where [l]oan [e]stimates were not sent to applicants pursuant to TILA disclosure requirements . . . ." With respect to the Connecticut SAFE Act, the audit stated that HLCs "were found to present an unacceptable amount of risk. The issues found were systemic and required immediate attention. Compliance [t]raining was conducted . . . for all [HLCs] regarding what is and is not unlicensed activity. Additionally, written guidance was provided to all [HLCs] to supplement the training. . . . The most prevalent issues were as follows: Impermissible Credit [Inquiries]; Credit Repair Advice; Discussion of Rate and Term; Credit Decisions; Disqualified Borrowers." Moreover, the report stated that, "[w]hile there are sufficient reporting tools available in Byte to track and monitor TRID compliance, 2017 saw an unusual increase in violations" with "loan estimates sent out late or not sent out at all."

---

[4] RESPA is the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq.

1st Alliance Lending, LLC *v.* Dept. of Banking

On May 3, 2018, two associate financial examiners from the department visited the plaintiff's place of business unannounced to conduct a routine compliance examination. The plaintiff, along with other mortgage lenders, was scheduled to be examined between the first quarter of 2016 and May 3, 2018. Of the mortgage lenders that the department was required to examine, the examiners chose the plaintiff on the basis of the date of its last examination and the location of its place of business. During the examination, Massey and Eric Sanders, the plaintiff's chief executive of loan servicing, completed Uniform Manager's Questionnaires, which the department gives to all licensees for mortgage lender exams. In response to the questionnaire, Massey and Sanders provided the examiners with, inter alia, the plaintiff's 2017 internal audit report, which indicated that the plaintiff was not in compliance with state and federal law governing mortgage lenders. The examiners also interviewed various personnel of the plaintiff, including MLOs, HLCs, and executives. Following the May 3, 2018 examination, the examiners requested additional documents from the plaintiff, which Massey and Sanders provided. Beginning on September 19, 2018, one of the department's attorneys, Stacey Serrano, also emailed Massey requesting documents, some of which she provided.

On December 5, 2018, as a result of the department's compliance examination, the commissioner issued to the plaintiff notices of (1) intent to revoke the plaintiff's mortgage lender license, (2) intent to issue a cease and desist order, (3) intent to impose a civil penalty, and (4) the right to a hearing. Through June 14, 2019, the department, pursuant to General Statutes § 4-182 (c),[5]

---

[5] General Statutes § 4-182 (c) provides in relevant part that "[n]o revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action and the specific provisions of the general statutes or of regulations adopted by the agency that authorize such intended action, and the licensee was

1st Alliance Lending, LLC *v.* Dept. of Banking

sent letters notifying the plaintiff of the opportunity to show compliance with the legal requirements for retention of its mortgage lender license. The plaintiff, however, did not show compliance. On July 15, 2019, the commissioner issued amended and restated notices of intent to (1) revoke the plaintiff's mortgage lender license, (2) issue an order to cease and desist, and (3) impose a civil penalty (amended notice). The amended notice alleged eleven grounds for finding that the plaintiff violated state and federal law.[6]

given an opportunity to show compliance with all lawful requirements for the retention of the license. . . ."

[6] Specifically, the amended notice contained the following allegations: the plaintiff (1) engaged the services of unlicensed MLOs in violation of 12 C.F.R. § 1026.36 (f) (2) (2019) and General Statutes §§ 36a-486 (b) (1) and 36a-678 (a); (2) assisted or aided and abetted the conduct of individuals acting as unlicensed MLOs in violation of § 36a-498e (a) (6); (3) accepted applications or referrals of applicants from, or paid fees to, unlicensed MLOs in violation of General Statutes § 36a-496; (4) failed to comply with General Statutes §§ 36a-485 to 36a-498f, inclusive, 36a-498h, 36a-534a, and 36a-534b, or other state or federal law applicable to its business in violation of § 36a-498e (a) (8); (5) failed to establish, enforce and maintain policies and procedures reasonably designed to achieve compliance with § 36a-498e (a) in violation of § 36a-498e (b) (1); (6) failed to make records available and to cooperate with the department's Consumer Credit Division's examination in violation of General Statutes § 36a-17 (e); (7) failed to provide Connecticut applicants with adverse action notices in violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681m (a); (8) required that Connecticut applicants submit documents verifying information related to the application before providing loan estimates in violation of 12 C.F.R. § 1026.19 (e) (2) (iii) and § 36a-678 (a); (9) failed to identify unlicensed MLOs on the respective loan documents even though such individuals had primary responsibility for origination in violation of 12 C.F.R. § 1026.36 (g) (1) (ii) and § 36a-678 (a); (10) made untrue statements of material fact or omitted to state a material fact necessary to make the statements not misleading or engaged in an act, practice or course of business that operated as a fraud or deceit on persons by holding out unlicensed MLOs to potential borrowers as the individuals primarily responsible for mortgage loan origination and failing to disclose to potential borrowers that such persons were unlicensed to do so, and disclosing to investors, government agencies and regulators that the licensed MLOs were the individuals primarily responsible for the origination of the mortgage loans, in violation of General Statutes § 36a-53b; and (11) made a false or misleading statement to the department when it stated that employees were not informed of their terminations in writing, when in fact,

1st Alliance Lending, LLC *v.* Dept. of Banking

While the revocation proceeding regarding the plaintiff's compliance issues (compliance matter) was pending, the plaintiff's surety company notified the department, in May, 2019, that it was cancelling the plaintiff's surety bond coverage effective July 31, 2019. Upon receiving this notice, the department sent the plaintiff "a letter, dated June 7, 2019, stating that [General Statutes] § 36a-492[7] required the plaintiff to maintain a surety bond running concurrently with the period of the license for the plaintiff's main office, and that the plaintiff's failure to have a bond in effect on July 31, 2019, would result in the commissioner's automatic suspension of the plaintiff's license and inactivation of the licenses of each Connecticut [MLO] sponsored by the plaintiff." (Footnote added.) *1st Alliance Lending, LLC v. Dept. of Banking*, 342 Conn. 273, 277, 269 A.3d 764 (2022). The letter further informed the plaintiff that it could avoid these outcomes by reinstating or obtaining a new surety bond or by ceasing to do business and surrendering its license. Id.

On July 29, 2019, the plaintiff sent an email to the department stating that it was voluntarily surrendering its license. Id., 278. The commissioner did not accept the plaintiff's license surrender and instead suspended the plaintiff's mortgage lender license on July 31, 2019. Id. In light of the plaintiff's failure to reinstate or obtain a new surety bond, on August 1, 2019, the commissioner, pursuant to § 36a-492 (c), issued to the plaintiff notices of automatic suspension, intent to revoke its mortgage

the plaintiff provided employee termination forms to employees informing them of their termination of employment, in violation of General Statutes § 36a-53a.

[7] General Statutes § 36a-492 (a) provides in relevant part: "Each licensed mortgage lender . . . shall file with the commissioner a single surety bond, written by a surety authorized to write such bonds in this state, covering its main office and any branch office, in a penal sum determined in accordance with subsection (d) of this section . . . . The bond shall cover all mortgage loan originators sponsored by such licensee. . . ."

---
1st Alliance Lending, LLC *v.* Dept. of Banking
---

lender license, and its right to a hearing (surety bond matter). Id. "The plaintiff requested a hearing, which was held in September, 2019. Following the hearing, the commissioner upheld the suspension. The commissioner also concluded that, pursuant to General Statutes § 36a-494, the plaintiff's failure to maintain a surety bond, as required by § 36a-492, supported the revocation of the plaintiff's mortgage lender license. Accordingly, the commissioner ordered the revocation of the plaintiff's mortgage lender license. The suspension and revocation had national ramifications for the plaintiff because they hampered its ability to conduct business in other states and could result in 'a series of cross-defaults with other counterparties and [other] revocations.' A properly effectuated surrender would not have had these negative ramifications." Id., 278–79.

In November, 2019, the plaintiff appealed the commissioner's order in the surety bond matter to the Superior Court, which subsequently dismissed the appeal. See *1st Alliance Lending, LLC* v. *Dept. of Banking*, Superior Court, judicial district of New Britain, Docket No. CV-19-6056459-S (August 26, 2020) (70 Conn. L. Rptr. 365, 369), aff'd, 342 Conn. 273, 269 A.3d 764 (2022). In March, 2021, the plaintiff appealed to our Supreme Court, which affirmed the judgment of the trial court. See *1st Alliance Lending, LLC* v. *Dept. of Banking*, supra, 342 Conn. 292. In doing so, our Supreme Court rejected the plaintiff's claims that "the governing statutes do not permit the defendants to suspend the plaintiff's license . . . [and] that, even if the relevant statutes gave the defendants discretion to suspend its license, the trial court incorrectly concluded that the commissioner lawfully exercised his discretion." Id., 279–80. The Supreme Court held that the plaintiff's attempted surrender of its license was ineffective because it did not comply with General Statutes § 36a-51 (c), and because "the plaintiff did not properly surrender its license before

---

1st Alliance Lending, LLC *v.* Dept. of Banking

---

the expiration of the surety bond . . . the commissioner was statutorily required to suspend the plaintiff's license." Id., 288. Addressing the plaintiff's claim that the commissioner did not lawfully exercise his discretion, the Supreme Court stated: "The plaintiff also argues that the statutory scheme should not be interpreted to permit the department to decline to take action on a request to surrender, thereby creating a situation in which the lender has a license but no surety bond. In other words, the plaintiff contends, the department's own actions in failing to accept the license surrender created the licensing violation. Neither the plaintiff's brief, nor our independent research, however, indicates that the department is under any statutory or regulatory obligation to take action on a request to surrender within a time certain following receipt of the request. Moreover, in this case, there is no indication in the record that the department unreasonably delayed in taking action on the plaintiff's request; rather, it was the plaintiff that waited to submit its request to surrender until two days before its surety bond was set to be cancelled. After not receiving a response to its June 7 letter, the department even followed up with the plaintiff. The plaintiff was well aware of the ongoing 2018 enforcement proceeding and of the obligation to maintain a surety bond as long as it held a license. At any time following [the surety's] notice of cancellation, the plaintiff could have reached out to the department to discuss the time and conditions for a request to surrender. See General Statutes § 36a-51 (c) (1). The plaintiff failed to do so. To the extent that the plaintiff wants to impose greater time constraints on the department's response to a request to surrender a mortgage license, its recourse is with the General Assembly, not this court." Id., 289–90.

While the appeal of the surety bond matter was pending, the department continued with the revocation proceeding in the compliance matter. Between September,

---

1st Alliance Lending, LLC *v.* Dept. of Banking

---

2019, and February, 2020, the department held fifteen days of administrative hearings on the amended notice, during which the parties presented witness testimony and thousands of pages of exhibits to the hearing officer, Attorney Cynthia Antanaitis. At the end of the administrative hearings, the hearing officer, pursuant to General Statutes § 4-179,[8] wrote a proposed decision, which she gave to the commissioner for consideration along with the entire administrative record. On April 16, 2021, the commissioner issued a decision in which he found that the plaintiff had violated (1) the Connecticut SAFE Act by engaging the services of unlicensed MLOs; (2) the Fair Credit Reporting Act, 15 U.S.C. § 1681m,[9] by failing to send adverse action notices to prospective borrowers; (3) General Statutes §§ 36a-498e (a) (7)[10] and 36a-678 (a)[11] by providing consumers with loan estimate disclosures without the verification of information or an executed real estate contract; (4) § 36a-498e (a) (6) by aiding and abetting the unlicensed

---

[8] General Statutes § 4-179 provides in relevant part: "(c) Except when authorized by law to render a final decision for an agency, a hearing officer shall, after hearing a matter, make a proposed final decision. . . ."

[9] The Fair Credit Reporting Act provides in relevant part: "If any person takes any adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report, the person shall . . . provide oral, written, or electronic notice of the adverse action to the consumer . . . ." 15 U.S.C. § 1681m (a).

[10] General Statutes § 36a-498e (a) provides in relevant part that "[n]o person who is required to be licensed and who is subject to this section . . . may, directly or indirectly . . . (6) Conduct any business as a mortgage lender, mortgage correspondent lender, mortgage broker, lead generator, mortgage loan originator or loan processor or underwriter without holding a valid license as required under this section . . . or assist or aid and abet any person in the conduct of business as a mortgage lender, mortgage correspondent lender, mortgage broker, lead generator, mortgage loan originator or loan processor or underwriter without a valid license . . . (7) Fail to make disclosures as required by this section . . . and any other applicable state or federal law including regulations adopted thereunder . . . ."

[11] General Statutes § 36a-678 (a) provides that "each person shall comply with all provisions of the Consumer Credit Protection Act [15 U.S.C. § 1601 et seq.] that apply to such person . . . ."

---
1st Alliance Lending, LLC *v.* Dept. of Banking
---

activities of call center employees; (5) General Statutes § 36a-17 (e) by failing to produce subpoenaed records to the department; (6) § 36a-498e (b) by failing to establish, enforce, and maintain policies and procedures reasonably designed to achieve compliance with regulatory requirements; (7) General Statutes § 36a-53b (2)[12] by failing to inform potential borrowers that call center employees were not licensed MLOs; and (8) § 36a-53b (3) by failing to dispel the notion that its call center representatives were licensed. On the basis of these violations, the commissioner ordered the plaintiff to cease and desist its violations, revoked the plaintiff's license to act as a mortgage lender in Connecticut, and imposed a civil penalty in the amount of $750,000.

Pursuant to General Statutes § 4-183,[13] the plaintiff appealed the commissioner's decision to the Superior Court. The plaintiff subsequently filed a motion for leave to present additional evidence. The plaintiff argued that certain Byte data logs, which the hearing officer had excluded during the administrative hearings, demonstrated that the HLCs did not conduct activities that require an MLO license. The court, *Cordani, J.*, pursuant to § 4-183 (h),[14] granted the motion and

---

[12] General Statutes § 36a-53b provides in relevant part that "[n]o person shall, in connection with any activity subject to the jurisdiction of the commissioner . . . (2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

[13] General Statutes § 4-183 (a) provides in relevant part that "[a] person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

[14] General Statutes § 4-183 (h) provides that, "[i]f, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings

---

1st Alliance Lending, LLC *v.* Dept. of Banking

---

remanded the matter to the department, ordering it to consider additional evidence from the Byte system. On April 5, 2022, the commissioner issued a supplemental decision in which he found that the additional Byte system evidence did not refute the relevant facts upon which his decision was based and declined to make any changes to his decision. The plaintiff appealed the commissioner's decision and supplemental decision to the Superior Court, which dismissed the plaintiff's administrative appeal. This appeal followed. See General Statutes § 4-184.[15] Additional facts will be set forth as necessary.

I

The plaintiff first claims that the trial court improperly failed to vacate or modify the commissioner's order to revoke the plaintiff's mortgage lender license because the commissioner did not have the authority to revoke it. It argues that the commissioner could not have revoked its license on April 16, 2021, because its license already had been revoked on October 4, 2019, in the surety bond matter. The department, on the other hand, argues that the commissioner had authority to revoke the plaintiff's license because (1) the plaintiff's license was active when the department sought revocation of the plaintiff's license in the compliance matter; (2) the plaintiff attempted to avoid revocation in the compliance matter by attempting to surrender its license in the surety bond matter, in which the department was statutorily required to proceed in revoking the plaintiff's license; and (3) revocation in the compliance matter and revocation in the surety bond matter have

---

and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court."

[15] General Statutes § 4-184 provides in relevant part that "[a]n aggrieved party may obtain a review of any final judgment of the Superior Court under this chapter. . . ."

1st Alliance Lending, LLC *v.* Dept. of Banking

materially different purposes and consequences. We agree with the department.

"We begin by articulating the applicable standard of review in an appeal from the decision of an administrative agency. Judicial review of [an administrative agency's] action is governed by the [Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq.][16] . . . and the scope of that review is very restricted. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Citations omitted; footnote added; internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 800, 955 A.2d 15 (2008).

"Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence,

[16] General Statutes § 4-183 (j) provides in relevant part: "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . ."

1st Alliance Lending, LLC *v.* Dept. of Banking

the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . [Our Supreme Court has] determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . . Whether the relevant statutory scheme granted the commissioner the legal authority to . . . revoke the plaintiff's mortgage lender license is a question of statutory interpretation over which our review is plenary. . . . We review . . . the relevant statutory scheme in accordance with General Statutes § 1-2z and our familiar principles of statutory construction." (Citations omitted; internal quotation marks omitted.) *1st Alliance Lending, LLC* v. *Dept. of Banking*, supra, 342 Conn. 280–81.

We also note that, "[b]ecause the . . . appeal to the trial court [was] based solely on the [administrative] record, the scope of the trial court's review of the [commissioner's] decision and the scope of our review of that decision are the same. . . . In other words, the trial court's decision in this administrative appeal is entitled to no deference from this court." (Citation omitted; internal quotation marks omitted.) *Commissioner of Correction* v. *Freedom of Information Commission*, 307 Conn. 53, 63 n.15, 52 A.3d 636 (2012); see also *Hartford Police Dept.* v. *Commission on Human Rights & Opportunities*, 347 Conn. 241, 246 n.1, 297 A.3d 167 (2023).

General Statutes §§ 36a-488 (b)[17] and 36a-492 require mortgage lenders to maintain surety bond coverage. Pursuant to § 36a-492 (c), when a surety company seeks

---

[17] General Statutes § 36a-488 (b) provides in relevant part: "In the case of an initial application for a [mortgage lender] license, the following supplementary information shall be filed, as applicable . . . (2) a bond as required by section 36a-492 . . . ."

---
1st Alliance Lending, LLC *v.* Dept. of Banking
---

to cancel a mortgage lender's bond, it must notify the commissioner of the effective date of cancellation, at which point the "commissioner *shall* automatically suspend the licenses of a mortgage lender . . . ." [18] (Emphasis added.) Our Supreme Court has stated that "the use of the word 'shall' in § 36a-492 (c) is mandatory, and, as a result, the commissioner is statutorily required to suspend a mortgage lender license in the event of surety bond cancellation unless the mortgage lender satisfies one of the two exceptions to the requirement of automatic suspension." *1st Alliance Lending, LLC* v. *Dept. of Banking*, supra, 342 Conn. 283. Once the automatic suspension is in place, § 36a-492 (c) requires that "the commissioner shall (A) give the licensee notice of the automatic suspension, pending proceedings for revocation or refusal to renew pursuant to section 36a-494 and an opportunity for a hearing on such action in accordance with section 36a-51 . . . ." In the present case, given the plaintiff's notice that it intended to surrender its license, which the commissioner refused to accept, it was clear that the plaintiff was not seeking a renewal of its license, leaving revocation as the only statutory option available to the commissioner under § 36a-492, which the commissioner successfully accomplished.

Essentially, the plaintiff argues that its license, having been revoked once, could not be revoked a second time. The commissioner argues that the plaintiff cannot

---

[18] General Statutes § 36a-492 (c) provides in relevant part: "The surety company shall have the right to cancel the bond at any time by a written notice to the principal stating the date cancellation shall take effect . . . . A surety bond shall not be cancelled unless the surety company notifies the commissioner in writing not less than thirty days prior to the effective date of cancellation. After receipt of such notification from the surety company, the commissioner shall give written notice to the principal of the date such bond cancellation shall take effect . . . . The commissioner shall automatically suspend the licenses of a mortgage lender . . . on such date . . . ."

successfully thwart an ongoing revocation proceeding based on allegedly significant substantive compliance failures by surrendering its license or by engineering an automatic revocation due to the cancellation of its surety bond. The resolution of this issue is important because the parties agree that not all revocations are equal and that the revocation at issue in the present case has greater regulatory consequences for the plaintiff both in Connecticut and in other jurisdictions.

Section 36a-494 (a) (1) provides that the commissioner has the authority to "suspend, revoke or refuse to renew any mortgage lender . . . license or take any other action . . . for any reason which would be sufficient grounds for the commissioner to deny an application for such license . . . or if the commissioner finds that the licensee . . . has done any of the following . . . (C) violated any of the provisions of this title or of any regulation or order adopted or issued pursuant thereto pertaining to any such person, or any other law or regulation applicable to the conduct of its business . . . ." The statutory scheme further provides that the department may pursue revocation proceedings against a mortgage lender with an inactive license under certain circumstances. Section 36a-51 (c)[19] expressly permits

---

[19] General Statutes § 36a-51 (c) provides in relevant part: "(1) Any licensee may surrender any license issued by the commissioner under any provision of the general statutes by surrendering the license to the commissioner in person or by registered or certified mail, provided, in the case of a license issued through the system, as defined in section 36a-2, such surrender shall be initiated by filing a request to surrender on the system. No surrender on the system shall be effective until the request to surrender is accepted by the commissioner. Surrender of a license shall not affect the licensee's civil or criminal liability, or affect the commissioner's ability to impose an administrative penalty on the licensee pursuant to section 36a-50 for acts committed prior to the surrender. . . . If no proceeding is pending or has been instituted by the commissioner at the time of surrender . . . the commissioner may still institute a proceeding to suspend, revoke or refuse to renew a license . . . up to the date one year after the date of receipt of the license by the commissioner, or, in the case of a license issued through the system, up to the date one year after the date of the acceptance by the commissioner of a request to surrender a license.

---
1st Alliance Lending, LLC *v.* Dept. of Banking
---

the commissioner to revoke mortgage lender licenses that have expired or been surrendered up to one year after expiration or the date that the commissioner accepted a request to surrender. Although the statutory scheme is silent as to whether the commissioner may revoke a license that already has been revoked, we find that the commissioner has such authority under the circumstances in the present matter.

In *Stern* v. *Medical Examining Board*, 208 Conn. 492, 545 A.2d 1080 (1988), our Supreme Court concluded that the Medical Examining Board (board) had no jurisdiction to revoke the plaintiff's license to practice medicine because the plaintiff allowed his license to expire before the board filed disciplinary charges against him. Id., 501. The court reasoned that the board only had authority to discipline "physicians," and the fact that the plaintiff's license had expired meant that he was not a physician *at the time that the board commenced disciplinary proceedings*. Id., 502. The court further reasoned that, although the board might have had "continuing jurisdiction to levy a monetary fine on the plaintiff," the board only sought revocation of the plaintiff's license. Id., 503.

Although the present matter is similar to *Stern* because the plaintiff did not have an active mortgage lender license at the time that the commissioner revoked its license in the underlying proceedings, the present matter is distinguishable from *Stern* in two significant ways. First, the plaintiff held an active mortgage lender license at the time that the department

---

"(2) If any license issued on the system expires due to the licensee's failure to renew such license, the commissioner may institute a revocation or suspension proceeding, or issue an order revoking or suspending the license, under applicable authorities not later than one year after the date of such expiration. . . ."

---

1st Alliance Lending, LLC *v.* Dept. of Banking

---

initiated revocation proceedings against it in the compliance matter. The plaintiff's license did not become inactive until approximately ten months after the commissioner first issued notice of intent to revoke the plaintiff's license in the compliance matter. Second, the department not only sought to revoke the plaintiff's license, but also to impose a civil fine and to issue a cease and desist order, whereas the board in *Stern* sought only to revoke an expired license. Accordingly, unlike the board in *Stern*, the commissioner had authority to pursue revocation proceedings and civil penalties in the compliance matter because the plaintiff was a licensed mortgage lender subject to the department's authority at the time that the proceedings commenced. See *Patel* v. *Board of Healing Arts*, 22 Kan. App. 2d 712, 713, 920 P.2d 477 (1996) (because jurisdiction was proper at time disciplinary proceedings commenced, court found that subsequent cancellation of plaintiff's license did not affect board's jurisdiction).

Moreover, the plaintiff cannot avoid the consequences of violating the mortgage loan statutes merely by forfeiting its surety bond during the department's compliance revocation proceeding. If that were the case, the department's ability to hold mortgage lenders accountable for violating mortgage loan statutes would be significantly circumscribed because compliance revocation proceedings, which by nature require intensive fact finding, take more time than revocation proceedings based on a mortgage lender's failure to maintain proper surety bond coverage. "In construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended." (Internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, supra, 288 Conn. 803. Thus, we conclude that the commissioner had the authority to follow through with its initial revocation proceedings in the compliance matter after

1st Alliance Lending, LLC *v*. Dept. of Banking

the plaintiff forfeited its surety bond, which *required* the commissioner to initiate additional revocation proceedings that carry lesser consequences. See id., 805 ("[t]he plaintiffs' contention that a provider can place itself beyond the reach of these strong statutory sanctions and provisions simply by terminating its provider agreement on thirty days notice, defies logic and requires a construction of the statute that thwarts its intended purpose, and leads to an absurd result").

Furthermore, the final status of the plaintiff's license was not yet settled when the commissioner revoked the plaintiff's license in the compliance matter. The commissioner issued the order to revoke the plaintiff's license in the compliance matter on April 16, 2021. At that time, the plaintiff's appeal of the surety bond matter to the Supreme Court was still pending. Our Supreme Court's affirmance of the surety bond revocation in February, 2022, would not constitute a basis for the Superior Court to reverse the commissioner's revocation decision in the underlying matter. Clearly, the commissioner had the authority and jurisdiction to revoke the plaintiff's license for its various compliance failures given that that the revocation proceedings were instituted prior to the surety bond matter and the plaintiff was still disputing the revocation of its license in the surety bond matter when the commissioner acted in the present matter. The plaintiff could have chosen to abandon its appeal of the revocation in the present matter because its revocation in the surety bond matter had been upheld by our Supreme Court, but it chose to continue with the appeal because of the regulatory consequences of the revocation in the present matter as well as the substantial penalty that the commissioner imposed. Under these circumstances—where the plaintiff, recognizing the possibility of a compliance revocation, consciously caused the first revocation to avoid

1st Alliance Lending, LLC *v.* Dept. of Banking

the more serious consequences of the second revocation—it is somewhat disingenuous for the plaintiff to argue that, once its license had been revoked, it could not be revoked a second time. This is especially true given that the more serious revocation proceeding, which resulted in the second revocation, began first.

Because we find that the commissioner had the authority to revoke the plaintiff's mortgage lender license in the compliance matter after the compelled revocation of the plaintiff's license in the surety bond matter, the trial court did not err in failing to modify or vacate the commissioner's revocation order.

## II

The plaintiff next claims that the court improperly deferred to the department's statutory interpretation of "mortgage loan originator" as defined in § 36a-485 (20). We disagree.

"[R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, supra, 288 Conn. 833. "An appellate court's duty in assessing whether substantial evidence has been presented is to determine whether the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred from the

evidence presented." (Internal quotation marks omitted.) Id., 834.

The parties' dispute as to the meaning of "mortgage loan originator" presents a question of statutory interpretation. As previously stated, although courts afford deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes, such deference is "unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 716–17, 6 A.3d 763 (2010). The department's interpretation of "mortgage loan originator" has never been subjected to judicial scrutiny or consistently applied by the agency over a long period of time. Accordingly, the traditional deference normally accorded to an agency's interpretation of a statutory term is not warranted in this case. See id., 717–18. Additionally, because the appeal to the trial court was based solely on the record, we accord no deference to the trial court's interpretation of "mortgage loan originator." See *Commissioner of Correction* v. *Freedom of Information Commission*, supra, 307 Conn. 63 n.15.

The Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (federal SAFE Act), 12 U.S.C. § 5101 et seq.,[20] is "the main federal statute governing licensing" of MLOs. *Consumer Financial Protection Bureau* v. *1st Alliance Lending, LLC*, Docket No. 3:21-cv-55 (RNC), 2022 WL 993582, *3 (D. Conn. March 31, 2022). The federal SAFE Act "encouraged states to implement state versions of the SAFE Act, with the

---

[20] Title 12 of the United States Code, § 5102 (4) (A), provides that a loan originator, who must be licensed, "means an individual who—(I) takes a residential mortgage loan application; and (II) offers or negotiates terms of a residential mortgage loan for compensation or gain . . . ."

---

1st Alliance Lending, LLC *v.* Dept. of Banking

---

minimum standards in the federal statute as a floor. 12
C.F.R. § 1008.1 (b)." *Consumer Financial Protection
Bureau* v. *1st Alliance Lending, LLC*, supra, 2022 WL
993582, *2. As a result of the federal SAFE Act, the
Connecticut legislature enacted the Connecticut SAFE
Act, which provides in relevant part that "[m]ortgage
loan originator means an individual who for compensa-
tion or gain . . . (A) takes a residential mortgage loan
application, or (B) offers or negotiates terms of a resi-
dential mortgage loan. . . ." General Statutes § 36a-485
(20). Pursuant to the federal SAFE Act as implemented
by the Connecticut SAFE Act, individuals who engage
in either activity must be licensed as an MLO.[21]

Both parties agree that the additional definitions set
forth in Regulation H, 12 C.F.R. § 1008 et seq., which
implements the federal SAFE Act, should govern what
conduct constitutes acting as an MLO pursuant to the
Connecticut SAFE Act. Regulation H provides that "[a]n
individual 'takes a residential mortgage loan applica-
tion' if the individual receives a residential mortgage
loan application for the purpose of facilitating a deci-
sion whether to extend an offer of residential mortgage
loan terms to a borrower or prospective borrower (or to
accept the terms offered by a borrower or prospective
borrower in response to a solicitation), whether the
application is received directly or indirectly from the
borrower or prospective borrower." 12 C.F.R.
§ 1008.103 (c) (1) (2024). The parties disagree as to
whether the conduct of the plaintiff's HLCs meets the
definition of "tak[ing] a residential mortgage loan appli-
cation" as set forth in Regulation H. The plaintiff argues
that the department improperly expanded the definition

---

[21] Because we conclude that substantial evidence supports the commis-
sioner's finding that the plaintiff's HLCs took residential mortgage loan
applications in violation of the Connecticut SAFE Act, we do not reach the
issue of whether substantial evidence also supports the commissioner's
finding that the HLCs offered or negotiated terms of residential mortgage
loans.

---

1st Alliance Lending, LLC *v.* Dept. of Banking

---

of MLO to include individuals that "collect limited information to enter into a computer [so] that the company can provide a prequalification letter . . . ." The department, on the other hand, argues that it has not expanded the definition of MLO and that the plaintiff's HLCs' conduct constitutes taking applications under the guise of processing prequalification. We agree with the department.

"In construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended. . . . Moreover, [w]e must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve. . . . If there are two possible interpretations of a statute, we will adopt the more reasonable construction over one that is unreasonable." (Citations omitted; internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, supra, 288 Conn. 803–804.

Here, the plaintiff's HLCs communicated with potential borrowers, collected information, and input such information into the Byte database, which automatically generated draft loan applications for the MLOs with that information. The plaintiff argues that this conduct does not constitute "taking a loan application" because HLCs do not collect *all* information necessary for an application. In particular, the plaintiff argues that it avoided the licensure requirement by instructing the HLCs not to collect information on potential borrowers' property addresses. It appears that the plaintiff seeks to apply the definition of "application" set forth in TRID, which provides that "an application consists of the submission of the consumer's name, the consumer's income, the consumer's social security number to obtain a credit report, *the property address*, an estimate of the value of the property, and the mortgage loan amount sought." (Emphasis added.) 12 C.F.R. § 1026.2

(a) (3) (ii) (2024). Regulation H, however, defines application more broadly. It states that "[a]pplication means a request, in any form, for an offer (or a response to a solicitation of an offer) of residential mortgage loan terms, and the information about the borrower or prospective borrower that is customary or necessary in a decision on whether to make such an offer." 12 C.F.R. § 1008.23 (2024). Because the federal SAFE Act provides the minimum standards for state versions of the SAFE Act, the Connecticut SAFE Act definition of "application" cannot be narrower than the federal definition. We conclude that the broader definition set forth in Regulation H governs the definition of application for the purpose of determining whether the plaintiff violated the Connecticut SAFE Act. Accordingly, the plaintiff cannot avoid the licensing requirement of the Connecticut SAFE Act merely by instructing the HLCs not to obtain property addresses because neither the federal SAFE Act nor Regulation H expressly requires applications to contain that information.

Even if we accepted the plaintiff's contention that property addresses are a necessary element of applications, there is substantial evidence in the record showing that the HLCs routinely collected all information necessary, including property addresses, to complete all six components of the 1003 form, which the plaintiff agrees is a residential mortgage loan application. For example, the plaintiff employed Martin Murdock as an HLC from July, 2016, to January, 2019. The following exchange occurred between the department's counsel and Murdock before the hearing officer:

"Q. So, looking at the first bullet point [of the HLC job description] it says 'obtain all applicable information to complete 1003.' Would you say that while [an HLC for the plaintiff] that you basically obtained all applicable information to complete 1003 for potential borrowers?

---

1st Alliance Lending, LLC *v.* Dept. of Banking

---

"A. Yes.

"Q. And then in parentheses it says 'no property information or final loan amount.' Would you at times obtain property information for a potential borrower?

"A. At times, yes.

"Q. And would you obtain a final loan amount for a potential borrower while employed as [an HLC for the plaintiff]?

"A. Yes.

"Q. So, looking at this description of [HLC while employed by the plaintiff] you would obtain all applicable information to complete a 1003, including property information and final loan amount?

"A. Yeah. . . . [A]t times I sometimes didn't do the full inquiry. I would get income, assets, credit information, and I would ask them if there's a particular property that they had in mind. If they didn't, then I would leave that information out for property information, the final loan amount. If they did, I would let them know if that house is something that they could pursue."

The plaintiff also employed Alexander Cottone as an HLC from June, 2016, to December, 2018. Similar to Murdock, Cottone testified that he would obtain all information necessary to complete all six parts of the 1003, including property addresses, which he used to gather information on loans available to potential borrowers.[22] Sara Jenkins, an HLC employed by the plaintiff

---

[22] The following exchange occurred between the department's counsel and Cottone before the hearing officer:

"Q. Okay. So, you would obtain information to complete a 1003?

"A. I would, yes. I would absolutely get all parts that were necessary to complete a 1003, all six parts, yes.

"Q. So, this [HLC job description] indicates no property information. So would you at times get property information . . . ? . . .

"A. Yes, when people would tell me that they found a house I would tell them, send me the contract. I wouldn't be the one who would put the address in the system. The majority of the time it was done by the [MLO]. They were the one who put that last part in, which we had a few at the company.

1st Alliance Lending, LLC *v.* Dept. of Banking

from July, 2013, to July, 2019, also testified that she would obtain purchase and sales agreements from potential borrowers, which showed the property addresses. Furthermore, the plaintiff's own internal compliance audit report stated that HLCs engaged in activity that required an MLO license and that the compliance issues were "systemic." Because the plaintiff's HLCs testified that they routinely obtained property addresses from potential borrowers, substantial evidence supports a finding that the HLCs took mortgage loan applications even under the plaintiff's own interpretation of Regulation H.

The plaintiff additionally argues that the HLCs' collection of information does not constitute the taking of a mortgage loan application because the HLCs did not input consumer information directly into applications. The appendix to Regulation H, however, provides that "[a]n individual 'takes a residential mortgage loan application' even if the individual . . . [o]nly inputs the information into an online application or other automated system . . . ." 12 C.F.R. § 1008, Appendix A (a) (1) (i) (2024). Here, HLCs routinely collected all information required for a residential mortgage loan application and input such information into the Byte system, which automatically created draft applications for the

I'm sure you guys know. But, yes, we would get that information. It would come in the form of either a purchase and sales contract, which would come directly to us as [an HLC]. And then it was handed off to—which was the last part of the—the application, and then it was handed off to the [MLO] for them to do the official . . . 1003. . . .

  "Q. So, even before you get a purchase and sale contract would you receive information concerning a property address that a borrower was interested [in]?

  "A. Yes, absolutely.

  "Q. And what if anything would you do with that information?

  "A. Usually look up the house, look up taxes, what the purchase price is on Zillow, or . . . something similar to that. That would give me an accurate portrayal of what the potential amount could be for . . . the loan amount."

1st Alliance Lending, LLC *v.* Dept. of Banking

MLOs. We conclude that inputting consumer information into the Byte system constitutes taking a residential mortgage loan application pursuant to the definition set forth in Regulation H.

Lastly, the plaintiff argues that the HLCs' collection of information does not constitute the taking of a mortgage loan application because MLOs independently verify the information before completing the application. The appendix to Regulation H, however, provides that "[a]n individual 'takes a residential mortgage loan application' even if the individual . . . [i]s not responsible for verifying information. The fact that an individual who takes application information from a borrower or prospective borrower is not responsible for verifying that information . . . does not mean that the individual is not taking an application . . . ." 12 C.F.R. § 1008, Appendix A (a) (1) (i) (2024). Accordingly, even if the MLOs were responsible for verifying information collected by HLCs, an HLC's collection of unverified consumer information constitutes taking an application.

The trial court properly concluded that substantial evidence supports the commissioner's finding that the plaintiff violated the Connecticut SAFE Act by using unlicensed HLCs to take residential mortgage loan applications. The administrative record reveals that, under the plaintiff's business model, HLCs collected information from potential borrowers, including their property addresses, and input the collected information into the Byte system, which automatically generated draft applications for the MLOs. We conclude that this conduct constitutes "taking a residential mortgage loan application" under the definitions set forth in Regulation H and the Connecticut SAFE Act. Accordingly, we conclude that the court did not improperly defer to the department's interpretation of the definition of MLO in

1st Alliance Lending, LLC *v.* Dept. of Banking

reaching its conclusion that substantial evidence supports the commissioner's finding that the plaintiff violated the Connecticut SAFE Act.

III

The plaintiff next claims that the commissioner improperly applied § 36a-498e (b) (1) retroactively. Although the department agrees that § 36a-498e (b), which became effective July 1, 2018, does not apply retroactively, it argues that substantial evidence supports the commissioner's finding that the plaintiff's improper conduct continued after the provision's effective date and, therefore, the commissioner did not apply the statute retroactively.[23] We agree with the department.

The appropriate standard of review is well settled. As previously stated, "[r]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, supra, 288 Conn. 833.

Section 36a-498e (b) provides in relevant part: "(1) [n]o person, other than an individual, who is required

---

[23] The department also argues that the plaintiff did not preserve its retroactivity claim for appeal because it "never made this argument before the commissioner and at best presented a cursory statement about the effective date of the subsection before the trial court." The plaintiff stated the following in its memorandum in support of its appeal to the trial court: "§ 36a-498e (b) was promulgated by Public Act 17-233 and became effective July 1, 2018. None of the sixteen borrower transactions discussed in the [commissioner's decision] extend past May, 2018. Accordingly, [the plaintiff] could not have violated § 36a-498e (b) . . . with regard to the transactions discussed in the [commissioner's decision]." Because this claim presents a question of whether the department improperly applied a statute, the plaintiff properly preserved the claim by raising it to the trial court. We, therefore, reject the department's preservation argument.

1st Alliance Lending, LLC *v.* Dept. of Banking

to be licensed . . . shall fail to establish, enforce and maintain policies and procedures reasonably designed to achieve compliance with [regulatory requirements]. . . . (3) No violation of this subsection shall be found unless the failure to establish, enforce and maintain policies and procedures resulted in conduct in violation of . . . state or federal law . . . .''

Here, the commissioner made the following findings: "While [the plaintiff] had a patchwork of policies and procedures that were modified over time, these were insufficient to address the violations involved in this case. More important, such policies and procedures were not enforced. [The plaintiff] hired employees with no prior experience or training in the financial services industry to be the main point of consumer contact; did not sufficiently address the red flags associated with call center employee conduct; assigned call center employees to sales rather than having them supervised by a licensed MLO; offered only sporadic training . . . which was at odds with the compensation structure and employee contests that encouraged call center employees to snare borrowers at any cost; and did not utilize a predictable and consistent pattern of discipline in dealing with problem employees. While [the plaintiff] argues that it subsequently attempted remedial measures, including discipline, in some instances, this was a case of 'too little, too late.' ''

Substantial evidence in the record supports the commissioner's finding that the plaintiff failed to establish, enforce, and maintain policies and procedures reasonably designed to achieve compliance with regulatory requirements and that such failure resulted in conduct that violated state and federal law. The plaintiff's own 2017 internal audit report, which was published on February 1, 2018, stated that its business model increased the likelihood of violations, and communications

between the plaintiff's compliance officer and execu-
tives confirmed that the plaintiff understood this.
Indeed, the plaintiff created a business model that
incentivized the HLCs to close loans by paying them
commission, holding contests, and offering prizes based
on the number of loans they closed. Some HLCs made
more in commission than base salary, and many
believed they were the primary contact between the
plaintiff and potential borrowers. Although the plaintiff
incentivized the HLCs to close loans, it instructed them
not to take the property information of potential bor-
rowers to avoid the unlicensed taking of mortgage loan
applications. As discussed in part II of this opinion,
however, this instruction was often ignored by HLCs,
without negative consequences, and, thus, substantial
evidence supports the commissioner's finding that the
plaintiff violated the Connecticut SAFE Act. Moreover,
the plaintiff concedes that it violated TILA and other
regulatory requirements related to issuing adverse
action notices to borrowers. Accordingly, the plaintiff's
policies and procedures resulted in regulatory viola-
tions.

It can be reasonably inferred from the administrative
record that the plaintiff's systemic compliance issues
continued after the effective date of § 36a-498e (b). The
plaintiff argues that it could not have violated the Con-
necticut SAFE Act after July 1, 2018, because its 2018
internal audit report rated its institutional licensing
compliance as "satisfactory" and its compliance man-
agement as "fair." This report is undercut, however, by
the fact that the plaintiff was provided an opportunity
to show compliance with the legal requirements for
retention of its mortgage lender license on June 14,
2019, but it failed to do so. Additionally, testimony of
the plaintiff's employees indicates that the plaintiff did
not come into compliance with the Connecticut SAFE

1st Alliance Lending, LLC *v.* Dept. of Banking

Act after July 1, 2018. Massey, the plaintiff's vice president of compliance, testified that from 2017 to 2019, the plaintiff did not focus on compliance. She stated that she had to argue for "even the simplest of compliance," and it was "not something that was well liked or supported." She further testified that after she published the 2017 internal audit report on February 1, 2018, she recommended long-term solutions to ensure that the plaintiff complied with licensing requirements, but the plaintiff never implemented the solutions. In fact, the plaintiff told Massey that it would not implement her recommendations at least partially because they would cost the plaintiff too much money.

Moreover, Murdock, Cottone, and Jenkins, who were employed by the plaintiff as HLCs before and after July 1, 2018, testified that, throughout their employment with the plaintiff, they collected all information necessary to complete residential mortgage loan applications, which supports the commissioner's finding that the plaintiff violated the SAFE Act, as discussed in part II of this opinion. Neither Murdock, Cottone, nor Jenkins indicated that the plaintiff changed their job responsibilities after July 1, 2018. Because the evidence demonstrates that the plaintiff did not make any significant changes to ensure regulatory compliance after July 1, 2018, the commissioner reasonably could infer from the record that the plaintiff's violations that took place prior to the effective date of § 36a-498e (b) continued after that date.

Substantial evidence in the record supports the commissioner's finding that the plaintiff failed to establish, enforce, and maintain policies and procedures reasonably designed to achieve compliance with regulatory requirements, which resulted in conduct that violated, inter alia, the Connecticut SAFE Act after July 1, 2018. Because substantial evidence supports the commissioner's finding that the plaintiff violated § 36a-498e (b) after

---
1st Alliance Lending, LLC *v.* Dept. of Banking
---

its effective date, we conclude that the commissioner did not improperly apply § 36a-498e (b) retroactively.

IV

The plaintiff next claims that the commissioner improperly concluded that the plaintiff failed to fulfill its obligation pursuant to § 36a-17 to cooperate with the department's investigation because (1) the department failed to seek judicial enforcement of its subpoena and (2) substantial evidence does not support the commissioner's finding that the plaintiff failed to cooperate with it. We disagree.

Section 36a-17 provides in relevant part: "(c) For the purpose of any investigation . . . the commissioner may . . . direct, order or subpoena such person to produce records the commissioner deems relevant or material. . . . (e) Any person who is the subject of any inquiry, investigation, examination or proceeding pursuant to this section shall (1) make its records available to the commissioner in readable form . . . (3) provide copies or computer printouts of records when so requested; (4) make or compile reports or prepare other information as directed by the commissioner . . . and (6) otherwise cooperate with the commissioner. . . ."

The following additional facts are relevant to the resolution of this claim. On September 19, 2018, as part of the department's investigation into the compliance matter, Serrano requested that the plaintiff provide emails sent and received by ten of the plaintiff's employees over a specified four month period. In recognition that the materials requested were voluminous, Serrano offered to allow a "rolling basis for the production of such records" and advised the plaintiff that it did not have to produce emails protected by the attorney-client privilege. Counsel for the plaintiff responded as follows: "[T]here are over 200,000 emails for the custodians and time frame you identified, some of which are protected

1st Alliance Lending, LLC *v*. Dept. of Banking

by the attorney-client privilege and others of which are personal or otherwise irrelevant to regulated lending activities. To review each of these 200,000-plus emails . . . would be time and cost prohibitive." After discussing the production request over a phone call, Serrano emailed the plaintiff's counsel clarifying the scope and relevancy of their production request and explaining that failure to comply would result in a violation of § 36a-17. On October 12, 2018, the department issued a subpoena ordering the plaintiff to produce the requested emails, with which the plaintiff failed to comply. At the time that the administrative hearings began, the plaintiff still had not produced a significant portion of the requested emails.

The commissioner found that, "[d]uring the hearing, the department noted that no emails were produced in response to the request, notwithstanding the department's subsequent issuance of a subpoena . . . with which [the plaintiff] failed to comply." It further found that "[the plaintiff's] claim of hardship is not persuasive. In addition, as a regulated member of the financial services industry serving consumers in Connecticut and other states, [the plaintiff's] failure to comply with a governmental subpoena is unacceptable." The commissioner thereafter concluded that "[the plaintiff's] failure to produce the requested emails even after the agency subpoenaed them constitutes a violation of [§] 36a-17 (e) . . . . As a then-licensed mortgage lender, [the plaintiff] had an obligation to comply with state laws governing the operation of its licensed business."

On appeal, the plaintiff argues that the commissioner cannot find that it had failed to cooperate in violation of § 36a-17 because the department failed to seek judicial enforcement of the subpoena. Although § 36a-17 grants the commissioner the authority to request the Superior

1st Alliance Lending, LLC *v.* Dept. of Banking

Court to order a party to comply with a subpoena,[24] the department is not required to do so.[25] Obtaining a court order would permit the department to move for contempt in the event of failure to comply, but a court order is not necessary to make the subpoena enforceable. Rather, if the plaintiff wished to avoid the subpoena, it could and should have filed a motion to quash or otherwise objected to the subpoena. See *State* v. *Williams*, 146 Conn. App. 114, 148, 75 A.3d 668 (2013) ("[a] subpoena . . . commences an adversary process during which the person served with the subpoena may challenge it in court before complying with its demands" (internal quotation marks omitted)), aff'd, 317 Conn. 691, 119 A.3d 1194 (2015); *Southridge Capital Management, LLC* v. *Pitkin*, Superior Court, judicial

[24] General Statutes § 36a-17 (f) provides: "The [S]uperior [C]ourt for the judicial district of Hartford, upon application of the commissioner, may issue to any person refusing to obey a subpoena issued pursuant to subsection (c) of this section an order requiring that person to appear before the commissioner or any officer designated by the commissioner to produce records so ordered or to give evidence concerning the matter under investigation or in question. Failure to obey the order of the court may be punished by the court as a contempt of court."

[25] The plaintiff additionally argues that the department cannot find that it failed to cooperate because the department failed to "exhaust [its] statutory remedies" by seeking judicial enforcement of the subpoena. Such argument is without merit. "The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. . . . Under that doctrine, a trial court lacks subject matter jurisdiction over an action that seeks a remedy that could be provided through an administrative proceeding, unless and until that remedy has been sought in the administrative forum. . . . In the absence of exhaustion of that remedy, the action must be dismissed." (Internal quotation marks omitted.) *Direct Energy Services, LLC* v. *Public Utilities Regulatory Authority*, 347 Conn. 101, 145–46, 296 A.3d 795 (2023). The exhaustion of *administrative* remedies doctrine applies to parties that prematurely seek to avail themselves of judicial remedies in an administrative matter. There is no corollary for this doctrine as to judicial remedies, however, as we have never held that an administrative agency is required to seek judicial remedies before enforcing their statutory authority in administrative proceedings. The doctrine is therefore inapplicable where, as here, the department used administrative remedies to enforce its subpoena pursuant to its statutory authority without bringing the matter to the court.

1st Alliance Lending, LLC *v.* Dept. of Banking

district of Hartford, Docket No. CV-07-4034033-S
(March 24, 2008) (45 Conn. L. Rptr. 238, 238–39) ("[b]y
its application to quash an investigative subpoena
issued pursuant to [the commissioner's statutory
authority], the plaintiff is asserting his right to be heard
expeditiously on a matter that is limited in scope from
an ordinary civil action"). Accordingly, we conclude
that the department was not required to seek judicial
enforcement in order to find that the plaintiff failed to
cooperate with its subpoena.

The plaintiff next argues that the evidence does not
support the commissioner's finding that it violated
§ 36a-17 because the plaintiff made efforts to resolve
the production dispute, and it produced many of the
emails requested. The plaintiff contends that it "made
repeated attempts to meet and confer with [the depart-
ment] in order to reach a reasonable resolution" but that
the department "largely ignored the plaintiff's request
to meet and confer." The record reveals, however, that
the department was responsive to the plaintiff's con-
cerns regarding its production request. Between Sep-
tember 26 and October 5, 2018, Serrano and the plain-
tiff's counsel exchanged multiple emails in which the
department narrowed the scope of its request and
extended the deadlines for production. On October 5,
2018, the plaintiff's counsel and Serrano talked about
the production request over the phone, and Serrano
sent a follow-up email again clarifying the scope of its
request and deadlines for production.

Despite the department's willingness to work with
the plaintiff so that it could meet its burden of produc-
tion, the record demonstrates that the plaintiff did not
produce all emails requested. Although the plaintiff
points to emails cited in the commissioner's order as
evidence that it complied with the department's produc-
tion request, Daniel Landini, an associate financial
examiner for the department, testified that the plaintiff

---
*1st Alliance Lending, LLC v. Dept. of Banking*

---

never produced the emails requested. The plaintiff's counsel also stated before the hearing officer that "our issue is not that we didn't have the emails. It is that there were way too many." Moreover, John DiIorio, the plaintiff's chief executive officer, testified that he did not know if the plaintiff ever produced the emails requested by the department. He also testified, however, that the plaintiff did not produce the emails requested in the department's subpoena because it was "waiting for [the department] to seek enforcement, and [it] didn't." Thus, contrary to the plaintiff's assertions, substantial evidence supports a finding that the department conferred with the plaintiff to resolve the plaintiff's concerns, but the plaintiff still failed to produce all requested emails.

The department, pursuant to its statutory authority in § 36a-17, issued a valid subpoena on the plaintiff to produce emails sent and received by particular employees during a limited period of time. The plaintiff never effectively challenged the subpoena and refused or failed to fully comply with it. Thus, the trial court properly concluded that substantial evidence in the record supports the commissioner's finding that the plaintiff failed to cooperate with the department's subpoena in violation of § 36a-17.

V

The plaintiff next claims that it was deprived of due process because (1) the department failed to give the plaintiff an opportunity to be heard by an independent fact finder, and (2) the court failed to provide meaningful review of the commissioner's decision.[26] We conclude that the plaintiff's due process claim lacks merit.

---

[26] The plaintiff also argues that it was deprived of due process because (1) the department failed to formally articulate its interpretation of "mortgage loan originator," and (2) the trial court deferred to the department's interpretation. In part II of this opinion, we concluded that the court did not improperly defer to the department's statutory interpretation because substantial evidence supports the commissioner's finding that the plaintiff

---
1st Alliance Lending, LLC *v.* Dept. of Banking
---

The plaintiff first argues that the department failed to provide a neutral and impartial hearing because both the commissioner and the hearing officer were biased in favor of the department. It argues that the hearing officer was biased because she is employed by the department and reports to the commissioner. It additionally argues that the commissioner was biased because he (1) improperly found that the plaintiff violated the Connecticut SAFE Act and (2) filed the notices of intent and issued the final decision in the administrative matter. We are not persuaded.

Our Supreme Court has "held repeatedly that the procedures required by the UAPA exceed the minimal procedural safeguards mandated by the due process clause." (Internal quotation marks omitted.) *Pet* v. *Dept. of Health Services*, 228 Conn. 651, 661, 638 A.2d 6 (1994). The UAPA provides that, "[i]n a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice." General Statutes § 4-177 (a). "[A] hearing in an agency proceeding may be held before (1) one or more hearing officers, provided no individual who has personally carried out the function of an investigator in a contested case may serve as a hearing officer in that case, or (2) one or more of the members of the agency." General Statutes § 4-176e.

---

violated the Connecticut SAFE Act even pursuant to the plaintiff's own interpretation of MLO. Furthermore, the department applied the definition set forth in Regulation H, which the plaintiff agrees governs the definition of MLO. Accordingly, the department has not changed the law nor applied a "novel" interpretation of MLO as both parties understood the same regulation to apply in the present matter. See *Levinson* v. *Board of Chiropractic Examiners*, 211 Conn. 508, 535, 560 A.2d 403 (1989) ("due process requires that the notice given must . . . fairly indicate the legal theory under which such facts are claimed to constitute a violation of the law" (internal quotation marks omitted)). The fact that the department did not accept the plaintiff's interpretation as to what conduct constitutes acting as an MLO under Regulation H does not amount to a due process violation. Thus, the plaintiff's argument that the department's statutory interpretation violated its due process rights is without merit.

---

1st Alliance Lending, LLC *v*. Dept. of Banking

---

"It is well established that [i]t is not violative of due process for the same authority which initiated the subject of the hearing to listen to and determine its outcome as long as that authority gives the person appearing before it a fair, open and impartial hearing. . . . An administrative agency can be the investigator and adjudicator of the same matter without violating due process." (Internal quotation marks omitted.) *Elf* v. *Dept. of Public Health*, 66 Conn. App. 410, 425, 784 A.2d 979 (2001). Moreover, "there is a presumption that administrative [agency] members acting in an adjudicative capacity are not biased. . . . To overcome the presumption, the plaintiff . . . must demonstrate actual bias, rather than mere potential bias, of the [agency] members challenged, unless the circumstances indicate a probability of such bias too high to be constitutionally tolerable. . . . The plaintiff has the burden of establishing a disqualifying interest." (Internal quotation marks omitted.) *Moraski* v. *Board of Examiners of Embalmers & Funeral Directors*, 291 Conn. 242, 262, 967 A.2d 1199 (2009).

Here, the department provided the plaintiff with fifteen days of administrative hearings before a hearing officer, and the commissioner subsequently issued a final decision after reviewing the hearing officer's proposed decision as well as the administrative record. The plaintiff does not point to any evidence that shows that the hearing officer personally carried out investigative functions in this matter. The fact that the hearing officer is an employee of the department, standing alone, does not render the proceedings offensive to due process. See *Elf* v. *Dept. of Public Health*, supra, 66 Conn. App. 425. Nor is due process offended merely because the commissioner initiated the administrative proceeding and determined its outcome. See id. Although the plaintiff argues that the evidence relied

1st Alliance Lending, LLC *v.* Dept. of Banking

on by the commissioner does not support his determination that the HLCs took applications and offered or negotiated loan terms, mere disagreement with the commissioner's findings is not sufficient to demonstrate that the commissioner was biased. Rather, the plaintiff attacks the propriety of the structure of the department generally, essentially arguing that there is inherent potential for bias. Because, as previously noted, the combination of investigatory and adjudicative functions within the same agency does not itself offend due process, the plaintiff has not satisfied its burden of showing that it suffered unconstitutional bias. See id. Accordingly, we conclude that the department's hearing procedures complied with the UAPA and the plaintiff has failed to establish any facts indicating that the hearing officer or commissioner was biased. Thus, the department did not deprive the plaintiff of due process.

The plaintiff additionally argues that the trial court deprived it of due process by failing to provide meaningful review of the commissioner's decision. Again, we are not persuaded. "Our case law establishes that judicial review of administrative decisions is deferential. A statutory right to appeal, however, must be meaningful. [A] court cannot take the view in every case that the discretion exercised by the local [agency] must not be disturbed, for if it did the right of appeal would be empty . . . ." (Internal quotation marks omitted.) *Gibbons* v. *Historic District Commission*, 285 Conn. 755, 766, 941 A.2d 917 (2008). As previously discussed, "[r]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, supra, 288 Conn. 833.

1st Alliance Lending, LLC *v.* Dept. of Banking

The plaintiff argues that the court misapplied the substantial evidence test by deferring to the department and, therefore, violated its due process rights. Such an argument is meritless. The plaintiff has failed to point to anything in the court's memorandum of decision that would support a conclusion that the trial court applied an incorrect standard of review. Instead, the plaintiff merely disagrees with the court's ultimate conclusions. The court, however, properly articulated the substantial evidence test and analyzed whether the record supports the commissioner's findings of violation. Moreover, on appeal to this court, we sit in the same position as the trial court and conduct a de novo review of the administrative record, employing the same substantial evidence test. See *Commissioner of Correction* v. *Freedom of Information Commission*, supra, 307 Conn. 63 n.15. Because we review the record to ensure that substantial evidence supports the commissioner's challenged findings, we ensure that the court afforded the plaintiff due process by applying the correct test in determining that the commissioner's findings are supported by substantial evidence in the record.

## VI

The plaintiff next claims that the penalties ordered by the commissioner are unconstitutionally excessive in violation of the eighth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. We conclude that the plaintiff's claim is inadequately briefed and, therefore, we decline to review it.

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and

1st Alliance Lending, LLC *v.* Dept. of Banking

efficiently to consider claims of error raised on appeal
. . . the parties must clearly and fully set forth their
arguments in their briefs. . . . The parties may not
merely cite a legal principle without analyzing the rela-
tionship between the facts of the case and the law
cited." (Citation omitted; internal quotation marks omit-
ted.) *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868
(2016); see also *Getty Properties Corp.* v. *ATKR, LLC*,
315 Conn. 387, 413, 107 A.3d 931 (2015) (claim was
inadequately briefed when appellants undertook "no
analysis or application of the law to the facts of [the]
case"). "Where a claim is asserted in the statement of
issues but thereafter receives only cursory attention in
the brief without substantive discussion or citation of
authorities, it is deemed to be abandoned." (Internal
quotation marks omitted.) *Connecticut Light & Power
Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108,
120, 830 A.2d 1121 (2003).

Here, the plaintiff argues that the penalties ordered
by the commissioner are unconstitutionally excessive.
The plaintiff uses approximately one and one-half pages
to set forth the legal framework for determining
whether a civil penalty is an excessive fine in violation
of the eighth amendment to the United States constitu-
tion or article first, § 8, of the Connecticut constitution.
See *Seramonte Associates*, *LLC* v. *Hamden*, 202 Conn.
App. 467, 481, 246 A.3d 513 (2021) ("to determine
whether a financial penalty is unconstitutional under
the excessive fines clause of the eighth amendment to
the federal constitution, courts rely on [a] two step
inquiry"), aff'd, 345 Conn. 76, 282 A.3d 1253 (2022).
Then, without engaging in legal analysis, the plaintiff
concludes that, "[h]ere, the remedies are excessive fines
under the federal and state tests." Not only does the
plaintiff fail to discuss the facts of the case, but it also
fails to specify which penalties the commissioner
imposed and analyze how the legal authorities cited

---
1st Alliance Lending, LLC *v.* Dept. of Banking
---

support its argument that such penalties are excessive. Because the plaintiff makes no effort to employ the governing "grossly disproportional test"; see *Seramonte Associates*, *LLC* v. *Hamden*, supra, 481–86; the plaintiff's claim that the commissioner ordered unconstitutionally excessive penalties is inadequately briefed.

## VII

Last, the plaintiff claims that if any of the commissioner's findings of violation were made in error, we must remand the matter for a new penalty hearing because the commissioner failed to specify which violations support the imposition of each penalty. As we have previously concluded in this opinion, the commissioner's challenged findings are supported by substantial evidence in the record. Therefore, remand is unwarranted.

The judgment is affirmed.

In this opinion the other judges concurred.

---